# Exhibit A



July 26, 2018

Mark W. Nelson, Esq.
The Nelson Law Firm, LLC
1740 High Street
Denver, Colorado, 80218

RE: **The Expert Opinion of Robert L. Myers:**
Regarding Market Value, Fair Market Rental Value and Stigma Damage of Five Homes Built by
Richmond Homes in Firestone and Frederick, Colorado

Dear Mr. Nelson:

Per your request for opinions regarding the market value, rental value and stigma damage
to five properties described below. I have made physical inspections of the properties, conducted
interviews and examined documents relating to the purchase and condition of the properties. The
following properties are the subject of this report.

- 4632 Colorado River Drive, Firestone, Colorado is owned by Justin Borgmann
  and Jami Borgmann.

- 4633 Colorado River Drive, Firestone, Colorado is owned by Mary Ritz and James
  Ritz.

- 4667 Lakeside Drive, Firestone, Colorado is owned by Robby Orbanosky and
  Judith Orbanosky.

- 6580 Empire Avenue, Frederick, Colorado is owned by Philip Winterland and
  Joslyn Winterland.

- 6584 Empire Avenue, Frederick, Colorado is owned by Stevan Adjemian, and
  Ashley Adjemian.

I along with two associates, JoAnn Apostol and Aaron Siegmund, inspected each of
the homes on May 16, 2018, and interviewed one of the owners of each home. We
completed an appraisal for each property and identified the Market Value and Market
Rental Value of the properties. The appraisals were completed without consideration that

each home had been constructed using the Weyerhaeuser TJI Floor Systems with the Gen 4 Flak Jacket Protection as the floor system of the home, and that the systems had been partially removed and replaced at the time of the inspections. I then examined market data, interviewed market participants, reviewed documents and conducted a survey to determine if the homes had ongoing stigma damage.

The following is a summary of the scope of tasks performed prior to reaching my opinions.

- Multiple conversations with Mark W. Nelson, Esq., regarding the properties and the formaldehyde damage that was discovered in the homes owned by the above-named owners.

- Review of the Complaint and Amended Complaints for Case #2017CV030628: Jami Borgmann, Justin Borgmann, Derek Barr, Paige Barr, Mary Ritz, James Ritz, Robby Orbanosky, Judith Orbanosky, Philip Winterland, Joslyn Winterland, Stevan Adjemian, and Ashley Adjemian, Plaintiffs v Weyerhaeuser Company, Defendant

- Review of miscellaneous publications, news articles, memos and correspondence relating to the description of the Weyerhaeuser TJI floor system with Flak Jacket Protection installed on the Plaintiffs' home and other homes in Colorado in 2016 and 2017. The information reviewed includes a description of possible health risks related to the emission of formaldehyde gas from the joist systems, and three remediation plans recommended by Weyerhaeuser to eliminate or reduce the emission of the gas to recognized safe levels in the impacted homes.

- Property inspections and interviews with one of the owners of each property on May 16, 2018.

- Consultation and inspection of subject properties and comparable properties with JoAnn Apostol, Colorado Certified Residential Appraiser; Ms. Apostol is a Denver area residential appraiser and co-authored the baseline appraisal and report for the properties. Aaron Siegmund, real estate appraiser trainee, was also present during the inspections and interviews.

- Discussions with appraisers, brokers, buyers and sellers with respect to attitudes about formaldehyde gas issues.

- Completion of a survey of Denver area real estate brokers regarding perceived market reactions to the homes that had the Weyerhaeuser TJI Floor Systems with Flak Jacket Protection installed at the time of original home construction.
- Completion of an appraisals for each property, as if there was no damage to the property, as of May 16, 2018.
  - The appraisals are to be used to identify the Market Value and Rental Value of each of the properties and are intended to establish the base values of the properties for litigation and stigma damages, as of the date of the inspection, May 16, 2018.

My Client is identified as Mark W. Nelson, Esq. and the intended users of the appraisal reports include Jami Borgmann, Justin Borgmann, Mary Ritz, James Ritz, Robby Orbanosky, Judith Orbanosky. Philip Winterland, Joslyn Winterland, Stevan Adjemian, Ashley Adjemian and the United States District Court of Colorado. The reports have been made in conformance with, and are subject to, the Uniform Standards of Professional Appraisal Practice (USPAP) and have been completed based upon the recommended methods and techniques of the Appraisal Foundation.

**Summary of Events**

In mid-2017 each of the above-named owners purchased and moved into their newly constructed homes. The homes were built by Richmond Homes and constructed using the Weyerhaeuser TJI Floor Systems with the Gen 4 Flak Jacket Protection as the floor systems of the homes. Upon moving into the homes, owners began to experience symptoms that have been attributed to exposure to excessive and harmful levels of formaldehyde gas, including headaches, nausea, fatigue, sinus issues (nose bleeds, congestion and drainage), sore throats, and skin dryness. A short time after moving into their new homes, they were notified that there was a problem with the floor system used in their home, and they were told to evacuate the home and seek alternative housing elsewhere, which they did. The floor systems were replaced and they moved back into the homes in early to mid-2018.

On July 18, 2017, Weyerhaeuser issued a press release notifying the public that all of the Weyerhaeuser TJI Floor Systems with Flak Jacket Protection manufactured after December 1, 2016 were being recalled. Weyerhaeuser later notified builders that it had three approved methods available to mitigate the problem and reduce the emission levels of formaldehyde to safe levels. The first method involves replacing the floor joists with new floor joists that do not have properties

emitting dangerous levels of gas. The second method involves cryo-blasting and/or mechanical removal ("mechanical removal") of the formaldehyde resin from the joists. The third method involves painting over or encapsulation of the floor joists with a product that seals the floor joists and reportedly does not allow gasses to escape. This system is similar in concept to encapsulation methods used for asbestos.

All of the owners' homes were repaired using the joist replacement method approved by Weyerhaeuser, which was performed by Richmond Homes. The removal of the joists was not a total removal of the original joist but a removal of the impacted areas. The following pictures taken by Justin Borgmann shows the partially removed joist and new joist added for support of the structure.





The six plaintiffs' homes involved in the Richmond Homes joist replacement replace process reported numerous problems with the remediation. Several of the owners noted areas of flak jacket coating were visible after the joists were removed and had to point them out to the remediation contractors. Several owners reported floor squeaks and soft spots in the new floor, and I confirmed the soft areas in the floor and squeaks during my inspections of the homes. The photographs below, taken by Justin Borgmann, show areas of cosmetic damage in drywall, interior trim, stairs and floors were present after the remediation that required follow up repair.



**Market Value**

A Market Value appraisal was completed on each of the subject properties based on the hypothetical condition that the home had no history of formaldehyde issues, and no structural or cosmetic damage evident at the time of inspection. I engaged JoAnn Apostol, Certified Residential Appraiser, who is an active appraiser in the Denver Metropolitan area to assist me in the baseline appraisal of the subject property. This collaboration was required for me to obtain geographic competency and an understanding of the market dynamics present in the Firestone and Frederick areas. The Appraisal Reports are attached to, and made a part of, this report. Our opinion of market value was reached by the use of the Sales Comparison Approach, and in some cases, the Cost Approach to value. The estimate of Market Rental Value for each property was completed by using direct comparison. A summary of the Market Value conclusions for each property follows:

| Property | Owners | Market Value | Rental Value |
|---|---|---|---|
| 4632 Colorado River Dr, Firestone | Justin and Jami Borgmann | $610,000 | $3,000/Mo |
| 4633 Colorado River Dr.,Firestone | Mary and James Ritz | $570,000 | $2,300/Mo |
| 4667 Lakeside Dr, Firestone | Robby and Judith Orbanosky | $600,000 | $2,450/Mo |
| 6580 Empire Ave, Frederick | Philip and Joslyn Winterland | $530,000 | $3,000/Mo |
| 6584 Empire Ave Frederick | Stevan and Ashley Adjemian | $475,000 | $2,200/Mo |

**Stigma**

Stigma is defined in *The Appraisal of Real Estate, Twelfth Edition, The Appraisal Institute 2001, pg216,* as: "A stigma is an externality that negatively impacts the value of a property or properties in proximity to it.'' It is assumed, as a basis for my opinion, that all emissions of formaldehyde gas will be remediated and that the home will be restored to a marketable condition when turned over to the owners for occupancy. The question is: If the owners were to sell the property, would the disclosure of the issues surrounding the Flak Jacket joists and subsequent remediation have an impact on the sale of the home? The owners must, by law, disclose that the home had a faulty and potentially dangerous floor system installed and remediation was required. It is clear that the structure of the home was altered from the original plans and that environmental remediations have taken place. In addition, as the pictures found earlier in this report illustrate, the

original joists were not completely removed by Richmond Homes in the remediation process. A drywall ceiling was installed in the basements of the homes where the joist replacement the technique was used, therefore, there will be no visible evidence of the remediation for future owners, unless there is a future problem. The following heading are found in the Colorado Sellers Property Disclosure Form.

| | **ENVIRONMENTAL CONDITIONS** If you know of any | | **A.** | **STRUCTURAL CONDITIONS** |
|---|---|---|---|---|
| **N.** | of the following **EVER EXISTING** on any part of the Property check the "Yes" column: | | | If you know of any of the following problems **EVER EXISTING** check the "Yes" column: |

In my 45 years as a real estate broker and over 30 years as a real estate appraiser, I have seen market fears impact the sales prices of properties for different reasons. In the 1980's, radon gas was a market fear that impacted the price of homes affected. Testing became the norm, and the seller typically was required to mitigate radon issues prior to the completion of the sale. The emotional response to radon has significantly diminished in the market, and although testing and mitigation are common, the price impact based on fear has diminished. Lead-based paint is another example of a market fear that, at one-time, impacted home prices. There is a federal requirement to disclose any known lead-based paint for all homes built prior to 1978, which includes significant fines for failure to disclose. The strictly enforced lead-based paint disclosure requirement has resulted in a reduced fear level for buyers, and prices do not tend to be impacted, with the exception of remediation, if needed.

Areas of significant market fear are homes that have been cleaned after methamphetamine manufacturing took place in the home, repaired flood damaged homes, where a repeat event is possible, and homes that were repaired after suffering structural damage due to soils movement. Mold is a condition that is similar to formaldehyde contamination in that the fear of health issues as a result of mold exposure is very common. Since the exposure is, for the most part, unknown to those being exposed, a fear is present for many homebuyers. Almost every real estate contract I have examined, as a broker or appraiser in the past five years, has included a mold disclosure as a standard document. The inclusion of this disclosure, if mold is present or if it is not present, is evidence of the market concern with the issue.

The off-gassing of unacceptable levels of formaldehyde is new to the real estate market, and I was unable to identify any identical case studies evaluating site-built homes that had potentially harmful levels of formaldehyde and subsequent remediation of those homes. There have been cases involving mobile homes that emitted potentially harmful levels of formaldehyde,

that were litigated; however, mobile homes are personal property, and the subject property is real property. The remediation of mobile homes often exceeded the original cost of the home. Therefore, no meaningful statistics can be applied to a real property damage case similar to the subject of this report.

Based on my experience as a real estate broker and real estate appraiser, which includes my investigation into the specific facts of this case, it is my opinion that the property will have a stigma attached after the floor system is remediated, and the property is restored to a marketable condition. There will be two concerns for a typical buyer, in my opinion. The first concern is whether formaldehyde levels are acceptable, and whether those levels will increase again after the purchase? This concern will be present when one of the two recommended methods of remediation are used that do not involve the full replacement of the floor joist system in the home.  If the floor joist system is replaced, concerns will include damage to the structure of the home, squeaky or uneven floors, and interior cosmetic stress. Since the remove and replace remediation does not entirely remove the original floor system, it is also reasonable for homeowners to be concerned about remaining formaldehyde off-gassing within the home. The challenge is to estimate the amount of the stigma and reduce it to a dollar or percentage amount. The real estate market and pricing considerations do not follow an exact mathematical formula, as the reactions of buyers differ. A condition that is of great concern to one buyer may be of little or no concern to another. This effect would be present with the subject property and some buyers would not purchase the property for any price, due to the fear of reoccurrence. Alternatively, some buyers would not care because the problem is reportedly fixed, and some buyers would look at the disclosure as an opportunity to negotiate a lower price. Two basic economic principles come into play with respect to the facts of this case, the Principle of Competition and the Principle of Substitution.

The 12TH Addition of The Appraisal of Real Estate, published by the Appraisal Institute summarizes the appraisal principles on page 38.

**Competition***: Between purchasers or tenants, the interactive efforts of two or more potential purchasers or tenants to make a sale or secure a lease; between sellers or landlords, the interactive efforts of two or more potential sellers or landlords to complete a sale or a lease; among competitive properties, the level of productivity and amenities or benefits characteristic of each property considering the advantageous or disadvantageous position of each property relative to the competitors.*

**Substitution:** *The appraisal principle that states that when several similar or commensurate commodities goods or services are available, the one with the lowest price will attract the greatest demand and widest distribution. This is the primary principle upon which the cost and sales comparison approaches are based.*

Based on the Principle of Competition, it is clear the subject property would be at a disadvantage to similar homes offered for sale that had not had a faulty floor system installed or had a remediated formaldehyde issue. The Principle of Substitution states that a lower price for a similar product will attract the greatest demand. I conclude that the subject property would be marketable after remediation, but most likely at a lower price than a competitive home that had not suffered the same issues.

There are several recognized methods used to quantify the effects of stigma. The most reliable is the paired sales analysis or sale-resale analysis. These techniques compare the sale of homes impacted by an event with similar homes not impacted by the event. Another method is a statistical analysis of homes impacted by a specific event with comparison to non-impacted properties. The existence of formaldehyde is a private issue between buyer and seller and not of public record for the homes sold. In addition, remediation of formaldehyde issues in homes in Colorado did not begin until mid-2017, at the earliest, and continues into 2018.

As such, there are not a statistically reliable number of sales of homes post-remediation, with full disclosure, to compare to the sales of similar unaffected homes.  Since there is little or no verifiable data available for homes sold with formaldehyde issues, the use of these types of analyses are not possible. A third recognized method is survey and interview. This method tests the reaction to a condition or event and is typically based on information obtained from market participants, including potential buyers, real estate brokers, appraisers and sellers of real estate. This is the method I utilized to assist me in reaching an opinion of stigma in this case.

I have had discussions with respect to formaldehyde stigma in the recent appraisal classes in which I was the instructor and noted the appraisers' opinions. I also conducted a survey of real estate brokers in the Denver Metropolitan area to determine the knowledge and reaction to the formaldehyde issue. It is my opinion, based on my experience, that buyers are significantly influenced by the opinions of the real restate brokers that they have chosen to represent them. The brokers are typically more informed of potential issues that relate to the value of real estate, and their professional advice has a significant impact on the actions of the buyers that they represent.

The results of the full survey are attached to this opinion letter, and a summary of the survey follows:

- There were 101 respondents to the survey.

- 14.85% of the respondents have 0-5 years' experience, 11.88% have 5-10 years, 19.80% have 10-15 years and 53.47% have over 15 years' experience.

- 97.03% of the respondents practice real estate in Adams, Arapahoe, Boulder, Jefferson, Larimer or Weld Counties.

- 61.39% of the respondents were aware of the defective floor joist system, and 38.61% had no knowledge prior to the survey.

- 59.41% of the respondents knew that Weyerhaeuser had recalled the floor systems and that mitigation was in process.

- 42.57% of the respondents knew there was litigation regarding the issue

- If a broker was representing a buyer, and they were advised that the home had been repaired, 51.35% would advise their client not to make an offer on the home, 22.97% would advise buyers to offer less than a similar home without the issue, and 25.68% would advise their buyer that there was no issue and offer the same as a similar home.

- 96% to 100% of the brokers would disclose the mitigated floor system when dealing with either the buyer or sellers of the homes affected.

- Brokers were asked if they were listing a home to sell, would they expect market resistance if the floor system hand been replaced?  A summary of responses revealed that 25.2% indicated that there would be significant market resistance, 27.85% expected moderate resistance, 30.38% expected a small impact, and 16.46% responded that there would be no impact.

- Brokers were asked if they were listing a home to sell, would they expect market resistance if the floor system had been Cryo-blasted?  A summary of responses revealed that 39.97% indicated that there would be significant market resistance, 45.57% expected moderate resistance, 13.92% expected a small impact, and 2.53% responded that there would be no impact.

- Brokers were asked if they were listing a home to sell, would they expect market resistance if the floor system hand been painted over/? A summary of responses

revealed that 63.2% indicated that there would be significant market resistance, 29.11% expected moderate resistance, 7.59% expected a small impact, and 0% responded that there would be no impact.

- Questions were asked to obtain the brokers' opinions as if they were representing a buyer, and the floor system had been replaced. A summary of the responses indicated that 76.92% indicated that they would advise the buyer to seek an outside opinion to determine if the home was safe, 14.10% would advise buyers to find a different home, and the remainder indicated that there would be some impact on pricing.

- Questions were asked to obtain the brokers' opinions as if they were representing a buyer, and the floor system had been cryo-blasted. A summary of the responses indicated that 78.21% indicated that they would advise the buyer to seek an outside opinion to determine if the home was safe, 17.95% would advise buyers to find a different home, and the remainder indicated that there would be some impact on pricing.

- Questions were asked to obtain the brokers' opinions as if they were representing a buyer, and the floor system had been painted over. A summary of the responses indicated that 65.38% indicated that they would advise the buyer to seek and outside opinion to determine the home was safe, 30.77% would advise buyers to find a different home, and the remainder indicated that there would be some impact on pricing.

- A specific question regarding the impact on pricing was asked of the brokers, assuming the floor joist system had been replaced. A summary of the responses indicated that 50.00% stated there is no impact on value, 9.46% estimated $1,000 to $5,000 in price reduction, 10.81% indicated that 3% to 5% would represent the price impact, 12.16% indicated a price impact at over 5% and 17.57% indicated that they would advise the buyer not to buy the home.

- A specific question regarding the impact on pricing was asked of the brokers, assuming the floor joist system had been cryo-blasted.  A summary of the responses indicated that 17.14% stated there is no impact on value, 12.86% estimated $1,000 to $5,000 in price reduction, 21.43% indicated that 3% to 5% would represent the price impact, 18.57% indicated a price impact at over 5%, and 30.00% indicated that they would advise the buyer not to buy the home.

- A specific question regarding the impact on pricing was asked of the brokers, assuming the floor joist system had been painted over.  A summary of the responses indicated that 7.35% stated there is no impact on value, 10.29% estimated $1,000 to $5,000 in price reduction, 8.82% indicated that 3% to 5% would represent the price impact, 20.59% indicated a price impact at over 5%, and 52.95% indicated that they would advise the buyer not to buy the home.

The results of the survey and my interviews with brokers and real estate appraisers clearly establishes that there will be a stigma attached to the homes after remediation is completed. The impact to the property differs based on the type of remediation selected to correct the problem. The solution with the least amount of anticipated stigma is the replacement of the floor system. There were concerns relating to the structural integrity of the home and main floor issues, which is evidenced by the 17.57% of the brokers indicating that they would advise the buyers not to purchase the property, even at a reduced price. A stronger indication of stigma was expressed with the mechanical removal solution, and the strongest market resistance is indicated when painting over the joists to encapsulate them. Common comments observed that if the paint on the interior and exterior of the home deteriorated, why would the paint over the floor system not eventually fail?

Based upon all of the forgoing data, and my observations, experiences as a real estate broker and real estate appraiser for the past 45 years, I estimate that the ongoing stigma to the property, even assuming all formaldehyde and cosmetic problems were corrected, would largely depend on type of correction. In all cases, I conclude that there will be a stigma to the properties. I have based my opinions on the uncertainty that the remediation has and will continue to work, and that a typical buyer will seek a price advantage because of these issues. The percentage of brokers that would advise the buyers not to purchase an affected home at any price would, in effect, reduce the available buyers for the home and increase marketing time and the related holding costs to own the home during the extended marketing period. As discussed earlier, I assume the economic Theory of Competition will impact the property prices.

The subject properties are located in new home areas that have homes available for sale that do not have faulty floor systems, and there are new homes and resale homes available nearby with no similar issues. There is no reason for a buyer to assume the risk of contamination, structural issues, or market fears except price. I have estimated the probable price adjustment based upon my

investigation with quantifiable estimates and based upon my professional experience and judgement after the consideration of the relevant data available.

Assuming the floor system is replaced, 40.47% indicated that the reduction in value would be from 3% to not making an offer on the home at any price. It is my opinion that a typical buyer would purchase the home after an approximate 5% adjustment in price if the floor system was successfully replaced, all cosmetic repairs had been satisfactorily performed, and an acceptable air quality test had been obtained.

Assuming the floor system is mechanically treated, 70.00% indicated that the reduction in value would be from 3% to not making an offer on the home at any price, with 48.57% indicating a higher than 5% price impact.  It is my opinion that a typical buyer would purchase the home after an approximate 10% adjustment in price, if the floor system was successfully mechanically treated, all cosmetic repairs had been satisfactorily performed, and an acceptable air quality test had been obtained.

Assuming the floor system is painted over, 82.35% indicated that the reduction in value would be from 3% to not making an offer on the home at any price, with 73.53% indicating a higher than 5% price impact. It is my opinion that a typical buyer would purchase the home after an approximate 15% adjustment in price, if the floor system was painted over, all cosmetic repairs had been satisfactorily performed, and an acceptable air quality test had been obtained.

If any one of the conditions noted above (successful remediation, cosmetic repairs, and acceptable air quality) were not obtained the price adjustment would be greater than that stated above.

The subject properties had a partial removal of the floor systems and I estimate that market the impact of this remediation technique would be greater than a full floor joist replacement but less that a mechanical removal of the formaldehyde. Therefore, I estimate the stigma to the subject properties would be between 5% and 10% or approximately 7.5% and that it would be applied to the Market Value of the home. For example; if a home value, without consideration of the contamination was $610,000, the following calculation would apply: $610,000 x 7.5% = $45,750. The estimated stigma would also include additional costs related to the formaldehyde problem. A typical buyer will require that the owner provide testing for formaldehyde at the time of contract, at the owner's expense.

Further, I expect the marketing time to be increased as a result of the diminished pool of potential buyers. Therefore, I conclude that the total stigma damages for the subject property are no less than are listed below.

| Property | Owners | Market Value | Stigma Damage |
|---|---|---|---|
| 4632 Colorado River Dr, Firestone | Justin and Jami Borgmann | $610,000 | $ 45,750 |
| 4633 Colorado River Dr.,Firestone | Mary and James Ritz | $570,000 | $ 42,750 |
| 4667 Lakeside Dr, Firestone | Robby and Judith Orbanosky | $600,000 | $ 45,000 |
| 6580 Empire Ave, Frederick | Philip and Joslyn Winterland | $530,000 | $ 39,750 |
| 6584 Empire Ave Frederick | Stevan and Ashley Adjemian | $475,000 | $ 35,625 |

**Market Rent**

A rent survey was completed in the area of each home to determine the fair market rent of each property, as of the date of value. Similar properties were selected for comparison, and the range of rents in the area ranged from $1,995 to $3,900 per month. After analyzing the features of the home, square footage, age and location, we concluded to an estimate of Market Rent, which was summarized earlier in this report. The list of comparable rental properties and analysis is included in the Appraisal Reports for each property.

I have attached the current appraisal report for each property and survey results in the addendum to this report. My opinions are based on my experience as both a Real Estate Broker and a Certified General Appraiser and an active participant in the Colorado real estate market for approximately 45 years. I submit this report with the certification found on the following page.

Respectfully Submitted:

Robert L. Myers
Colorado Certified General Real Estate Appraiser #1716
Colorado Licensed Real Estate Broker #163741

# CERTIFICATION

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

I have completed no services as an appraiser, or in any other capacity, regarding the property that is the subject property of this report within the three-year period immediately preceding my acceptance of this assignment.

I have no bias with respect the property that is the subject of this report or to the parties involved with this assignment.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the *Uniform Standards of Professional Appraisal Practice and The Code of Ethics and Standards of Practice of the National Association of Realtors.*
 I have made a personal inspection of the properties that are the subject of this report.

JoAnn Apostol has provided significant real property appraisal assistance to the person signing this certification. Aaron Siegmund, real estate appraiser trainee, assisted in measuring the homes and was present for the owner and some market participant interviews.

Robert L. Myers
Colorado Certified General Appraiser #1716
Colorado Licensed Real Estate Broker #163741

# ADDENDUM

**ROBERT L. MYERS**
944 Cheyenne Boulevard
Colorado Springs, CO 80905
(719)559-9584 Business (719) 930-4795 Cell
rob@myerscompany.biz

## PROFESSIONAL EXPERIENCE

## APPRAISAL
*The Myers Company, LLC*

I have been a real estate appraiser since 1984 and am currently active in the appraisal practice. I hold a State of Colorado designation as a Certified General Appraiser which allows me to appraise both commercial and residential properties in the state. I have completed over 5,000 residential appraisals and several hundred commercial appraisals since 1984. I was licensed as a real estate broker in Colorado in 1973 and have been continuously been active as a broker since that time. I am a part time appraisal instructor for Brightwood College and am nationally certified as an instructor for The Uniform Standards of Appraisal Practice (USPAP).

## LICENSES AND CERTIFICATIONS:
Colorado Certified General Appraiser #CG 1716
Colorado Real Estate Broker #1B00163714
Nationally Certified Instructor for Uniform Standards of Appraisal Practice #10575

## PROFESSIONAL ASSOCIATIONS AND COMMUNITY AFFILIATIONS
Pikes Peak Association of Realtors
National Association of Realtors Appraisal Section
Colorado Springs Home Builders
Rapid City, SD Planning Commission 1982
Pikes Peak Mental Health, Finance Committee member 1995
Saint Mary's High School Football Coach 1992-1994
Colorado College, Football Coach 1994-1997
Coronado High School Football Coach 2015-2017
Appraisal Instructor Appraisal Continuing Education School 2005-2009
Appraisal Instructor Brightwood College 2010- Present

## INSTRUCTOR FOR LICENSING AND CONTINUING EDUCATION: BRIGHTWOOD COLLEGE

| | |
|---|---|
| Uniform Standards of Appraisal Practice | Land Value and Cost Approach |
| Appraisal Principles | Sales and Income Approach |
| Appraisal Practice | FNMA Guidelines |
| Advanced Residential Applications | Statistics and Modeling |
| Residential Case Studies | Industry Update FNMA Guidelines |
| Distinctive Residential Properties | Introduction to Litigation and Expert Witness Testimony |

## TESTIMONY AND DEPOSITIONS

11/2001 *Glauvitzv v Glauvitz*   El Paso County District Court 01DR2424 Attorneys-Hall and Evans
06/2001 *Harney v Wellshire Homes* El Paso County District Court 99-CV-1750 Attorneys: Hall and Evans
10/2002 *Stalcap and LewisvV Schlage Lock Company, Ingersoll-Rand Company, and Eagle-Pitcher Industries* Denver Federal Court CV 02-RB-1188 (OES) Deposition Attorneys: D Robert Jones
01/2003 *Dassero V Falcon Properties* El Paso County District Court Case Number: 01 CV 839 Deposition Randel M Weiner Attorney
**7**/2004 *Reeves v Carr* El Paso County District Court 02DR4400 Attorney Michael Luchetta
10/2004  *Saulnier v Hansen* El Paso County District Court 03DR1828 Attorney Michael Luchetta
05/2005 *Hyattvv v Hyatt*  El Paso County District Court 03DR4212 Div 9 Attorney Michael Luchetta
1/2005  *Nadine A. Johnson Trust v Old Republic National Title*-Arbitration   Attorney Edward McCord
01/2007  *Goldbergv v Goldberg* El Paso County District Court 06DR2706 Attorney Michael Luchetta
04/05/2007 *Wanda Hasty v Fremont Paving and Redi-Mix*  Deposition Attorney Randall M. Weiner
06/2007 *Cunico v Cunico*  El Paso County District Court *06 DR 4341* Attorney Michael Luchetta
9/9/ 2008 *Clay Walton v Terry Rush Walton* El Paso County District Court 07DR4694 Attorney Michael Luchetta
02/2009*United Western Bank v. Homestar Mortgage Services LLC* Denver District Court Case 07 CV 11616. Attorney Moye/White
09/2012  *Hoerauf V Hoerauf*  El Paso County District Court #DR 4100 Attorney Michael Carpenter
01/2012 *Ames V CHS* Denver District Court - Deposition Attorney Randall M Weiner
12/2012 *Grock LLC v. Canon City & Royal Gorge RR, LLC et al.*, Fremont County D. Ct. Case No. 2012 CV 52.Deposition Dan Slater Attorney
11/2013 *Evans v Evans* El Paso County District Court Case #13DR 1548 Attorney Michael Carpenter
02/2015 *Citizens for quiet Skies v Mile High Skydiving* Boulder District Court Case #2013CV31563,Trial Attorney Randal M. Weiner

01/2016 *Baron v Kissing Camels Property Owners Association* El Paso County District Court Case # 2015cv31111 Attorney Edward Gleason
01/2016 *Sinclair Pipeline v Ivar Larson & Lauren Sandberg* Weld County District Court Case #2012 CV 907 Deposition Attorney Matt Ososfky
12/2016 *Henrique &Andreina Fernandez* v *Buildrite Builders, LLC* Judicial Arbiter Group JAG No. 16-0717A Attorney Trevor Young
02/2018 *Harding v Shironaqka*, Weld County District Cour tCase #17CV30261 Deposition Attorneys: Gerald Jorgensen & Brandon Hitchens

## No Publications

## APPRAISAL TRAINING AND CLIENT LIST

| | |
|---|---|
| **Aappraisal Institute**:<br>  Capitalization Theory Part A<br>  Capitalization Theory Part B<br>  Case Studies in Real Estate Valuation<br>  Litigation Valuation<br>  Electronic Appraisals<br>  Standards of Professional Practice and Conduct<br>  Uniform Appraisal Standards for Federal Land Acquisitions, 2016 Yellow Book | **Northwest Training Institute:**<br>  Small Office Complex Development<br>  Apartment Development<br>  Large Project Finance |
| **Colorado Approved Real Estate Licensing**<br>  Appraisal I<br>  Appraisal II<br>  Real Estate Finance<br>  Real Estate Law<br>  Real Estate Contracts<br>  Real Estate Management<br>  Colorado Broker's preparation<br>  CREC Annual Updates | F.N.M.A. REO Appraisal Seminar<br>Site Valuations<br>Affordable Housing Disposition Program<br>Appraising from the Review Appraiser's Perspective<br>Appraising Complex Residential Properties<br>Pikes Peak Area Council of Governments Building Codes<br>Condemnation Appraisals<br>1031 Exchanges |
| **Miscellaneous**<br>NCRE Property Inspection<br>Commercial Real Estate Finance<br>Appraisal reporting of complex properties<br>Colorado Eminent Domain<br>Helping Buyers and sellers in a changing market<br>Mortgage brokers license required classes | National USPAP Instructor Class<br>Market valuations and financial considerations<br>Wealth through mortgages parts 1, 2 and 3<br>Electronic Appraisals<br>Brokerage administration |
| **Appraisal clients**<br>Central Bank and Trust<br>Colorado East Bank<br>TBK Bank<br>Northstar Bank<br>Independent Bank<br>5-Star Bank<br>Collegiate Peaks Bank<br>Cheyenne Mountain Bank<br>Vector Banks<br>Stockman Kast Tyan & Company<br>Garden of the Gods Bank<br>Stockmen's Bank<br>Farmers State Bank<br>City of Colorado Springs<br>City of Salida<br>State of Colorado<br>FDIC | **Attorney Clients**<br>Michael Luchetta   Virginia Gatz<br>Michael Carpenter   Leo Finklestein<br>Robert Clothier   David Johnson<br>Lisa Dailey   Trevor Young<br>Han Law Group   Lee Jolivet<br>Robert Fisher   Sidney Patin<br>Tom Henley   Jennifer James<br>Bill Hornbostel   Julie Wolf<br>Jeanne M. Wilson   Mark Finlayson<br>Clawson & Clawson   Ken Myers<br>Hall and Evans   Howard Alpern<br>Matthew Osofsky   Deanne Cain Fischlein<br>Randell Weiner   Patricia Germer-Coolidge<br>Lewis Roca Rothgerber  James English<br>Hamilton Faatz   Ross Marhoffer<br>Moye/White   Robert Wells<br>Joi Kush   Nichole Bartell<br>Brian Boal   Carl Graham<br>Cordell & Cordell   Susan Marhoffer<br>Gerald Jorgensen    Mark Nelson |
| | |

**FEE SCHEDULE:  $225.00 per hour for testimony and trial preparation, $175.00 per hour for research and consulting, mileage @ $0.57 per mile. Appraisals are completed on a fixed fee bid.**

