**Exhibit B**

1               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO

2

     Civil Action No. 17-cv-02224-PAB-ME

3    _____


4                  VIDEOTAPE DEPOSITION OF:
                 ROBERT MYERS - March 26, 2019

5    _____


6    JAMI BORGMANN, an individual,
     JUSTIN BORGMANN, an individual,

7    JAMI BORGMANN and JUSTIN BORGMANN on behalf of their
     two minor children, S.B. and E.B.,

8    TONY AUYANG, an individual,
     MARY RITZ, an individual,

9    JAMES RITZ, an individual,
     DEREK BARR, an individual,

10   PAIGE BARR, an individual,
     ROBBY ORBANOSKY, an individual,

11   JUDITH ORBANOSKY, an individual,
     HANNAH ORBANOSKY, an individual,

12   PHILIP WINTERLAND, an individual,
     JOSLYN WINTERLAND, an individual,

13   STEVAN ADJEMIAN, an individual,
     ASHLEY ADJEMIAN, an individual,

14   KELSY HERRICK, an individual,
     JEFFREY HERRICK, an individual,

15   KELSY AND JEFFREY HERRICK on behalf of their three
     minor children, D.H., M.H. and M.H.,

16
           Plaintiffs,

17

     v.

18

     WEYERHAEUSER COMPANY,

19

     Defendant.

20   _____

**H+G**

**Hunter+Geist, Inc.**

**303.832.5966**        1900 Grant Street, Suite 1025        ▪ www.huntergeist.com
**800.525.8490**        Denver, CO 80203                     ▪ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

Robert Myers   03/26/2019
JAMI BORGMANN, ET AL. v. WEYERHAEUSER

Page 3

```
1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
3    Civil Action No. 17-cv-02224-PAB-ME
     _____
4           VIDEOTAPE DEPOSITION OF:
              ROBERT MYERS - March 26, 2019
5    _____
6    JAMI BORGMANN, an individual,
     JUSTIN BORGMANN, an individual,
7    JAMI BORGMANN and JUSTIN BORGMANN on behalf of their
     two minor children, S.B. and E.B.,
8    TONY AUYANG, an individual,
     MARY RITZ, an individual,
9    JAMES RITZ, an individual,
     DEREK BARR, an individual,
10   PAIGE BARR, an individual,
     ROBBY ORBANOSKY, an individual,
11   JUDITH ORBANOSKY, an individual,
     HANNAH ORBANOSKY, an individual,
12   PHILIP WINTERLAND, an individual,
     JOSLYN WINTERLAND, an individual,
13   STEVAN ADJEMIAN, an individual,
     ASHLEY ADJEMIAN, an individual,
14   KELSY HERRICK, an individual,
     JEFFREY HERRICK, an individual,
15   KELSY AND JEFFREY HERRICK on behalf of their three
     minor children, D.H., M.H. and M.H.,
16
          Plaintiffs,
17
     v.
18
     WEYERHAEUSER COMPANY,
19
          Defendant.
20   _____
```

Page 2

```
1         PURSUANT TO NOTICE, the deposition of ROBERT
     MYERS was taken on behalf of the Defendant at 1900
2    Sixteenth Street, Suite 1400, Denver, Colorado 80202,
     on March 26th, 2019, at 9:01 a.m., before Jennifer
3    Windham, Certified Shorthand Reporter and Notary
     Public within Colorado.
4
5            A P P E A R A N C E S
6    For the Plaintiffs:
7         MARK W. NELSON, ESQ.
              The Nelson Law Firm, L.L.C.
8             1740 North High Street
              Denver, Colorado 80218
9
10   For the Defendant:
11        MICHAEL A. SINK, ESQ.
              LINDSEY DUNN, ESQ.
12            JESSICA FRENKEL, ESQ.
              Perkins Coie, L.L.P.
13            1900 Sixteenth Street
              Suite 1400
14            Denver, Colorado 80202
15
     Also Present:
16
17        John Jensen, Videographer
18
19
20
21
22
23
24
25
```

Page 3

```
1              I N D E X
2    EXAMINATION OF ROBERT MYERS:              PAGE
     March 26, 2019
3
     By Mr. Sink                               7
4
5
6
7                                       INITIAL
     DEPOSITION EXHIBITS:              REFERENCE
8
     Exhibit 317   Amended Notice of Deposition    9
9                  of Robert Myers
10   Exhibit 318   Robert L. Myers Curriculum Vitae   25
11   Exhibit 319   Letter to Nelson from Myers,       80
                   Re:  The Expert Opinion of
12                 Robert L. Myers, Regarding Market
                   Value, Fair Market Rental Value
13                 and Stigma Damage of 10961 Unity
                   Lane, Commerce City, Colorado 80022,
14                 3/30/18
15   Exhibit 320   Residential Appraisal Report for   84
                   10961 Unity Lane, Commerce City,
16                 Colorado 80022, 2/22/18
17   Exhibit 321   Letter to Nelson from Myers,       85
                   Re:  The Expert Opinion of
18                 Robert L. Myers, Regarding Market
                   Value, Fair Market Rental Value
19                 and Stigma Damage of Five Homes
                   Built By Richmond Homes in Firestone
20                 and Frederick, Colorado, 7/26/18
21   Exhibit 322   Residential Appraisal Report for   86
                   4632 Colorado River Drive, Firestone,
22                 Colorado 80504, 6/12/18
23   Exhibit 323   Residential Appraisal Report for   86
                   4633 Colorado River Drive, Firestone,
24                 Colorado 80504, 5/16/18
25
```

Page 4

```
1    Exhibit 324   Residential Appraisal Report for   86
                   4667 Lakeside Drive, Firestone,
2                  Colorado 80504, 5/16/18
3    Exhibit 325   Residential Appraisal Report for   87
                   6580 Empire Avenue, Frederick,
4                  Colorado 80516, 5/16/18
5    Exhibit 326   Residential Appraisal Report for   87
                   6584 Empire Avenue, Frederick,
6                  Colorado 80516, 5/16/18
7    Exhibit 327   Letter to Nelson from Myers,       87
                   Re:  The Expert Opinion of
8                  Robert L. Myers, Regarding Market
                   Value, Fair Market Rental Value
9                  and Stigma Damage of 8052 South
                   Valleyhead Way, Aurora, Colorado,
10                 7/29/18
11   Exhibit 328   Residential Appraisal Report for   88
                   8052 South Valleyhead Way, Aurora,
12                 Colorado 80016, 5/23/18
13   Exhibit 329   Letter to Nelson from Myers,       88
                   Re:  The Expert Opinion of
14                 Robert L. Myers, Regarding Market
                   Value, Fair Market Rental Value
15                 and Stigma Damage of 670 Dry Creek
                   Place, Littleton, Colorado, 7/29/18
16
     Exhibit 330   Residential Appraisal Report for   89
17                 670 East Dry Creek Place, Littleton,
                   Colorado 80122, 5/23/18
18
     Exhibit 331   Letter to Nelson from Myers,       89
19                 Re:  The Expert Opinion of
                   Robert L. Myers, Regarding Market
20                 Value, Fair Market Rental Value
                   and Stigma Damage of 8773 Dunraven
21                 Street, Arvada, Colorado, 7/29/18
22   Exhibit 332   Residential Appraisal Report for   90
                   8773 Dunraven Street, Arvada,
23                 Colorado 80007, 5/23/18
24   Exhibit 333   E-mail to JoAnn from Rob, Re: 8773   129
                   Dunraven, 7/9/18, with various
25                 e-mails attached
```

Page 5

```
1   Exhibit 334    Exhibit 1, MYERS-DOCS 000698 to      209
                    000721
2
    Exhibit 335    E-mail to Myers to Irvin, Subject:    239
3                   Realtor Warning, 1/25/18, with
                    various e-mails attached
4
    Exhibit 336    Survey                                249
5
    Exhibit 337    Survey                                249
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1       WHEREUPON, the following proceedings were
2   taken pursuant to the Federal Rules of Civil
3   Procedure.
4       *     *     *     *     *
5    (At this time Jessica Frenkel is not present.)
6       THE VIDEOGRAPHER:  Good morning.  We are
7   on the record.  The time is 9:01 a.m. on March 26,
8   2019.  We are here for the videotaped deposition of
9   Robert Myers in the matter of Jami Borgmann, et al.,
10  versus Weyerhaeuser Company in the United States
11  District Court for the District of Colorado.  Civil
12  Action No. 17-cv-02224-PAB-MEH.
13      The deposition is being held at 1900
14  Sixteenth Street, Suite 1400, Denver, Colorado.  The
15  videographer is John Jensen, and the court reporter is
16  Jennifer Windham with Hunter + Geist, Inc., of Denver,
17  Colorado.
18      Please note that audio and video
19  recording will take place until all parties have
20  agreed to go off the record.  Microphones are
21  sensitive and may pick up whispers, private
22  conversations, and cellular interference.
23      Will counsel please state their
24  appearances beginning with the plaintiffs' counsel.
25      MR. NELSON:  Mark Nelson for the

Page 7

1   plaintiffs.
2       MR. SINK:  Michael Sink and Lindsey Dunn
3   for the defendant.
4           ROBERT MYERS,
5   having been first duly sworn to state the whole truth,
6   testified as follows:
7        (Deponent's reply to oath:  I do.)
8           EXAMINATION
9   BY MR. SINK:
10      Q.  Good morning, Mr. Myers.
11      A.  Good morning.
12      Q.  Do you prefer to go by Robert or some
13  other --
14      A.  Rob is fine.
15      Q.  Rob.  Thank you.  Would you please state
16  your address for the record.
17      A.  944 Cheyenne Boulevard, Colorado Springs,
18  Colorado 80905.
19      Q.  Thank you.  How long have you lived in
20  Colorado Springs?
21      A.  1979 was the first time I was -- moved
22  there.  I was away for about four years in the '80s,
23  but for some time.
24      Q.  Thank you.  You've been deposed before, I
25  take it?

Page 8

1       A.  Yes.
2       Q.  Can you estimate how many times?
3       A.  Not more than ten, but more than five
4   so . . .
5       Q.  Fair enough.  Approximately, of those
6   five to ten times, how many times have you been
7   deposed as an expert witness?
8       A.  All of the time.
9       Q.  I won't belabor all of the usual rules
10  about depositions given your experience, but I just
11  want to remind you of a few -- in case it's been a
12  little while since your last deposition.  I'm, of
13  course, going to ask questions today.  If there's any
14  question that you don't understand, feel free to ask
15  for clarification, and I'll be happy to provide it.
16      Again, as you've been doing already, I'll
17  try to -- if you would wait for me to ask the
18  question, and I'll give you enough time to respond so
19  we don't end up talking over each other for the court
20  reporter; is that fair?
21      A.  Yes, sir.
22      Q.  Thank you.  Are you under -- taking any
23  medication today or have any other medical condition
24  that would otherwise impair your ability to give true
25  and accurate answers today?

Page 9

1    A.  No.
2         (Deposition Exhibit 317 was marked.)
3    Q.  I'm passing you what's been marked as
4  Exhibit 317, which is an amended notice of deposition
5  for your testimony in the Borgmann matter.  Do you see
6  that?
7    A.  Yes, sir.
8    Q.  Have you previously received a copy of
9  that notice?
10    A.  I believe so.
11    Q.  Not only are you testifying in this case
12  today, as notified in 317 by agreement of the parties,
13  you are also testifying in the Chi v. Weyerhaeuser
14  Company; is that correct?
15    A.  Yes.
16    Q.  And you're also testifying in the
17  Gilchrist versus Weyerhaeuser arbitration matter; is
18  that correct?
19    A.  Yes.
20    Q.  Any other matters that you're prepared to
21  testify today about?
22    A.  Not that I recall, but . . .
23    Q.  Across those three cases, you issued five
24  written expert reports; is that correct?
25    A.  That sounds correct.

Page 10

1    Q.  We'll come to those reports in a little
2  while.  I just want to make sure we've -- we're all on
3  the same page as what we're here today to discuss.  I
4  want to talk a little bit about your education.  Where
5  did you grow up?
6    A.  Salida, Colorado.
7    Q.  Did you attend high school?
8    A.  Yes.
9    Q.  What year did you graduate?
10    A.  1970.
11    Q.  Did you attend college?
12    A.  Some.  A year at Metro in Denver, and
13  then a year at Western State in Gunnison, and then on
14  and off different classes and different universities
15  since that time.
16    Q.  Did you receive a degree from any of
17  those universities?
18    A.  I did not.
19    Q.  What areas of study did you enroll for in
20  those schools?
21    A.  Well, at Metro, I was in the -- I was a
22  Denver Police cadet at the time, so it was in criminal
23  justice.  At Western State it was business, and
24  courses since then have all been business, appraisal,
25  or real estate related.

Page 11

1    Q.  How long, approximately, did you study
2  business at Western State?
3    A.  Well, I was only there a year, so a year.
4  A year.
5    Q.  What kind of courses did you take at
6  Western State while you were there?
7    A.  I'd like to put that in context a little
8  bit.  That was 50 years ago.
9    Q.  Sure.  To the extent you recall.
10    A.  Yeah.  It was entry level, English,
11  finance, economics, statistics, that sort of thing.
12    Q.  So you mentioned statistics --
13    A.  Yes.
14    Q.  -- as an area of interest today.
15    A.  Yes.
16    Q.  Do you recall what, if any, training you
17  received while you were at Western State regarding
18  statistics?
19    A.  Possibly a class.  Again, that was a
20  while ago.
21    Q.  It's fair to say, as you sit here today,
22  you don't recall specifically any statistical
23  training?
24    A.  No, no.
25    Q.  And I'm sorry.  No, you don't recall any?

Page 12

1    A.  I don't -- not at Western State.
2    Q.  Thank you.  Subsequent to Western State
3  you began to train as a real estate appraiser and
4  broker, as I understand it?
5    A.  Yes.
6    Q.  And approximately what time window did
7  you receive your training for both of those roles?
8    A.  Well, I started in the real estate
9  brokerage portion in, I believe, 1973 and took classes
10  at that time, and since then all of the mandatory
11  class education from that time on, so I believe that's
12  something like eight hours a year for the next
13  45 years.  And then within the real estate appraisal
14  industry, I've started taking classes in the early
15  '80s and have been actively involved in the appraisal
16  industry since the early '80s and have taken
17  similar -- the education requirements for appraisal
18  are a little greater, so there's more mandatory
19  classes.  From that time forward, I've taken classes
20  in appraisal.
21         I have also taught real estate appraisal
22  and real estate classes at Kaplan professional
23  schools, or whatever they call themselves, at whatever
24  particular time since -- started at Jones Real Estate
25  College and then Kaplan bought them, and then

Page 13

1  Brightwood College bought them, so same place,
2  different names. And I taught several, you know,
3  different classes at that level.
4        I also became certified as a national --
5  national certified instructor for the -- USPAP is the
6  acronym -- Uniform Standards of Appraisal Practice.
7  That's a national certification that you receive
8  education for. There's approximately 480 certified
9  instructors nationally.
10       Q. I just want to unpack a few things in
11  your answer. Thank you. Is there a difference
12  between a licensed and a certified broker?
13       A. Well, I'm not -- as a broker, there's not
14  that designation. As an appraiser, there is. So a
15  licensed appraiser versus a certified appraiser, yes.
16  There's two different levels -- licensed appraiser is
17  entry level. Typically, if you're in the residential
18  market, you have to work under a certified residential
19  appraiser. As far as your -- the market won't accept
20  your signature on its own. The certified residential
21  is the next level up in the appraisal license tree.
22  Certified general is the license that allows you to
23  appraise all property types, and that's the
24  certification I have.
25       Q. On the broker side, there's no

Page 14

1  distinction or level between brokers?
2        A. At this point in time, there's broker and
3  employing broker. So it's -- employing broker has to
4  have, I believe it's a minimum two years' experience
5  and a number of transactions before you can be
6  classified as an employee broker. When I became
7  licensed in the '70s, there were two levels. There
8  was real estate -- what do they call it -- agent, I
9  believe it was, and then real estate broker. So I
10  became licensed initially as a licensee or real estate
11  broker, whatever they called them at that time.
12  Again, that's a few years ago. And then I received a
13  broker designation after class work and experience
14  about two years later. I believe that was -- I
15  believe I became a broker in '76 or '77.
16       Q. And are you qualified as an employing
17  broker?
18       A. Yes.
19       Q. Do you have any certifications as a
20  broker?
21       A. Not particularly.
22       Q. Do you have any certifications as an
23  appraiser?
24       A. Well, just the general certifications.
25  So many of the certifications -- and I guess there is,

Page 15

1  as a broker, I guess I'm a Certified Distressed
2  Property Expert or whatever you -- there's some
3  designation for that that they give you after a
4  certain number of classes. But most of the
5  designations -- all of the designations I believe that
6  you're referring to are given out as you're being a
7  member of a private organization, like the appraisal
8  institute, for instance. They give out different
9  designations. I don't belong to the appraisal
10  institute, so I don't have any of their designations.
11       Q. The designation or designations that you
12  have, do you know how many you have, roughly?
13       A. I don't have designations other than that
14  Certified Distressed Property Specialist, whatever
15  that -- I don't have any specific designations from
16  any of the organizations. The National Association of
17  Realtors may have one that I probably have in the
18  appraisal area, but I don't even know what it is.
19  It's -- I joined when they first opened an appraisal
20  section, which was probably 1990 or 1995, and they
21  classified me as something, but . . .
22       Q. Who issued the depressed -- distressed
23  properties --
24       A. That's the -- that is the National
25  Association of Realtors.

Page 16

1        Q. And are you a member of any professional
2  organizations? It sounds like you are.
3        A. The Board of Realtors, National
4  Association of Realtors Board.
5        Q. Any others?
6        A. No.
7        Q. Are you currently an active or an
8  inactive broker?
9        A. Active.
10       Q. Are you currently an inactive or an
11  active appraiser?
12       A. Active.
13       Q. And do you have to maintain a license
14  status with the State of Colorado?
15       A. Yes.
16       Q. For both?
17       A. Yes.
18       Q. Once you obtain or you go through the
19  initial training process to be a broker -- we'll start
20  with broker. Once you go through the initial process
21  to go -- to become trained to be a broker, how do you
22  become a licensed broker by the state?
23       A. Well, that's initial. At this point in
24  time, the requirements are X number of hours of
25  specialized education in real estate. So you go to a



Page 17

1  school like Kaplan or Brightwood through
2  pre-licensing, mandatory pre-licensing classes, then
3  you take a state exam at that point. Once you pass
4  your exam, your -- you become a licensed broker. From
5  that point in time, you work under another broker, an
6  employing broker, for a minimum of two years. And
7  based on your number of transactions and experience,
8  you can apply to become an employing broker. That's
9  the system today, and it was similar to the system in
10 the '70s.
11       **Q.  And how about the appraisal process?**
12       A.  Same type of system. The -- there's your
13 mandatory -- they have mandatory qualifications for --
14 minimum qualifications. And there's specified hours
15 for both licensed, and then as you upgrade your
16 license to residential certified, more hours of
17 education and experience as you increase to certified
18 residential -- or certified general, more hours of
19 education, plus hours of proven experience within the
20 area.
21       And I believe that's -- well, the hours
22 that -- they say the equivalent of certified general
23 is the equivalent of a master's degree in hours, and
24 the experience, 2,500 hours, in commercial appraisals,
25 documented reports. So it typically takes someone

Page 18

1  three to four years to get that -- get those hours,
2  because they're actually -- you maintain a log, hours
3  within that specific appraisal, so it's not like you
4  work 2,080 hours in a year and you get 2,080 hours'
5  experience. It's logged experience, similar to the
6  time you bill as opposed to the time you spend.
7       **Q.  And you mentioned that some people
8  consider the amount of time spent to become a
9  certified appraiser is roughly equivalent to a
10 master's degree? Is that a trade --**
11      A.  Yeah. That's trade -- that's not --
12 it's -- there's specific hours in real estate
13 instruction, specific classes that you've got to take
14 for -- at this point in time, to become certified
15 general, you have to have a college education to start
16 the program, you have to have the mandatory education
17 afterwards. I believe it's 240 actual specified hours
18 of accepted and required education. And then on top
19 of that your 2,500 hours.
20      **Q.  Have you ever been an inactive broker?**
21      A.  No, not since I started.
22      **Q.  Do you know what, if anything, inactive
23 brokers are allowed to do professionally?**
24      A.  Well, they can't practice without a
25 license. So they could be -- you know, I mean,

Page 19

1  there's nothing that prohibits anyone from being an
2  assistant or working within the industry, but you
3  can't practice either as a broker or as an appraiser
4  without a license within the state.
5           MR. NELSON:  Expert witnesses come to
6  mind.
7       A.  I would guess that the -- if that was --
8  if the example was would an expert witness -- could
9  you be one and be inactive? Probably, yes, because
10 that's -- it's not specifically covered. However,
11 within developing the opinion, I needed to develop
12 opinions of value, I couldn't have done that. I
13 couldn't have completed the appraisals without a
14 certification or license, but I -- to the extent that
15 anybody would listen to me, I could be an expert like
16 anybody else.
17      **Q.  (BY MR. SINK)  And when you say
18 "permitted to practice," do you mean permitted by the
19 state?**
20      A.  By the state, right.
21      **Q.  In the course of your training as a
22 broker, what, if any, training did you receive in
23 statistical analysis?**
24      A.  Oh, general statistic classes within both
25 broker and appraisal. I teach statistics and

Page 20

1  modeling, or have taught statistics and modeling,
2  which is a specified appraisal class. Other classes
3  that they have within the appraisal industry, multiple
4  regression analysis and that sort of thing, I've taken
5  and taught those classes.
6       **Q.  Have you -- we'll start with received
7  training, and then we'll talk about --**
8       A.  Right.
9       **Q.  -- providing training. Have you, over
10 the course of either course then, broker or appraisal,
11 received training in survey methodology?**
12      A.  Well, within the ---
13          MR. NELSON:  Object to form.
14          Go ahead.
15      A.  Okay. I believe you're saying have I
16 received training or been exposed to -- from a
17 statistics point of view what are accepted methods
18 for -- for survey and statistical analysis. Within
19 the general classes, that is -- those topics are
20 discussed.
21      I also have training, I guess, you'd call
22 it, or at least significant exposure from both of my
23 daughters that are heavily involved in the statistical
24 world. One is an epidemiologist, and the other is
25 a -- or is going to be a Ph.D. tomorrow. And her



minor field of study was statistics and statistical analysis. So I've been exposed over many years of discussions, crying jags, everything that you get exposed to as a father with your daughters going through the pain of their education.

**Q. (BY MR. SINK) Congratulations that it's almost -- almost complete.**

A. Hers is almost complete, yeah.

**Q. How much time -- that's a bad question -- sorry.**

**You would consider the training about survey methods that you received to be part of your broader statistical training; is that right?**

A. Yes, yes.

**Q. How much time over the years do you think you've received training regarding statistics?**

MR. NELSON: Object to form.

A. It's hard to say in a number of hours. There's both classroom, and then there's outside, independent study that through published -- publications and recognized experts in the field that, you know, texts that I would independently study, have independently studied. So it's hard to say in the number of actual hours.

**Q. (BY MR. SINK) How about just limiting it to classroom training.**



A. Classroom training between the classes I've attended and the classes I've taught, 100 hours, 150 hours, something like that. It's hard to pin down.

**Q. You mentioned you've done some reading, apart from classroom instruction on statistics and/or survey methodology; is that right?**

A. Right.

**Q. Can you recall any particular text that you found particularly helpful?**

A. Yeah. Dr. Randall Bell is the most recognized expert in the appraisal field on diminution of value and the approaches, acceptable approaches, to -- to the science of gathering the data and analyzing the data.

He's had, I believe, three texts, published texts, that -- I own all three and have studied those with regard to the different types of diminution. They discuss studies that have been done on specific topics that cover a wide range from airport noise to the Charlie Manson house to different types of diminution of value cases from flooding, toxic matters similar to the subject of this particular case.



So that -- as I said, he's recognized as a -- as the expert in our field. He's a Ph.D. and also a certified general appraiser. And I've spent a great deal of time inside of his textbooks.

**Q. Do you recall the name of any of the books offhand?**

A. I -- you know, I'd have to look it up. They all have the same name. I mean, they're all volume 1, 2 and 3 of the same name, and they reference diminution of value. But a Google search of Dr. Randall Bell and appraisal will give you those textbooks. I just can't recall, but that would be where you would find them.

**Q. Any other writers that you can think of that had a particularly important impact?**

A. Well, I -- you know, I read all of the articles that come out -- periodic articles that are published through the appraisal institute and the Appraisal Foundation. So anything that comes out regarding diminution of value or that type of valuation, I try to stay on top of because I deal with it regularly.

**Q. And are those articles published in a journal or magazine of some form?**

A. Well, typically like the appraisal



foundation puts out articles all of the time, which I'm -- because I'm a member of the Foundation, because I'm a certified appraiser, I mean, just by fact that -- and also an instructor, I get e-mails directly from the Appraisal Institute or Foundation, and I also get, you know, the articles forwarded from the Appraisal Institute, which is a private organization that I talked about earlier, but their education section is probably the leader in the industry. I've taken almost all of their classes that they offer.

**Q. Are there any particular articles that you recall that stand out published by either of those two institutions that you found particularly helpful for your work in these cases?**

A. Just general theory. I mean, it's -- there hasn't been -- within those two organizations and with any publications that I've found, I wasn't aware of a specific study that had been done regarding formaldehyde off-gassing. It's a new issue for the market.

**Q. Were there any specific articles, not about formaldehyde specifically, that you found particularly helpful for your work in this case?**

A. Oh, there's articles on similar type of value issues with regard to methamphetamine houses,



Page 25

1  houses with mold issues, houses with asbestos.  So
2  houses that have issues that potentially affect
3  health.  So those -- anything -- I mean, with this
4  particular case, anything that an article that -- or a
5  condition that may affect health, an article would be
6  germane to this issue, if not specific, related or
7  close, as far as market reaction.
8      Q.  Can you recall any -- the titles or
9  authors of any specific articles?
10     A.  I cannot.
11     (Deposition Exhibit 318 was marked.)
12     Q.  I'm handing you a copy of 318.  Do you
13 recognize that?
14     A.  Yes.
15     Q.  What is that?
16     A.  That was the resume and CV that was
17 included with my expert report as appraisals as of the
18 date of value for the homes I looked at.
19     Q.  So I'm going to walk you through the
20 report.  I want to make sure you have it in front of
21 you so you can give me assistance if you can.  I will
22 start with the professional experience based on --
23 with the Myers Company, LLC.  That's your company, I
24 take it?
25     A.  Yes.

Page 26

1      Q.  How long has that been an existing
2  company?
3      A.  I think it became an existing company in
4  1979 or '78, one of those two years.
5      Q.  So since that time, you've been providing
6  your appraisal services pursuant to the Myers Company?
7      A.  Yes.  And/or there's been some times
8  where during that period of time I've had different
9  affiliations for a short period of time.  I believe it
10 was two years.  Although I had the Myers Company, I
11 was active -- a broker under ReMax Properties, and
12 then became, again, the broker for the Myers Company.
13     So there's a two-year period in the 2000s
14 that I was working with ReMax Properties, and my
15 license, my broker's license was with that company,
16 other than the Myers Company.  Other than that, it's
17 been consistently with -- as the employee broker with
18 the Myers Company.
19     Q.  So you do both appraisal work and broker
20 work for the Myers Company?
21     A.  Yes.
22     Q.  Are there any other appraisers or brokers
23 employed by or affiliated with the Myers Company?
24     A.  Broker.  My wife is also a real estate
25 broker, and she's the only other employee of the Myers

Page 27

1  Company at this point.
2      Q.  And are you both the members of the Myers
3  Company?
4      A.  I don't think so.  I think I'm the sole
5  member, but I -- again, that -- that was a long time
6  ago, so I'm not sure from a legal point of view
7  whether she's a member or not.
8      Q.  You're not aware of any other members
9  besides yourself and perhaps your wife?
10     A.  No.
11     Q.  In the last sentence of that description,
12 it says that you're a part-time appraisal instructor
13 for Kaplan Professional Schools, correct?
14     A.  Yes.
15     Q.  And we've talked a little bit about that
16 already this morning.  When it says a part-time
17 appraisal instructor, how often do you teach classes
18 or did you teach classes?
19     A.  Oh, for the past six or seven years, I've
20 probably taught -- I'm going to say between 8 and -- 8
21 and 15 classes a year.  So, you know, once a month or
22 less, or slightly less than once a month, on average.
23 Typically more towards the end of the year when people
24 are trying to get their education hours in when their
25 licenses are due and the first of the year when the

Page 28

1  new uniform standards of appraisal practice comes out
2  and they want to be informed of the new rules, and
3  then less in the summer and the middle of the year.
4  But I'm going to say the average was probably 8 to 15
5  times a year.
6      Q.  And when it says "Kaplan," you mean
7  Kaplan in its various forms?
8      A.  Kaplan, Brightwood.  Prior to Kaplan,
9  Jones Real Estate School.  And at this point in time,
10 as of January 1, I've retired from Kaplan.  So I'm no
11 longer -- I'm not accepting teaching assignments today
12 from them.  However, I'm remaining active and will
13 teach the uniform standards.  So as a national
14 instructor, I will do that or can do that either
15 independently or through another organization, or that
16 organization.  So part-time, part part-time.
17     Q.  Approximately, when did you start being
18 an appraisal instructor for Kaplan or one of its
19 forums?
20     A.  The first time -- the first go around I'm
21 going to say was in the early '90s.  And I probably
22 taught for four and five years out of the Jones Real
23 Estate School in Colorado Springs.  And then the last
24 go around -- I believe before I retired, it was either
25 six or seven years.  I've taught with Denver -- based

Page 29

1  out of Denver -- the Brightwood or Kaplan office out
2  of Denver.
3      Q.   In both cases it was primarily sort of
4  continuing education courses?
5      A.   Or licensing, yeah.  Both.
6      Q.   And how long would a typical course go?
7      A.   Well, the continuing education classes
8  are usually a day.  Licensing classes are up to a
9  week.  I would teach up to four or five days in a row
10 the classes themselves.  And all of the subjects from
11 start to finish, we would probably have four
12 instructors teaching a licensing, 240 hours, or
13 whatever that period of time that would be.  So it
14 typically takes a student -- I'm going to say two to
15 three weeks of consecutive -- five days a week, eight
16 hours a day to get their minimum education.
17     Q.   And your component of that several-week
18 process was approximately a week?
19     A.   Yeah, yeah.  You know, and it would
20 change.  Sometimes I would teach more, sometimes less.
21 I was commuting from Colorado Springs.  So I, from a
22 schedule point of view, I typically like to teach like
23 two to three days in a row so that I was only
24 traveling once.  And then I'd go back and work in my
25 office and maybe come back the next week and do two or

Page 30

1  three days again.
2      Q.   So on the -- like in the licensure
3  education when you would come to teach for a day,
4  would it be a full day of teaching or --
5      A.   Yes.
6      Q.   -- would you teach a class or two?
7      A.   No.  Full day.
8      Q.   And what topics would you typically teach
9  in the licensure program?
10     A.   Let's see.  I think I've listed some of
11 those.  I taught Principles and Practice, Advanced
12 Real Estate Applications, Residential Case Studies,
13 Statistics and Marketing, Sales and Income Approach,
14 Land Value and Cost Approach, Fannie Mae Guidelines,
15 Industry Update, Distinctive Residential Properties.
16 I also taught a litigation class, and maybe some
17 others.
18     We changed the classes as far as
19 continuing education.  They're constantly changing.
20 Because after someone has taken one, they don't want
21 to take it again, so we try to come up with new
22 classes.
23     Q.   So it appears that you were looking at
24 on your CV, Exhibit 318, the topics listed under the
25 instructor for licensing and continuing education; is

Page 31

1  that correct?
2      A.   Yes, yes.  Those are all individual
3  classes.
4      Q.   And you indicated that those were the
5  classes, and there may have been a few more?
6      A.   Yes.
7      Q.   I'm going to direct your attention to the
8  second page of the CV.  It appears that there are some
9  other courses that you were mentioning listed under
10 the boxes for American Institute of Real Estate
11 Appraisers; is that correct?
12     A.   These are classes I've taken, as opposed
13 to teach or taught.  I may have taught some of these
14 also, but these are specific classes I've taken.
15     Q.   So going back to page 1, Instructor for
16 Licensing and Continuing Education Section.  Other
17 than the classes listed, you also indicated there was
18 a litigation valuation class --
19     A.   Yes.
20     Q.   -- you taught?
21     A.   Yes.
22     Q.   Any other specific classes you can recall
23 beyond those?
24     A.   Not right off the top of my head.
25     Q.   So one of the items on the list is

Page 32

1  Statistics and Modeling.
2      A.   Yes.
3      Q.   Can you provide me any additional
4  information about what the instruction in that area
5  looked like?
6      A.   Sure.  That's a two-day class.  And it --
7  the first day is basically -- a basic statistic class
8  for real estate appraisers and how statistics apply to
9  real estate appraisers.  So very basic class as far as
10 statistics goes.
11     When a person is exposed to that class as
12 a real estate appraiser trainee, they're not an
13 expert -- you know, the goal isn't -- you're not an
14 expert in statistics after a day of statistics.  And,
15 as the instructor of these statistics classes, I'm not
16 a statistical expert.  My daughter is an expert; I'm
17 not.  You know, she holds a Ph.D. in that, and I
18 don't.  So I'm not an expert.  I'm an expert within
19 the application of statistics as it relates to real
20 estate appraisal.
21     And so in that particular class, you're
22 going to learn some of the basic statistical language,
23 the difference between the mean and the median and the
24 mode and what a standard deviation is and how those
25 apply -- those particular principles apply to being

Page 33

1  predictive as to real estate values.  So it's a --
2  it's a general understanding of -- of the area.
3       There are other classes that are more
4  refined, regression analysis classes and multiple
5  regression, that are more detailed in statistics and
6  have also taken and been exposed to.  They're, again,
7  more detailed as far as how those particular
8  statistical analyses apply to real estate.
9       For instance, what we would use in the
10  statistical field or in multiple regression is to try
11  to determine what the adjustment -- the proper
12  adjustment would be for square footage.  So you would
13  use a -- to the point that you have statistics, you
14  can use multiple regression to indicate a predictor or
15  an age adjustment.
16      The adjustment for a house, whether it's,
17  you know, one -- one year old or 15 years old.  The
18  predictive impact on a one-car garage versus a two- or
19  three-car garage.  Bathrooms would be another thing.
20      So we get indications from statistics to
21  help formulate opinions when we're making an
22  adjustment on a grid for those particular items.  So
23  that's where that's helpful.
24      The modeling portion of the class, the
25  second day of the class, is more how the financial

Page 34

1  market reacts to the appraisal -- the appraisal
2  process.  So our -- our -- the typical largest client
3  or biggest users of residential appraisal reports are
4  Fannie Mae, Freddie Mac and Ginnie Mae, which are
5  secondary purchasers of loans.
6       So they're the -- they're the biggest
7  users by percentage, so they each have rules as far
8  as -- and guidelines as far as appraisers are
9  concerned, and the second day of that class I teach
10  how those institutions view appraisers' reports, where
11  they have problems from a statistical point of view,
12  where they're looking for support and what they're
13  looking for to help guide the appraiser into issuing
14  compliant reports to their clients.  So that's what
15  that two days is about.
16  **Q.  You mentioned when talking about the**
17  **statistics day that for licensure process it was an**
18  **introductory statistics component?**
19      A.  Correct.  I believe this is a continuing
20  education class.  But I think it -- it may also be
21  a -- it's mandatory for residential and a certified
22  class.  I don't know that it's mandatory for
23  licensing, but it may be.  I just teach what they
24  assign me.  I don't know those.
25  **Q.  You indicated that -- during your answer,**

Page 35

1  **I believe, that the class that you teach doesn't go**
2  **into advanced statistics but that you had received**
3  **training yourself in some statistics; is that right?**
4       A.  Yeah.  As far as regression and multiple
5  regression, yes.
6  **Q.  Have you ever taught any classes on those**
7  **levels?**
8       A.  You know, on regression, yes.  I've
9  taught that particular class.  I have not taught the
10  multiple regression class that we offer.  I've taken
11  it, but I haven't taught it.
12  **Q.  And how does the regression class differ**
13  **from the first day of statistics class?**
14      A.  Well, a multiple regression analysis --
15  the difference between a multiple regression and a
16  straight regression is the number of multiples.  So if
17  you have more than two multiples, two things you're
18  indicating, then it's a multiple regression.
19      So let's say, for instance, if you were
20  just trying to do the impact of square footage to
21  market price, that would be a simple regression.
22  One -- one variable to -- comparing against market
23  price.  But if you were looking at square footage and
24  age and/or more, two or more, maybe also looking at
25  bathrooms and garage spaces, say, for instance, so

Page 36

1  make three or four, that's a multiple regression.
2       So you're going to gather statistics, and
3  it's going to give you an indication of what -- the
4  biggest indication is what the market seems to think
5  is more important.  That's what -- actually, rather
6  than the actual number, it gives you a weight as far
7  as what the market is -- is looking at.
8       So -- and that -- that comes in the -- in
9  the form of the reliability or the predictive
10  reliability of that individual statistic.  So if
11  square footage, say, has a very high reliability,
12  then -- and -- and garages have a low reliability or
13  bathrooms, then you know that the market is telling
14  you that you're going to weigh the square footage as a
15  more important factor in your grid than you do garages
16  or age or whichever.
17      So that -- and every market is different.
18  That could be -- it could be in certain markets
19  where -- where the -- a specific location you're
20  trying to measure the impact of a golf course or lake
21  backing to a golf course or lake, what reaction does
22  the market have to that specific location.  And in
23  certain areas, that could be a very high indication,
24  or it needs to be a high adjustment because the market
25  views it very importantly.

**Page 37**

1    Q.  You spoke several times about trying to
2  predict or evaluate what the market views something or
3  the value that it has.  How do you discern market
4  value of particular elements?
5    A.  Okay.  Well, there's -- there's multiple
6  ways to do that.  And that's -- from a statistical
7  point of view, that's the simple definition of what
8  statistics are as far as -- and their use in the
9  appraisal industry, or in any industry.  Statistics,
10  just the goal is to be a predictor.  So it's -- it's a
11  predictor of either the current or the future in any
12  particular -- whatever subject you're talking about.
13  So it's measuring what's the most likely response.  So
14  that's what the statistics do.
15        There are other ways, other than
16  statistics, to measure impacts of any individual
17  feature in a home or impact on the market in different
18  areas.  One would be, for instance, time.  So if I --
19  a typical sale/resale analysis, is if I have a home in
20  a subdivision that sold today, and it sold exactly one
21  year from now and there was a price differential, if I
22  can call and confirm that nothing had been done to
23  that house with the grantor or grantee and they hadn't
24  remodeled or there's nothing else involved, it's
25  simply a market change, then I'm going to have -- I

**Page 38**

1  can measure a percentage of change and -- based on
2  that sale/resale.
3        That's, if I have more than one, if I
4  have four or five within a subdivision, that give
5  me -- you know, that one sells in a year, one is
6  14 months, one is 13 months, one is 18 months, and
7  I -- I'm going to get a range of answers out of those,
8  I can -- I'll have enough information to draw a
9  conclusion.  Along with general statistics, I might
10  take that same area.
11        And one thing I do in almost every
12  appraisal is I'll take my subject neighborhood, and I
13  map that -- my neighborhood based on those neighbor
14  characteristics, and I'll take the last 12 months'
15  sales and look at the median sale price, and then I
16  take the immediate 12 months before.  So I go from
17  zero to 365 and get a median sales price, and then I
18  go from 366 to 730 days, and I get another number.
19        The median sales price, the difference
20  gives me an overall market appreciation or
21  depreciation in that particular market, the exact same
22  market, and what I find is some of the most -- the
23  reliable, the reliability of that to me is very high
24  because in that market the median square footage of a
25  property doesn't change.  So you're measuring the same

**Page 39**

1  type of house, the same style of home, the same market
2  influences within a neighborhood.  So that gives me a
3  number.  So that's a number.  And then if I can go out
4  and do sale/resale analysis and it confirms or doesn't
5  confirm that number, then I'm looking for why did it
6  or why didn't it.  There could be an answer to that.
7  So it's all of the investigative process.
8        Before I formulate the opinion, I try to
9  look at the question from several different angles.
10  It's not -- you know, statistics are not perfect.  The
11  problem with statistics in the real estate market and
12  in the appraisal market, especially quantitative
13  adjustments, is we extract, through statistics,
14  quantitative adjustments, and we put them on our grid,
15  but that's not how the market makes their decision.
16  They make their decision based on qualitative
17  analysis.  So Ms. -- Ms. Buyer and Mr. Buyer walk into
18  a house and they walk in that front door and they say,
19  man, I like the way this house feels.  This feels
20  right to me.  This is it.  They see it at the front
21  door.  There's no statistical measurement for that.
22  So purchasing a home is an emotional decision.  It's
23  not a mathematical one.
24        In 45 years as a broker selling hundreds
25  of homes, I've never walked in with a buyer, and they

**Page 40**

1  say, well, we're going to make an offer and it's going
2  to be based on a differential of -- of $45.35 for
3  main-level square footage, and $10 a square foot for
4  the basement, and $12 for the finished area, when
5  compared to other properties we've looked at.  That's
6  how I report it, but that's not the -- on the
7  forethought of the buyers and sellers in the market.
8  So we're interpreting their emotions and reducing it
9  to a number.
10        That system is imperfect.  So you're
11  reading that number -- or my reading of that number,
12  my opinion, by the nature of how we gather it, is
13  going to be different than an appraiser that has the
14  exact same data.  They're going to weigh it
15  differently.
16    Q.  In the regression component several times
17  you indicated that you're looking at final buy/sell
18  numbers; is that right?
19    A.  My assignment typically, and in the case
20  of the 19 homes I looked at, the starting point was to
21  estimate the market value of the home, as it's defined
22  within the report as a single point number.  So I take
23  all of those -- those -- the process and issue an
24  opinion of that final number, which is my estimate of
25  the most probable sales price at that point under the



Page 41

1  circumstances listed in the definition of market
2  value, which most typically the definition of market
3  value includes knowledgeable buyer, knowledgeable
4  seller, no undue circumstances, cash or cash
5  equivalent within the reported -- there's a definition
6  within the report, but that's the -- ultimately, the
7  summary of market value, because it's a straight-up
8  deal, not from your mother or grandmother. Everybody
9  -- you know, it's not some stupid person buying your
10  house. They're well informed. It's not some stupid
11  seller that doesn't know what their house is worth.
12  Everybody is educated.
13        They make a market decision based on
14  their own personal motivations. And my number is a
15  predictor of that outcome, and my opinion, in the
16  majority of the cases, are -- that's what the
17  indication that most buyers would -- would feel, and
18  that's my opinion. My opinion does not ever say that
19  every buyer is going to come to the same conclusion,
20  because that's impossible.
21        Q.  And I want to pull apart a couple of
22  different things. I understand you to have been
23  talking about how you came to your appraisal value; is
24  that right?
25        A.  Correct. That -- that's the start of the

Page 42

1  process.
2        Q.  Right. I want to set the particular
3  appraisals in this case to the side for a moment. And
4  I guess what I'm asking you here about is sort of the
5  statistic training and modeling that you provide to
6  potential brokers and appraisers and then provide in
7  the continuing education classes. You were speaking
8  earlier about regression analysis --
9        A.  Right.
10        Q.  -- single versus multiple; is that right?
11        A.  Right.
12        Q.  And in that world, you're attempting to
13  assign a value to some characteristic of a property;
14  is that roughly right?
15        A.  Exactly.
16        Q.  And when you do that, ultimately one of
17  the major inputs into the regression analysis is the
18  sales price of the home?
19        A.  Well, that's the variable. That's what
20  everything solves, too. So that's one of the axes,
21  that everything goes to the sale price, because that's
22  what -- that's what the answer is: What's the
23  predictor of the sales price.
24        Q.  And you're trying to work back from the
25  sales price to figure out how much each element

Page 43

1  contributes to the sales price?
2        A.  Exactly.
3        Q.  Do you have an opinion as to -- between
4  whether a single regression model is more or less
5  reliable than a multiple regression model?
6        A.  Well, it just depends on the question.
7  Again, what we're solving for. Let's say, for
8  instance, we're solving for time, then sales price
9  versus -- within a defined area, sales price versus
10  time, a single regression model is -- is very -- is
11  very predictive, because it's going to -- it takes all
12  of the factors into consideration, because I'm only
13  solving for one variable.
14        When I'm trying to get into the appraisal
15  grid, which has different factors, like, for instance,
16  typically square footage is the largest adjustment,
17  but other things come in, bathrooms, garages and so
18  forth, I have multiple factors, so in that case
19  multiple regression is more reliable. So there's not
20  one answer to that. It just depends on what you're
21  trying to measure.
22        Q.  And as I think you indicated, although
23  statistics are helpful, they're imperfect?
24        A.  Yes. I mean, as in any problem and any
25  type of science or analysis where you're using

Page 44

1  statistics, you're going to start with a hypothesis,
2  you're going to gather data and you're going to
3  approve -- you're going to support or not support your
4  hypothesis. You know the -- you know what you think,
5  and then that's where you start, but you're either
6  going to prove or disprove your initial thought.
7        Q.  And when you say prove or disprove, you
8  mean prove or disprove by the available data?
9        A.  By the data. It's either going to
10  support your opinion or change your opinion or totally
11  change your opinion.
12        Q.  Does regression analysis capture some
13  kind of error rate?
14        A.  Reliability. So it's going to weigh --
15  it's going to weigh the importance or -- and, I guess,
16  error rate would be as good of a way as any -- as
17  term -- as you'd use. It's going to say, well, this
18  data is less reliable than this data because it seems,
19  you know, either the data is more perfect or more
20  people seem to be reacting to this particular area of
21  the analysis than this.
22        In many cases, age becomes a very low
23  predictor, but that's normally because of the way I
24  select the data, not that age is not important. But
25  if I defined the neighborhood and all of the homes



Page 45

1  were built within two years of each other, it's going
2  to show statistically -- it's going to tell me age
3  makes no difference.  Well, I know that age does make
4  a difference, but it doesn't make a difference within
5  that neighborhood, because all of the homes were the
6  same age that I measured to start with.
7        So you have to have common sense within
8  reading your statistical output and know what -- you
9  have to know what goes in to the cake before you
10  understand, you know, why it tastes a certain way.
11     Q.   What is your understanding of what a T
12  statistic is?
13     A.   You mean a T -- the -- okay,
14  specifically, I'm not familiar with the term T
15  statistic.
16     Q.   Are you aware of a way in which you can
17  generate a confidence interval for a regression model?
18     A.   Yes, yes.
19     Q.   What is your understanding of what a
20  confidence interval is?
21     A.   Well, the confidence interval is exactly
22  what we're talking about.  The indicator of the level
23  of -- that the statistics give as to their
24  reliability.  So you see that reliability factor --
25  for people that deal with the result of multiple

Page 46

1  regression analyses as it relates to real estate, I
2  think the most recognizable would be Zillow, because
3  you look in your own neighborhood and you do a Zillow
4  on your house, and it's going to give you an
5  indication of value.
6        Also within that -- that Zillow report,
7  there's going to be a confidence rating as far as that
8  data, and I believe that's what you're speaking of.
9  So in that confidence value, what you'll find is the
10  more homogeneous the neighborhood, the higher the
11  confidence will be as far as the -- the predictor,
12  the -- so if -- if all -- tract homes, for instance,
13  have a much higher confidence rating than to use a
14  Denver market, the Capital Hill or Wash Park or an
15  area where all of the homes were custom homes built,
16  you know, in the 1920s.
17        Well, there's data in enough sales,
18  there's plenty of activity, but what makes that
19  decision is -- you have less confidence because it
20  could -- the statistics will say, well, this
21  particular house is 1500 square feet on the main
22  level, and it sold for 600.  And this one is 1500
23  square feet, and it sold for 800.  So from a
24  statistics point of view, that just makes it less
25  confident, the answer less confident.

Page 47

1        The fact is, is what probably happened is
2  it has to do something with lot size, location,
3  traffic count, the exterior design of the house, the
4  curb appeal.  Curb appeal is not a statistically --
5  you know, there's no input for that.  But it,
6  obviously, is a huge market factor.
7     Q.   So do you know how a confidence interval
8  is generated?
9     A.   It's generated statistically.  I mean,
10  it, basically, when you put all of the data into the
11  machine, it's going to say, you know, there's enough
12  data and enough similarity that there's a high
13  confidence that the statistic is -- is more predictive
14  than a -- or less predictive based on that -- that
15  confidence level or factor.  So that's exactly -- you
16  know, exactly what it is -- is telling you how
17  predictive it is.
18     Q.   You mentioned the machine.  What machine
19  are you referring to?
20     A.   Whatever -- whatever crunches your
21  statistical numbers, and that can be anything from an
22  Excel spreadsheet to a prepackaged program that is
23  written for a specific type of work.
24     Q.   Do you train brokers or appraisers on a
25  particular kind of software or program?

Page 48

1     A.   Well, most brokers and appraisers have --
2  are using Excel as their -- as their data generator,
3  and it feeds it into whatever model they have.  And
4  the reason is that the data -- we typically, as
5  appraisers, obtain most of our data through the
6  Multiple Listing Services.
7        And the Multiple Listing Services, you
8  can parse that data in a common delimited file and
9  import it into one of the predictive programs, so it
10  becomes a standard format for input.  And then within
11  my particular case, I use a software -- appraisal
12  software called ACI and have used that -- they've got
13  a model that they use, and I set up a multiple
14  regression analysis for my own use saying, okay, these
15  are the things I want to measure.  I want to measure
16  square footage, I want measure above-grade square
17  footage, below-grade square footage, lot size, age,
18  bathrooms, garages, factors that are within --
19  fireplaces, sometimes -- that have -- buyer
20  preferences would indicate, through my experience, are
21  important.  And then to the extent that those are
22  available through the MLS, check those items in the
23  MLS and receive, within the neighborhood, a common
24  delimited file that show all of the sales with all of
25  those features.

Page 49

1    I submit that into the ACI program, and
2  it's going to spit out multiple regression analyses,
3  computer-generated multiple regression analyses that's
4  going to give me those -- that raw data an indication
5  as far as the statistics, so that's how it works for
6  appraisers.  So it all starts -- all of those start
7  with the quality of the data.
8    Q.   When you run a regression analysis, do
9  you ever get a 100 percent confidence interval?
10    A.   No.
11    Q.   What -- what's usually the range that
12  experts rely on as a reasonably reliable confidence
13  interval, in your opinion?
14    A.   Well, and that, again, depends on within
15  the multiple regression that -- and as I alluded to
16  earlier, that confidence level doesn't necessarily
17  mean that that particular -- that particular thing
18  you're measuring doesn't have an impact on the market.
19  It's just telling you that it has a lower -- a garage
20  may have a lower impact on the market than the square
21  footage.  So you're looking at the reliability factor
22  relative to each other.
23    So when that confidence factor -- I know
24  that when I go out and I'm dealing with the distinct
25  property, some very custom unique property, historic

Page 50

1  property, I already know that I'm not going to get --
2  you know, I'm not going to be really relying on the
3  statistical analysis, because I know the data going in
4  is imperfect.  It's going to be imperfect to start
5  with.  So as far as that number goes, there's not a
6  single answer to that.
7    Q.   Among the other training and coursework
8  you've got listed here on your CV in Exhibit 318, is
9  Distinctive Residential Properties.  What does that
10  refer to?
11    A.   That is actually the -- a class on how to
12  appraise that unique property, the oddball property,
13  the one that doesn't fit in the model.  So within our
14  industry, within the residential industry, as I
15  mentioned earlier, Fannie Mae, and we'll just keep it
16  at Fannie Mae, whether it's Fannie, Freddie, or one of
17  those large institutional investors, they have
18  property standards that they're going to be -- they'll
19  only loan within these property standards.  Their
20  models, their financial models, are built and their
21  interest rates are based on needing to be highly
22  predictive in their foreclosure rates and also their
23  values.
24    So it's, as you have that homogenous
25  neighborhood, that cookie-cutter house, that's the

Page 51

1  loan that Fannie Mae wants to buy.  If you get outside
2  that box and there's elements that are outside that
3  box that are discussed within that class, then Fannie
4  Mae may not be the buyer, but that doesn't mean that a
5  loan is not available or that -- that loan or that
6  home doesn't have a value or you can't determine a
7  value.  It just means that you may have to use
8  alternative methods to give you a reliable indication
9  of value.  So that's a one-day class.  And it goes
10  through all of those -- those issues.  I wrote that
11  class.
12    Q.   So when it refers to distinctive, it's
13  distinctive in that it doesn't fall within one of the
14  institutions' lending criteria?
15    A.   Typically outside of the Fannie
16  Mae/Freddie Mac guidelines for one reason or another,
17  berm houses, you know.  Homes -- well, for loan size,
18  you know, I think now the current loan size is like
19  550,000 so -- or in that neighborhood for a conforming
20  loan.  So unless you had a whole bunch of down
21  payment, anything in Wash Park, Cherry Hills, any of
22  the higher-end neighborhoods, those are all -- would
23  be distinctive by this definition because they're all
24  -- would have loan sizes higher than the maximum loan
25  for Fannie Mae.

Page 52

1    Q.   And then you also mentioned on that
2  additional list a litigation valuation class?
3    A.   Yes.
4    Q.   And what does that consist of?
5    A.   Basically, that's the -- that covers
6  circumstances like today, depositions and trial, trial
7  prep.  What's proper procedure and kind of giving an
8  appraiser a look at what today's going to be like for
9  me.
10    Q.   So the class doesn't deal with an
11  alternative form of valuation for litigation?
12    A.   No, no, no.  It's -- there are different
13  types of rules for litigation that are different than
14  the standard appraisal.  I mean, the appraisal process
15  is identical.  Whether I do it for a mortgage, do it
16  for a homeowner trying to put his property on the
17  market, or do it for litigation, but each one of these
18  areas -- like, for instance, we talked about Fannie
19  Mae, they've got guidelines.  Litigation reports also
20  have guidelines.
21    Q.   I'll direct your attention to the bottom
22  portion of your CV in Exhibit 318 that's entitled
23  Testimony and Depositions.  It looks as if you have
24  given testimony, whether at trial or deposition,
25  approximately 20 times; is that correct?

Page 53

1      A.   Yes.  And there's a couple more recent
2  ones since I submitted this.  It's -- there's been a
3  few more, so 25.  And this list doesn't go all of the
4  way back to the start of my career.  So maybe more
5  over the years, but since 2001, which is -- the
6  others I don't remember.  I don't remember all of
7  these, but I write them down as I go.
8      Q.   In most of these cases, were you retained
9  to provide an appraised value of some set of
10  properties?
11      A.   In most cases, an appraisal was a
12  component.  There are some cases that may be in there
13  that it was a real estate brokerage case where I may
14  or may not have been opining as to the proper
15  procedures and disclosures for Realtors, but that
16  could be a case within -- within this.  I have -- I
17  have testified as far as a nondisclosure issue where a
18  broker should have made a disclosure and didn't.  The
19  result was a loss in value to the client, and I
20  testified that that broker should have disclosed or
21  didn't need to or whichever the case may be.
22      Q.   Were you ever certified as an expert in
23  any of these cases, do you recall?
24      A.   All of them.
25      Q.   Are there any cases in which you were not

Page 54

1  certified as an expert?
2      A.   No, not that I recall.
3      Q.   In any of these cases, did you offer an
4  opinion on stigma value?
5      A.   Yes.
6      Q.   Which cases?
7      A.   Oh, let's see here.  Going backwards,
8  from 2016, Sinclair was a stigma case, Baron/Kissing
9  Camels was, Citizens for Quiet Skies.  Let's see --
10  not that one -- Grock LCC (sic) was a fire stigma
11  case.
12      Q.   I'm sorry.  Which --
13      A.   Grock, that 12 of 2012.
14      Q.   Thank you.
15      A.   That was a fire stigma case.  Ames versus
16  CH-- -- going up again -- was an oil spill case with
17  stigma.  The next one was a divorce case.  Homestar
18  Mortgage was not a stigma case.  Let's see.
19  Walton/Walton was not a stigma case.  Hasty versus
20  Fremont Paving was a stigma case.  That was a
21  contaminated ditch by a paving company.  Dassero
22  versus Falcon Properties, 1 of 2003, was a flood case
23  with stigma.
24          Schlage in 2002 was a stigma case.  That
25  was a contamination by Schlage Company, a very large

Page 55

1  case in Colorado Springs that contaminated hundreds of
2  homes with dumping of toxic materials into the aquifer
3  and had significant stigma damage on the homes within
4  the plume, and the other one wasn't.  I think
5  Wellshire Homes -- no, that was just a construction
6  defect case, so . . .
7      Q.   And I'm going to walk you back through a
8  couple of these here in a minute.  Before I do that,
9  you mentioned there were a couple of additional
10  cases --
11      A.   Yes.
12      Q.   -- more recently than Sinclair Pipeline
13  in January of 2016; is that right?
14      A.   Yes.
15      Q.   Did any of those involve an opinion about
16  stigma damage?
17      A.   Yes.
18      Q.   What were the names of those cases?
19      A.   I don't have that right with me.  The
20  most recent was -- it was this year -- in 2019 -- or
21  either late 2018 or early '19.  It was a trial on mold
22  in Weld County in Greeley, and that was a stigma case,
23  a mold stigma case.  And let's see.  And that was
24  both, since this, there was both a deposition and a
25  trial in that case.

Page 56

1      Q.   Do you remember the names of any of the
2  parties to that case?
3      A.   That's what I'm trying to remember is --
4  you know, I can get that for you, but I just don't
5  have it right off the top of my head.  But I will
6  provide that to you.  I notice this is -- this was
7  accurate as of the time I submitted my report, but I
8  keep it updated, so I will definitely forward to Mark,
9  to you, the new CV that has the most recent cases on
10  it.
11          And that -- let's see.  I believe there
12  was a -- I'm trying -- I've got several cases I'm
13  working on that involve that, but they haven't -- I
14  haven't gone to deposition yet.  I've got three slide
15  cases I'm working on with -- landslide cases with
16  stigma involved, but I haven't been deposed or gone to
17  trial on those.  And then I've got one water damage
18  case in Weld County that I've not -- I've got a
19  mediation that comes up next month.
20      Q.   So going back through the ones that
21  you've listed or indicated are stigma damage related,
22  some of them you've already indicated what the nature
23  of the incident was, and I want to make sure that I
24  get each one for the record.  The Sinclair Pipeline
25  matter in January of 2016, what was the issue there?



Page 57

1       A.   That was Sinclair Oil had a pipeline
2   through a potential development site in -- what's the
3   name of it?  Was it Frederick?  One of the little
4   towns up there, whether it's -- one of those little
5   Weld County towns -- and had a pipeline through the
6   middle of the -- of the potential subdivision.  They
7   actually did a condemnation on an additional piece,
8   increased the size to double, and it, in effect,
9   because -- because of what they were putting through
10  there, which was jet fuel and combustible materials,
11  it reduced the area that the developer could build in.
12          They had to go from, you know, like,
13  50 feet on either side to 200 feet on either side to
14  be safe.  And so that one -- there was a diminution of
15  value.  And also a stigma to the development for --
16  for that particular issue.  That was prior -- it --
17  you know, it wasn't in the same subdivision, but it
18  was within a mile of the gas explosion that killed
19  those two people in Weld County, and I did -- I have
20  had my testimony like within four months of that
21  happening.  Said that that might be a market concern.
22  Definitely a market concern today.
23      Q.   How about the Baron matter, the
24  January 2016 matter, I think you indicated was also a
25  stigma case?

Page 58

1       A.   No.  That -- I said it was stigma.  That
2   one is strictly -- that was strictly -- that was a
3   case where a party in a very expensive subdivision,
4   million five houses on exclusive lots with ridge views
5   built -- built an in-fill house, went in and actually
6   changed the elevation of their -- their home that they
7   built to a non-approved elevation and blocked the view
8   of the neighbors' house of the value.
9           So there was a diminution of value to
10  the -- the existing home, based on the restricted
11  view, but that wasn't a market stigma, as in this
12  case, so I spoke incorrectly.  That was a diminution
13  of value case, but it wasn't a stigma case.
14      Q.   I believe you indicated the February 2015
15  case entitled Citizens for Quiet Skies involved
16  stigma; is that correct?
17      A.   Yes.
18      Q.   What was the issue there?
19      A.   A Boulder private airport that flew
20  parachute runs and they used -- they started expanding
21  the number of flights, and they used -- I don't know
22  if you're familiar with an airplane called a Beaver
23  airplane that they use for -- in Alaska for float
24  trips and that sort of thing -- very, very powerful
25  engines and very noisy -- and they increased their

Page 59

1   flights out of this parachute school to the point
2   where they were flying -- the people in the flight
3   pattern were affected, constantly affected by the
4   noise.  And in that particular case, I measured a
5   difference in value between people in the flight
6   pattern than people outside of the flight pattern
7   within the same neighborhood.
8       Q.   And December 2012 in the Grock matter, I
9   believe you indicated that was a fire?
10      A.   That was a fire case.  That was along
11  a -- along the railroad going by the Arkansas River
12  right into the Royal Gorge.  So it caused a fire to
13  the -- to both sides of the road.  And with that fire
14  and the immediate burning of that property, there's a
15  stigma associated with the fire, potential future
16  fires and so forth.  So at that point in time, there
17  was a stigma.
18      Q.   And then Ames v. CHS, I believe was oil
19  related, you said?
20      A.   Oil spill, yes.  Ames was the property
21  owner.  It was Mobil Oil or one of the large oil
22  companies had a storage facility like for regular oil
23  type gas station oil and they got leaks and totally
24  contaminated the -- had a flood and contaminated the
25  Ames property.

Page 60

1       Q.   On the first page of 318, I believe you
2   indicate in the April 5, 2007, matter, Wanda Hasty was
3   a ditch contaminant issue?
4       A.   Correct.  The Redi-Mix Company in that --
5   that's a concrete company dumping waste into a ditch,
6   contaminated the ditch so that she couldn't use the
7   ditch to irrigate her property.  Killed all of her
8   plants on the property in her pasture.
9           It happened.  They cleaned it and came to
10  an agreement, and then it happened again.  They did it
11  again.  They still continued dumping two years later.
12  It was the second time I got involved with the second
13  dumping.  That was -- that was that case.  And at that
14  point in time, I felt that with proper disclosure that
15  a reasonable buyer might think that if it happened
16  twice, it could happen again.
17      Q.   Do you recall what the contaminant was?
18      A.   Yeah.  It was -- it was an oil gas -- or
19  it was a cleaner.  They were using a cleaner for their
20  concrete trucks.  So some sort of acid contamination.
21  It didn't -- it didn't seem to -- I guess it would be
22  bad if you drank it, but it affected her growing of
23  her fields.  She had horses that she housed there and
24  all of her fields died and planting, so she had to
25  haul hay and made her property useless for growing



Page 61

1 anything.
2    Q.  And then January of 2003, the Dassero
3 matter, I think you indicated was a flood damage case?
4    A.  Yes.  That was a subdivision that
5 built -- out of Falcon.  They built a retaining pond
6 to a larger retaining pond to capture rainwater, and
7 the dam -- it was an earth dam -- the dam broke,
8 flooded all of the houses down below them, and they
9 replaced the earth dam with another earth dam.  So
10 that was the opinion of -- of the owner of that
11 property and my opinion that there was really -- there
12 was no repair to the cause of the problem, which was
13 the earth dam.  So it was likely that after disclosure
14 the market would reasonably think that that could
15 happen again to their property.
16    Q.  And then in October of 2002 in the
17 Stalcap matter?
18    A.  Right.  Stalcap versus Schlage.
19    Q.  That was the --
20    A.  That was the carcinogen that was dumped
21 into the aquifer and affected -- affected nearly a
22 thousand homes.
23    Q.  Do you recall what the contaminant was?
24    A.  Oh, it was some scientific name.  I'm not
25 sure.  It was cancer causing.

Page 62

1    Q.  By my count, that's nine cases involving
2 the current 2018/2019 case involving mold.  Does that
3 seem to match your --
4    A.  Either one -- either were deposed or went
5 to trial.  There were more cases that were settled,
6 but . . .
7    Q.  Sure.  In all of those cases, did you
8 represent the -- or were you retained on behalf of the
9 property owner?
10    A.  I'm going to say most likely, yes.  On
11 these cases, that would be correct.
12    Q.  In any of those cases, did you provide an
13 opinion that there was no stigma damage to the
14 property?
15    A.  Not on the cases that actually were
16 deposed.  I've issued a lot of opinions that say I
17 don't agree that there's stigma damage, but obviously,
18 that lawyer doesn't hire me.
19    Q.  Were you deposed or provided courtroom
20 testimony in any of those cases?
21    A.  No.  No.  Because I was usually
22 approached by someone looking to see if there was a
23 measure of stigma, and if I couldn't measure it, then
24 my opinion didn't work with the need of that
25 particular client, so it went no further.

Page 63

1    Q.  In any of these cases listed on the CV or
2 the one or two additional cases after this, did you
3 perform a twin paired sales analysis of any kind?
4    A.  When I can, I always try to do a paired
5 sales analysis, if the information is available.
6    Q.  Do you recall whether you did, in fact,
7 for any of these cases?
8    A.  I -- I don't recall on any specific -- on
9 any specific case what the exact methodology was or
10 even what my opinion was.
11    Q.  On the second page of your CV marked as
12 Exhibit 318 is a box at the bottom of the page
13 entitled Environmental Impact Appraisals.
14    A.  Right.
15    Q.  And do those correlate roughly with the
16 stigma cases we were just discussing?
17    A.  Yes.  All of the stigma cases that are on
18 there and then there's other ones that I have done
19 reports on that were either -- didn't go to trial,
20 settled or still in -- or at a stage where I haven't
21 been deposed yet.  So the oil fracking cases were
22 settled, so I wasn't involved with those.  The Waldo
23 Canyon fire appraisals, Black Forest and Spanish Peaks
24 fire appraisals were all -- they weren't litigated.
25 Basically, the purpose of those were all for tax

Page 64

1 purposes.  Your federal tax deduction for your loss in
2 a result of fire, so simply measuring it for tax
3 purposes.  And then the Broadmoor Resort landslide
4 case is still active.
5    Q.  You mentioned before that you've never
6 been disqualified as an expert in any of these cases,
7 correct?
8    A.  Correct.
9    Q.  Do you know or recall whether in any of
10 the cases anyone filed a motion to exclude your
11 testimony as an expert?
12    A.  I believe probably several.  I think
13 there was an exclusion filed for Quiet Skies almost
14 certainly.  I believe I recall it for the Quiet Sky,
15 because I saw documents.  And, in fact, the Sinclair
16 oil case also.  They filed to have me excluded.
17    Q.  Any others you can recall?
18    A.  There was a filing in the most recent
19 one, early filing in the most recent case on the mold
20 case to have me excluded as well, I believe.  I'm
21 sorry.  I get that paperwork, and it comes across, and
22 it's pre-deposition and pre-trial, and the attorney
23 says -- they call me and said, don't worry about this,
24 I'm giving you a copy, and we'll let you know if we
25 still need you, and they have.  So I assume within the



Page 65

1 process it gets acted on in some way.
2        MR. SINK:  It's about an hour and a half.
3 Are you ready to take a break?
4        MR. NELSON:  Yeah.
5        THE VIDEOGRAPHER:  Going off the record.
6 The time is 10:35 a.m.
7        (Recess taken, 10:35 a.m. to 10:54 a.m.)
8        THE VIDEOGRAPHER:  We are back on the
9 record.  The time is 10:54 a.m.
10       Q.  (BY MR. SINK)  Before the break, we were
11 walking through Exhibit 318.  And it's continuation of
12 your CV, so I still have some additional questions
13 there before we move on to the appraisals and reports
14 in this case.  You mentioned before reading and
15 valuing the work of Dr. Randall Bell, I believe it
16 was?
17       A.  Yes.
18       Q.  And you also indicated that there were
19 some periodical reports or articles in two
20 publications.  I believe it was the AI and the AF; is
21 that right?
22       A.  Yes.
23       Q.  Can you recall any other areas where you
24 would have found useful statistical or survey
25 information related to the work in these cases?

Page 66

1        A.  Well, specifically in these cases I
2 guess, you know, I read the Denver Post every day, and
3 the Denver Post often publishes statistical
4 information, market statistics as far as appreciation
5 rates and demand in the Denver area and different
6 areas.  So I read as much as I can within the local
7 newspapers or anything that's published around market
8 conditions, not specifically for this case, but for my
9 overall practice.
10       Q.  Are you, by any chance, familiar with the
11 publications of a Mr. A.R. Wilson?
12       A.  I'm not.
13       Q.  Have you, yourself, published any
14 articles or -- articles or books?
15       A.  No.
16       Q.  How long have you been testifying in
17 litigation matters, generally?
18       A.  Since the 1990s.
19       Q.  And what would you currently estimate is
20 the percentage of time you devote to
21 litigation-related work in your profession?
22       A.  10 percent.
23       Q.  And what is the remaining 90 percent,
24 approximately?
25       A.  It will be split between general

Page 67

1 appraisal practice and real estate practice.
2        Q.  And what do you mean by real estate
3 practice?
4        A.  Buying -- representing buyers and sellers
5 in the marketplace.
6        Q.  And what would you estimate your -- the
7 percentage of your annual income recently has been
8 related to your litigation work?
9        A.  Last year as a percentage, probably
10 around 10 percent.
11       Q.  Has that been roughly consistent over the
12 last 10 years?
13       A.  This work is not consistent at all.  So
14 it's going to -- you know, in fact the -- my practice
15 changes with the market, so some years I'm going to be
16 heavily involved in the appraisal business, some years
17 more heavily involved in the brokerage business.  As
18 far as this, I could have two years with no litigation
19 type work.  So it's just not consistent.  I'm not a --
20 I'm not an expert witness that is primarily an expert
21 witness.
22       Q.  Do you advertise your expert services?
23       A.  No.
24       Q.  Are you affiliated with an expert witness
25 listing service of any kind?

Page 68

1        A.  I may be.  I haven't submitted by name to
2 any service, but some attorneys have told me they
3 either listed me or something on a service that you
4 may look at individually.  I have no access to it, so
5 no firsthand knowledge.
6        Q.  In how many of your prior cases have you
7 any -- have you been asked to address formaldehyde in
8 home construction?
9        A.  None prior to this.
10       Q.  And you're being compensated for your
11 time in this matter?
12       A.  Yes.
13       Q.  And on the third page of your CV, that is
14 Exhibit 318, is that a correct statement of the
15 compensation you're receiving for this matter?
16       A.  Yes.
17       Q.  Can you estimate for me approximately how
18 much time you have spent so far for testimony and
19 trial preparation?
20       A.  For today -- you mean as of today?
21       Q.  As of today.
22       A.  I think the total bills were -- it's
23 somewhere in the neighborhood of $30,000, I believe.
24 It's -- there was -- I was paid on several different
25 occasions.  I mean, I have all of that information,

Page 69

1  but I just didn't commit it to memory. But they were
2  approximately -- approximately 1,500 a house for the
3  appraisal and report, and then I had some early
4  investigative reports. There were 19 reports, so --
5  or 19 appraisals, and that was what was paid to my
6  firm.
7          I paid, obviously, any assistants I had,
8  I paid that from my fee. So me, personally, I got the
9  remainder. But the billing to the case was
10 approximately $1,500 a home plus some preliminary
11 work, and then today's deposition and trial, whatever
12 that works out to be. Maybe another -- there will be
13 another two hours of -- that I haven't billed yet of
14 deposition prep. So I'll have another two hours of
15 that, and then the only other thing that's not listed
16 on there is -- is travel time. So I have four hours
17 of travel time when I'm done.
18     Q.  And when you're talking about the
19 numbers, you're referring to time spent across all
20 three cases?
21     A.  Yes. The cases, however they're divided.
22 From my point, there were 19 homes involved. And so
23 some of them are bundled with the others. So of those
24 19 homes, I -- from my personal inspection of all of
25 those homes through writing of the reports, whether

Page 70

1  that was combined with other homes or not, that was, I
2  believe, $1,500 a party -- that's what I think it was
3  is what I recall.
4      Q.  And having walked through the various
5  categories, do you have a rough sense of, again,
6  through to date, what the total invoice services have
7  been? If you'd like, I also have a calculator.
8      A.  Yeah, I've got one here.
9      Q.  Between 30- and 35,000. And do you have
10 an expectation, as you sit here today, if this case
11 goes to trial, how much additional time you would need
12 to spend in this matter?
13         MR. NELSON:  Which case?
14         MR. SINK:  Across all three.
15     A.  If it goes to trial, then I'll probably
16 have another five to six hours of trial prep plus the
17 trial, however long that takes, that the -- or if
18 they're individual cases, but I mean, normally in a
19 trial I'm in and out in four hours or so. But I've
20 also had a trial where I was on the stand for three
21 days. So it just depends on the -- on the trial, but
22 let's say at four hours, roughly a thousand plus
23 another thousand so -- for each individual trial,
24 start to finish with travel time, probably another
25 $2,500 or 3,000, maybe.

Page 71

1      Q.  (BY MR. SINK)  You mentioned that you
2  paid out of that fee costs for salaries associated
3  with people who were providing you assistance; is that
4  right?
5      A.  Correct.
6      Q.  And what individuals provided you
7  assistance in the preparation of your reports?
8      A.  JoAnn Apostol was involved in the
9  baseline appraisal reports. And she received $750 per
10 report, so half of it, about 15,000.
11     Q.  Anyone else?
12     A.  What's that?
13     Q.  Anyone else?
14     A.  No, not that I paid directly.
15     Q.  You mentioned you spent some time
16 preparing for today's deposition; is that right?
17     A.  Correct.
18     Q.  What did you do to prepare for today's
19 deposition?
20     A.  Phone conversation with the attorney, and
21 then the -- we met 30 minutes before this started.
22 General discussion about what was expected during the
23 deposition. I mean, how it worked and that sort of
24 thing.
25     Q.  Did you bring any documents with you

Page 72

1  today?
2      A.  No, I did not.
3      Q.  And how much time would you estimate you
4  spent preparing for today's deposition?
5      A.  Well, in total, I think two to
6  three hours.
7      Q.  You indicated you didn't compensate
8  anyone other than JoAnn for their involvement with
9  your work in this case, correct?
10     A.  Yes.
11     Q.  Did you -- other than counsel and other
12 than the plaintiffs, did you consult with anyone in
13 the preparation of your report?
14     A.  I gathered information through a number
15 of sources, but I didn't pay anybody for any
16 assistance.
17     Q.  Did you have any third parties review
18 drafts of your report?
19     A.  Other than the attorneys, no.
20     Q.  And on the last page of your CV,
21 Exhibit 318, is a scanned copy?
22     A.  That's of my broker -- or my real estate
23 appraisal certification license.
24     Q.  Do you have an equivalent license for
25 your broker status?



Page 73

1    A.  I do.  I do.  It's not on this resume.  I
2  have a -- I've got a separate case.  This is a -- my
3  standard -- most of the time, whenever I'm submitting
4  a CV, it's just related to appraisal, but I do have a
5  separate license.  And the number I believe is on the
6  first page, so you can check with the licensing
7  authority under IB00163714.
8    **Q.  Thank you.  You mentioned you were**
9  **retained in this case, among other things, to conduct**
10  **appraisals on 19 houses; is that correct?**
11    A.  Each -- each of the opinions -- or each
12  of the expert opinions that I issued involved a
13  baseline, an estimate of the baseline value of the
14  home at the time.  So I inspected and worked on
15  appraisals for each of the 19 homes.
16    **Q.  Do you recall when you were first**
17  **contacted about your assignment?**
18    A.  In general.
19    **Q.  When?**
20    A.  Oh, when.  That would be in 19 -- in
21  2017.  Probably August or September or October.
22  Sometime in that neighborhood.
23    **Q.  And who contacted you initially?**
24    A.  Mr. Nelson.
25    **Q.  Do you have an engagement letter with the**

Page 74

1  **Nelson firm?**
2    A.  I did, yes.
3    **Q.  At some point in time during your**
4  **retention in this case, were you provided information**
5  **for your review for preparation in the reports?**
6    A.  Not from any outside party.  I mean, I
7  was presented -- I was given information, general
8  information, by the law firm, and I had a copy of the
9  lawsuit filings and that sort of thing, so I had --
10  you know, a copy of other expert reports and so forth
11  that I reviewed.
12    **Q.  Do you recall whether you were provided**
13  **documents for your review that included correspondence**
14  **between anyone?**
15    A.  I don't recall.
16    **Q.  Do you recall whether you were given**
17  **copies of pleadings in the various suits?**
18    A.  Yeah.  The actual filings, what the
19  circumstances were and that sort of thing, yes, I was
20  given that.
21    **Q.  What, if any, other information were you**
22  **given that you can recall?**
23    A.  I was given information regarding, in
24  general, Weyerhaeuser's response to the situation.  I
25  had, you know, articles and publications from

Page 75

1  Weyerhaeuser describing -- from describing the
2  problem, their reaction to the problem, their
3  recommended mediation of the problem.  So with respect
4  to the initial 2016 manufacturing of the trusses
5  through, I believe, in July of 2017, they acknowledged
6  that there was a problem, and that was publicized.
7  And I -- if that wasn't given directly to me, I did a
8  Google search and read everything I could read about
9  it.
10    **Q.  Do you recall if you were given any**
11  **discovery responses in the case to review?**
12    A.  To my knowledge -- as far as other -- as
13  far as other expert discovery, I guess, not that
14  weren't directed to me.
15    **Q.  Did you review any deposition**
16  **transcripts?**
17    A.  No.
18    **Q.  Were you provided with any engineering**
19  **drawings or reports?**
20    A.  I was -- I was provided with general
21  engineering information with regards to the total
22  replacement method.  And in summary, I mean this -- as
23  I recall that specific information, it summarized the
24  recommended method, and then I believe it indicated
25  that the engineers felt that if it was done in this

Page 76

1  particular way it would meet safety standards.  So I
2  have read that type of report.  I don't -- which
3  exactly or anything, I can't tell you.
4    **Q.  Do you know who prepared those materials?**
5    A.  I do not.
6    **Q.  Were you provided any information about**
7  **Weyerhaeuser's warranty as part of your review?**
8    A.  Yes.  I mean, it was my understanding
9  that the -- that Weyerhaeuser was -- was warranting
10  the repairs, there was a limited warranty.
11    **Q.  Do you recall if you received**
12  **documentation about that or were you told that orally?**
13    A.  I believe I was told that orally.  I --
14  you know, that that's been a discussion, but I -- I
15  don't recall receiving a copy of an actual warranty
16  document that I could actually read and see what was
17  covered and what was not covered, so I don't recall
18  ever having that document.
19    **Q.  I know as part of the appraisal process**
20  **you took some photographs of the various properties;**
21  **is that right?**
22    A.  Yes.
23    **Q.  Apart from the photographs you took, were**
24  **you provided any photographs by anyone?**
25    A.  By several of the owners.



Page 77

1    Q.  Anyone else?
2    A.  No, not outside of the owners.  The
3  owners of the property, there were a couple that took
4  pictures during the reconstruction process.  So as,
5  for instance, part of the -- the remove and replace
6  process was to construct a drywall barrier, seal off
7  the area that had been repaired, and they took
8  pictures of that while it was under construction,
9  which I would have not been able to see without their
10  pictures, so they relied on those owners' pictures,
11  which were -- I got that from -- there were photos
12  from several different owners.
13    Q.  Do you recall who those owners were?
14    A.  No.  But if there -- and I think some of
15  those photos are in my reports.  I would have named
16  those -- who supplied those photos in the report.  I
17  don't know their names, though.
18    Q.  As part of the work you did in this case,
19  you spoke with the homeowners as part of the appraisal
20  process?
21    A.  At least one of them, yes.
22    Q.  At least one homeowner for each house?
23    A.  Yeah, yeah.  Some -- both people were
24  home in some cases.  Sometimes there was only one
25  owner there; sometimes there was only one owner.

Page 78

1    Q.  Apart from your interviews of the
2  homeowners, were you provided any written witness
3  statements?
4    A.  Not that I recall, other than summaries
5  that may have been in the filing.
6    Q.  Were you provided any medical records?
7    A.  No.
8    Q.  Were you provided any factual summaries
9  that were written?
10    A.  I was provided scientific testing
11  information by the owners on their homes where they
12  had tested after they moved back in.  Several of the
13  owners had testing done, and they -- and I had -- in
14  my work file, I've included those.  Whatever they gave
15  me, I've included in my work file.
16    Q.  Any other written summaries that you've
17  received?
18    A.  Not that I recall.
19    Q.  It appears from your work files that
20  there are also a handful of documents involving
21  publications or articles that you looked at; is that
22  correct?
23    A.  I've looked at quite a few articles, so
24  I've included -- at the time I included what, you
25  know, what I could remember to make sure I put in the

Page 79

1  file.  The case was less active to start with when I
2  was doing a lot of the preliminary research.  Once it
3  became evident that I was going to be engaged, at that
4  point in time anything I -- I have a -- I had a work
5  file section, so if I read it I snipped it out and put
6  it in my work file, but there were some things
7  probably read before that weren't snipped and put in
8  that work file prior to my engagement.
9    Q.  And based on your recollection,
10  approximately how many things -- how many articles
11  would you have copied and put in the work file?
12    A.  I don't recall.
13    Q.  More than ten?
14    A.  I don't know what -- yeah, I'm not sure
15  what's in the work file.  It was compiled over a year
16  ago and over a year period of time.  So it's -- I'm
17  sure you've got a copy of it.  It's hundreds of pages.
18    Q.  Are all of the materials you relied upon
19  in preparing your expert reports contained within your
20  work file?
21    A.  To the best of my ability, yes.
22    Q.  And were all of the materials in your
23  work file turned over for production in this case?
24    A.  Everything I had, I turned over.
25    Q.  What was the last time you turned over

Page 80

1  some work file information?
2    A.  That would have been six months ago, six
3  or eight months ago, something like that.
4    Q.  Have you done any research since then?
5    A.  I haven't done -- I have not been engaged
6  to increase my scope of work.
7    Q.  Apart from the scope of your engagement,
8  have you engaged in any additional research relevant
9  to your opinion since then?
10    A.  No.
11    Q.  I'm going to mark a series of exhibits
12  consisting of your reports in this case.  We'll mark
13  each one, and then we'll come back through and work
14  through them.
15    A.  Very good.
16      (Deposition Exhibit 319 was marked.)
17    Q.  Do you recognize Exhibit 319?
18    A.  Yes.
19    Q.  What is it?
20    A.  This appears to be the expert report
21  issued regarding the -- I believe it's the Jon Sparrow
22  property at 10961 Unity Lane, Commerce City, Colorado.
23    Q.  When you prepared this report, in what
24  format did you create it?
25    A.  In Word.

Page 81

1    Q.   And then this particular report appears
2  to have several attachments to it; is that correct?
3    A.   Let me see.  Well, it appeared -- now,
4  the report was issued -- there's the report and then
5  there's the work file, which is separate, not an
6  attachment to the report is the Word file.  The first
7  thing I'm looking at is the survey, the survey
8  questions that were used, which is not a part of the
9  report.  The summary of that was in the report.  What
10  I don't see is the underlying appraisal on Unity Lane,
11  which was provided with this report and attached to
12  it, but I don't see it.  Maybe it's in here.
13    Q.   So when you prepared a report, it
14  included the written section that's dated over your
15  letterhead, correct?
16    A.   Correct.
17    Q.   And it typically included certain
18  attachments; is that right?
19    A.   Yes.
20    Q.   And what were those attachments usually
21  in the form of?
22    A.   The attachment would be -- an attachment
23  to that report would be the underlying appraisal
24  report for the property or appraisal reports, because
25  in several cases more than one was -- was included in

Page 82

1  that report.
2         This particular one was a single --
3  single property, so there should be, as an attachment,
4  and submitted at the same time was my -- my
5  appraisal -- the appraisal report of Unity Lane and
6  the invoice would have been included.
7    Q.   And when you say "an invoice," you mean
8  an invoice for the appraisal cost?
9    A.   Yes.  Yep.
10    Q.   Anything else attached to the report as
11  part of the report?
12    A.   That would be, to my knowledge, the only
13  thing attached to the report.
14    Q.   And the rest of the materials would be
15  work file materials?
16    A.   Correct.
17    Q.   And you indicated that you provided a
18  copy of the written report in Word version; is that
19  right?
20    A.   Okay.  The report -- this report is Word.
21  The appraisal report is with one of the proprietary
22  softwares, so it's ACR.  I believe it was -- it may
23  have been appraised on Ala Mode.  JoAnn Apostol uses a
24  different appraisal software than I do.  And she
25  produced that report for my review, and so I signed

Page 83

1  her format as opposed to my typical format.
2    Q.   And do you know -- just, again, as a
3  matter of file transfer format, would that have been
4  in a PDF or an image file?
5    A.   Always a PDF, so it can't be altered, or
6  shouldn't be altered.
7    Q.   And then you also indicated an invoice.
8  Was that attached to the appraisal, or was that
9  separate from the appraisal?
10    A.   Attached.  I mean, it's a separate
11  document.
12    Q.   So attached to the report, but not the
13  appraisal?
14    A.   Yeah.  Attached to what I delivered to
15  the client.  So my typical submission would be expert
16  opinion, appraisal report or reports, and invoice.
17    Q.   And then you usually -- would you also
18  attach your CV?
19    A.   That's in -- that's in this.  Every one
20  of these reports has my CV in it, so that's -- it's an
21  addendum to this report.
22    Q.   Any other parts of the addendum that
23  would have been included in the report?
24    A.   Well, in the appraisal report, and I'd
25  have to see what -- you know, what is in the addendum

Page 84

1  and what's not.  It's a matter of form whether --
2  whether it's -- let's say, for instance, in my
3  particular report that I would use, a plat of the
4  property would be in my report, and it may be in the
5  addendum of another one.  But there you go, that --
6  that is part of -- if that's Unity Lane, that's part
7  of this.  There we go.  Now we've got it all.
8        (Deposition Exhibit 320 was marked.)
9    Q.   Apologies that I handed you one before it
10  was marked.  I'm showing you Exhibit 320.
11    A.   Right.
12    Q.   Exhibit 320 is the related appraisal
13  report for Exhibit 319; is that correct?
14    A.   Correct.
15    Q.   And I'm not trying to be mysterious here,
16  so I'll explain my --
17    A.   Okay.
18    Q.   -- dilemma, and if you can help me, I
19  would appreciate it.  In some cases, the format of the
20  report was produced in different ways depending on the
21  case.  Sometimes the reports would appear attached
22  with documents as part of a single PDF and sometimes
23  some of the materials were attached as part of a
24  separate work file, or at least what appears to be a
25  separate work file.

Page 85

1        So I'm trying to reconstruct what parts
2   of the reports were actually formally part of the
3   report versus what portions of the materials are part
4   of the work file.  So that's what I'm trying -- I
5   don't want to try to catch you off guard.  You're
6   welcome to look at anything you want to look at.
7        A.  No.  Yeah.  It's -- this, as I'm looking
8   at it right now, I have a report with -- with my
9   opinion, and that's going to -- and it includes
10  everything within that summary of the opinion.  And
11  then I have an appraisal report of the underlying
12  property.  That is the report.  That's the expert
13  report.  Everything else is work file.
14       Q.  So in the case of Exhibit 319, which was
15  not produced with a Bates number range, but apparently
16  everything after your appraiser license would then
17  seem to be part of your work file for that report; is
18  that correct?
19       A.  Correct.
20       Q.  And then the report would also include as
21  an attachment Exhibit 320, which is the associated
22  appraisal report?
23       A.  You're exactly correct.
24          (Deposition Exhibit 321 was marked.)
25       Q.  So I just showed you Exhibit 321.

Page 86

1        A.  Yep.
2        Q.  Do you recognize it?
3        A.  I do.  This was the report issued on five
4   properties:  4632 Colorado River Drive, 4633 Colorado
5   River Drive, 4667 Lakeside Drive, 6580 Empire Avenue,
6   and 6584 Empire Avenue.  And what's not here are the
7   actual reports that should be -- that are a part of an
8   attachment to this report.
9        Q.  And by "report," you mean appraisal
10  reports?
11       A.  Appraisal report, yes.
12          (Deposition Exhibit 322 was marked.)
13       Q.  Do you see Exhibit 322?
14       A.  Yes.
15       Q.  Is that one of the appraisal reports that
16  belong to the expert report that is Exhibit 321?
17       A.  It is.
18          (Deposition Exhibit 323 was marked.)
19       Q.  You've been handed Exhibit 323.  Do you
20  recognize it?
21       A.  Yes.  This is one of the appraisal
22  reports.
23          (Deposition Exhibit 324 was marked.)
24       Q.  You been handed Exhibit 324.  Do you
25  recognize it?

Page 87

1        A.  I do.  It is the Lakeside Drive appraisal
2   report.
3          (Deposition Exhibit 325 was marked.)
4        Q.  You've been handed Exhibit 325.
5        A.  Yes.
6        Q.  What is it?
7        A.  It is the report on 6580 Empire Avenue.
8        Q.  And it forms part of the expert report
9   that is 321?
10       A.  Yes.
11          (Deposition Exhibit 326 was marked.)
12       Q.  You've been handed 326.
13       A.  And that is the final report for this
14  opinion.
15       Q.  That is Exhibit 321.
16       A.  Yes.
17       Q.  So the expert report that is Exhibit 321
18  should include with it the five appraisals
19  denominated, Exhibits 322, 323, 324, 325 and 326?
20       A.  Correct.
21       Q.  Anything else?
22       A.  No.
23          (Deposition Exhibit 327 was marked.)
24       Q.  You've been handed Exhibit 327.
25       A.  Yes.

Page 88

1        Q.  What is it?
2        A.  This is a report for -- in reference to
3   8052 South Valleyhead Way, and I believe the owner's
4   name is Chi, C-h-i.
5        Q.  And does Exhibit 327 have an appraisal
6   report that goes with it?
7        A.  Yes.  It should be the appraisal report
8   for 8052 South Valleyhead Way, Aurora.
9          (Deposition Exhibit 328 was marked.)
10       Q.  You've been handed Exhibit 328.
11       A.  And that's the -- that is the
12  corresponding appraisal report.
13       Q.  For Exhibit 327?
14       A.  Correct.
15       Q.  So Exhibit 327 and Exhibit 328 constitute
16  the report for 8052 South Valleyhead Way?
17       A.  Yes.
18          (Deposition Exhibit 329 was marked.)
19       Q.  You've been handed Exhibit 329.
20       A.  Yes.
21       Q.  What is it?
22       A.  This is an opinion for damage on 670 Dry
23  Creek Place, Littleton.
24       Q.  Do you know the name of the homeowners
25  involved with that?

Page 89

1    A.   The homeowner on that one is Loy, L-o-y.
2    Q.   And that report should also have an
3 appraisal that goes with it.
4    A.   Yes.
5        (Deposition Exhibit 330 was marked.)
6    Q.   You've been handed Exhibit 330.  Do you
7 recognize it?
8    A.   I do.  It is the report that is a part of
9 Exhibit 329.
10    Q.   So 329 and 330 together constitute your
11 report for 670 Dry Creek Place?
12    A.   It does.
13    Q.   Anything else?
14    A.   Nope.
15        (Deposition Exhibit 331 was marked.)
16    Q.   You've been handed Exhibit 331.  Do you
17 recognize it?
18    A.   This is an opinion on 8773 Dunraven.
19 Property owner is Gilchrist.
20    Q.   Should this report also have a copy of a
21 real estate appraisal report?
22    A.   Yes, it should.
23    Q.   Do you know why this report at the
24 bottom, the lower right page of Exhibit 331, has the
25 stamp Exhibit 6 attached to it?

Page 90

1    A.   I do not.
2    Q.   You did not affix that stamp?
3    A.   I did not.
4        (Deposition Exhibit 332 was marked.)
5    Q.   You've been handed Exhibit 332, correct?
6    A.   I have.
7    Q.   What is it?
8    A.   It is the appraisal report that goes with
9 Exhibit 331.
10    Q.   Are there any other parts that should --
11 excuse me -- Exhibit 331 and 332 constitute your
12 report for the property, 8773 Dunraven Street,
13 correct?
14    A.   Yes.
15    Q.   Is there anything else that should be
16 part of that report?
17    A.   Not that I recall.
18    Q.   Well, I appreciate that there are a
19 decent number of reports and appraisal reports in
20 front of you now.  What I propose to do is to start
21 with your earliest report, which is Exhibit 319 and
22 Exhibit 320, and then we'll spend some time today
23 working through that report, talking both specifically
24 about 10961 Unity Lane, as well as some of the methods
25 and processes that you did for that report that appear

Page 91

1 also to have been the same for the other report, if
2 that works for you.
3    A.   Very good.
4    Q.   If at any point in time, of course, if
5 you want to look at one of the other reports or the
6 appraisal reports, feel free, let me know, and we can
7 parse specifically to help, but that's why I wanted
8 you to have all of the reports and appraisals in front
9 of you.
10        I'm going to start with some summary
11 information that I -- hopefully you can confirm for me
12 related to the various reports together.  By my count
13 there are five separate written reports; is that
14 correct?
15    A.   Correct.
16    Q.   Have you issued any other written reports
17 in any of these cases?
18    A.   I'm not -- I'm not sure -- and again not
19 to be evasive, I did 19 reports, so I don't know
20 what's in these cases and what's not.  You could
21 have -- there could be a name in there that I issued a
22 report on that's not here or -- but I issued all of
23 these, and there's -- whether it's included in one of
24 these opinions or another, there are 19 separate
25 reports -- appraisal reports or properties that I've

Page 92

1 completed, and I've -- and I think we are looking at
2 nine.  So there's ten other reports out there.
3 Whether they're related specifically legally to these
4 cases or not, they're -- they are related to the
5 Weyerhaeuser case.
6    Q.   Okay.  When you say 19 reports, is it
7 true that the very least that you mean are 19
8 appraisal reports; is that correct?
9    A.   Correct.  And some like, in this
10 particular -- I believe the three -- what was the
11 second one?  3/21 there are five opinions within one
12 report.  So there may be some other reports with
13 multiple opinions.
14    Q.   So -- and I -- I appreciate that there's
15 some overlap between the word report for an appraisal
16 report as well as the written report that --
17    A.   The expert report, yes.
18    Q.   So I will try to distinguish between the
19 expert report, which is the written summary that has
20 your opinion that also includes the appraisal report,
21 but when I want to talk separately about the appraisal
22 report, I'll specify that.  Does that work for you?
23    A.   That does.  Thank you.
24    Q.   And if you would help me out.  We'll try
25 to mirror any of that language that would be useful.

Page 93

1      A.  Good.
2      Q.  So you have performed 19 -- or issued 19
3  appraisal reports, correct?
4      A.  Yes.  I believe that number is correct.
5      Q.  How many expert reports have you issued
6  related to Weyerhaeuser matters?
7      A.  Well, I should have issued a report that
8  covers each one.  Like I said, if this one covers five
9  properties, there should be a report issued that
10  incorporates more than one property.  And it could
11  be -- if you don't mind, let me look at --
12      Q.  Of course.
13      A.  -- 29 and see if on 29 . . . It appears
14  that 29 just has the one value on it.  But for
15  whatever reason, there's -- oh, okay.  Loy is in this
16  one also.  Loy is in this one, but there's a separate
17  report.  Kittrell.  So I'm -- you know, and I'm --
18  in -- in a couple of cases, or one at least, there was
19  somebody named in the lawsuit that I didn't do an
20  appraisal on, so I have no opinion, but I don't
21  remember -- I don't remember the name by exclusion.
22      Q.  So your recollection is that you
23  performed 19 appraisal reports?
24      A.  Yes.
25      Q.  And your recollection is that for --

Page 94

1  whether one by one or in some combination, there
2  should be an expert report that covers all 19
3  appraisal reports?
4      A.  There should be an opinion that would
5  be -- that would summarize the damage for each of
6  those, at least that's my recollection.
7      Q.  In the three matters that we're here
8  today to discuss, which is the Borgmann versus
9  Weyerhaeuser matter, the Chi versus Weyerhaeuser
10  Company matter, and the Gilchrist versus Weyerhaeuser
11  Company arbitration, are you aware of any expert
12  reports that you've issued for those three cases that
13  are not currently in front of you?
14      A.  I'm not.  And Borgmann is here.  Okay,
15  good.  I -- I know Chi and -- they're identified.  But
16  Borgmann is here, so I'm not aware of any other
17  opinions.
18      MR. NELSON:  Why don't we go off the
19  record for a moment.
20      THE VIDEOGRAPHER:  Going off the record.
21  The time is 11:43 a.m.
22      (Recess taken, 11:43 a.m. to 11:47 a.m.)
23      THE VIDEOGRAPHER:  We are back on the
24  record, and the time is 11:47 a.m.
25      Q.  (BY MR. SINK)  Just before we took a

Page 95

1  break, you had indicated that your memory was that
2  there were 19 appraisal reports.  After taking the
3  break, it sounds like you want to revise that answer?
4      A.  I do.  There were nine appraisal reports,
5  not 19, therefore, also the estimate of the fees that
6  were paid to me are approximately half what I stated,
7  and the fees paid to JoAnn Apostol were half what I
8  stated, so -- I paid her $750 a report.  I received
9  somewhere in the neighborhood of $1,500 a report plus
10  some early consulting.  So I said 30- to 35-.  It's --
11  15 to 20 is a closer number.  And there were nine
12  properties, not 19 properties.  And I'm looking at all
13  of the documentation for the nine properties is in
14  front of me, and there's nothing other related to
15  these cases that should be here's.
16      Q.  I'll direct your attention to Exhibit 319
17  and 320, which compose -- or comprise your expert
18  report for 10961 Unity Lane, also known as the Sparrow
19  property; is that right?
20      A.  Yes.
21      Q.  Again, as I mentioned before, I'm going
22  to walk through this report in detail and attempt to
23  draw out where this report is similar to the other
24  reports.  We may ask detailed questions where this
25  report is different from the other ones.  But, of

Page 96

1  course, if you'd like to refer to another report,
2  please let me know and we're happy to do that.  Is
3  that okay with you?
4      A.  Yes.
5      Q.  The report you issued in Exhibit 319 is
6  dated March 30, 2018; is that correct?
7      A.  Yes.
8      Q.  That's almost a year ago, right?
9      A.  Yes.
10      Q.  Were you aware of what the expert
11  disclosure deadlines were in the three cases?
12      A.  Through Mr. Nelson I was advised
13  continually if -- as far as deadlines and making sure
14  that I was compliant with the deadlines, so to my -- I
15  was informed by Mr. Nelson's office, yes.
16      Q.  What was your understanding of when your
17  expert deadline was?
18      A.  Well, there were several deadlines within
19  what we're looking at, but I don't recall the exact
20  deadline.  I also don't recall at any time being late
21  on a deadline or being advised that I was late.  So I
22  assumed that I complied with what I was supposed to
23  comply with.
24      Q.  And I apologize.  I know this is going to
25  be a little bit logistically difficult.  But if you



Page 97

1  have your five expert reports in front of you, I'm
2  going to ask you about the date of each report.
3      A.  Okay.
4      Q.  The earliest report appears to be Exhibit
5  319.  That is March 30, 2018, correct?
6      A.  Correct.
7      Q.  The other four reports were issued on
8  July 26, 2018, and then three were issued on July 29,
9  2018; is that right?
10     A.  That is correct.
11     Q.  Have you revised any of these reports
12  since then?
13     A.  I have not.
14     Q.  Have you performed any analysis on any of
15  these reports since then?
16     A.  No.
17     Q.  Directing your attention back to 319 and
18  320, in the first sentence you indicate per your
19  request for opinions regarding the market value,
20  rental value, and stigma damage to the
21  above-referenced property -- and I believe then it's,
22  I have made physical inspections to the property and
23  examined documents relating to the purchase and
24  condition of the property; is that correct?
25     A.  Yes.

Page 98

1      Q.  Is it accurate to say that in each report
2  you are offering three distinct opinions?
3      A.  Yes.
4      Q.  One of those opinions is for the market
5  value -- the appraised market value as of the date of
6  the appraisal?
7      A.  Yes.
8      Q.  A second opinion is for the rental value
9  of the entire property?
10     A.  As of that same date of value.
11     Q.  And the third opinion is for the stigma
12  damage for that property?
13     A.  As of that date of value, yes.
14     Q.  Are there any other opinions that you are
15  offering in any of the reports other than those three?
16     A.  Not -- not to my knowledge.
17     Q.  In each of the five reports, you offer an
18  appraised market value for each of the homes as of the
19  date of appraisal, correct?
20     A.  Yes.
21     Q.  It appears that in seven of the cases you
22  use a sales comparison approach to determine the --
23  excuse me.  I messed that up.  Excuse me.  In two of
24  the nine cases it appears that you used a sales
25  comparison approach to determine the appraised value;

Page 99

1  is that right?
2      A.  No.
3      Q.  No.  Did you use the same method
4  throughout, or did you use different methods for the
5  appraisals?
6      A.  Well, I'd have to review every appraisal,
7  but to my recollection each of the appraisals used the
8  sales comparison method.
9      Q.  Why don't we start there.  What are the
10  ways of doing an appraisal of a piece of property?
11     A.  There are three methods to determine the
12  value of a property, market value of a property.
13  There's the cost approach, and that's the depreciated
14  cost of the improvements plus the estimated land
15  value.  So that is the cost approach.
16         The market approach or sales comparison
17  approach is a direct comparison with other properties
18  as sold within the marketplace, and that's the most
19  common and easily identified by the public.  That is
20  done in most cases.
21         And the third is an income approach in
22  properties where the rental value of a property
23  actually drives the value.  Let's say, for instance,
24  we've got a subdivision and 50 percent of the homes
25  are rented and we'll track a correlation between the

Page 100

1  rental value and the sales price value.  So in either
2  all three, two or one approach may be appropriate
3  depending on the property.
4      Q.  So if you had to define what an appraisal
5  is, what is it?
6      A.  An appraisal is a process -- the
7  appraisal is an intellectual process that gather --
8  you gather identification -- or individual property
9  characteristics within the context of the definition
10  of value you're using and also in context with the
11  intended use and the intended user.  Within all of
12  that context, you -- you reach an opinion of whatever
13  type of value you're reaching.  So an appraisal, by
14  definition, has a component of value that would
15  include a point of value, a range of values, or a
16  direction of values from another point.
17         So if I said -- if I was trying to
18  determine if the properties -- the properties in this
19  area are all -- I believe are above 500,000.  That's
20  an appraisal.  If I said they're 500,000, that's an
21  appraisal.  If I said they are 5- to 600, that's an
22  appraisal.  So it can be -- it's stated as a point
23  or -- a point of value or direction of value or
24  relative to another value.
25     Q.  What's the purpose of doing an appraisal?



Page 101

1    A.  That changes with every assignment.  So
2 the purpose of the appraisal is -- can be many
3 different things, but that's one of the original
4 determinations, essential determinations, that you
5 make when you accept an assignment, what is the
6 purpose of the appraisal.  The other elements would be
7 the intended use and the intended user, the date of
8 value, and then the definition of value being used.
9 So all of those questions work in concert.
10    Q.  So in a residential context is at least
11 one of the points of an appraisal to determine what
12 the likely market value would be of a home?
13    A.  Well, that would be -- that's the goal in
14 all of them.  If you accept an appraisal assignment,
15 then you're going to estimate the value -- the range
16 of value or direction of value for that property.  So
17 that's -- that's the answer.  And not -- not trying to
18 be distinct, but there's a definition difference
19 between an appraisal and an appraisal report, and both
20 have different standards.
21       The Exhibit 320 is an appraisal report.
22 To reach that opinion and state that in a written form
23 or oral form, like I may do today, which would also be
24 an appraisal report, I've gathered all of the
25 information and all of that goes into that conclusion

Page 102

1 and it's reported on that report.  So everything up to
2 actually writing the report, the analysis portion is
3 the appraisal, and then the report is the written or
4 oral document that summarizes my conclusions.
5    Q.  So appraisal can include the process of
6 coming to determining value?
7    A.  Appraisal is a process, so that's exactly
8 what it does.
9    Q.  And then an appraisal report is, among
10 other things, giving you the result of that process?
11    A.  Exactly what it does.  It's the
12 conclusions, the summary, and sometimes the
13 description of the methodology.  But the -- the
14 recorded conclusions.
15    Q.  When you talk about value in an appraisal
16 report, what are you talking about?
17    A.  Well, value is not an appraisal term
18 that's ever used in a vacuum.  So there are different
19 types of value.  So what we've dealt with here is
20 market value, which has a definition within the
21 report.
22       As we discussed earlier, that includes
23 willing buyer, willing seller, exposure to the market
24 for a reasonable amount of time, cash or cash
25 equivalent, and an arm's length transaction between

Page 103

1 the parties.  That's the definition of market value.
2       But there are other types of value that
3 we can appraise and do appraise.  Liquidation value,
4 for instance.  VA takes a property back, and they say
5 what -- what can we sell a home for in 30 days.  So
6 that -- within that definition of value, we're not
7 necessarily talking about typically motivated buyers
8 and sellers.  It has its own definition of value.  You
9 could have a value in use.  So a restaurant might have
10 a value in use as a restaurant, but it would not
11 have -- the real estate value would not equal the
12 value in use.
13       So in every appraisal report, the
14 standard of value or the definition that you're
15 appraising to is a required element.  So in this case,
16 each one of these cases is market value as defined.
17    Q.  Does an appraisal value or an appraised
18 value have a predictive component to it?
19    A.  Yes.
20    Q.  And how does that work?
21    A.  Well, the goal -- the objective is to
22 offer an opinion as to what you think the most likely
23 sales price would be under the requisite definition of
24 market value.  Under those conditions.  So we're -- as
25 of this date if -- as of today, I'm predicting that

Page 104

1 this property would sell for this -- for this amount
2 to the typical buyer, or it would be, I would say, the
3 most likely sales price would be a better way to play
4 it -- state it.
5    Q.  We talked earlier about statistics not
6 being an exact science.
7    A.  Correct.
8    Q.  Is appraisal an exact science?
9    A.  No.  The methodologies are scientific,
10 but in the end it's an opinion.  It's an opinion of
11 value.  It is an opinion, and it is as reliable as the
12 person that issues it.
13    Q.  Is there any way to evaluate the
14 reliability of an appraisal number?
15    A.  There are techniques within the review
16 process that can give you an indication of whether a
17 value is being favored in one direction or another.
18 If -- for instance, and this is based on my
19 experience.  If I'm -- if I'm in a litigation case,
20 in a divorce case, and I'm reviewing an appraisal and
21 it's -- through my own research, it's obvious that the
22 appraiser is -- is moving the appraisal in a direction
23 up or down, not uncommon in a divorce case.  Because
24 the people have -- the people -- the client has a
25 favored direction.  That's not proper.  That's not

Page 105

1  what we're supposed to do.  Our opinions are
2  independent, but still you can see the influence.
3       So there are certain things within an
4  appraisal that I, as someone who performed thousands
5  and thousands of appraisals, can see a favored
6  direction, and also whether it's a well-reasoned
7  report.
8       **Q.  You mentioned that appraisals are**
9  **supposed to be independent?**
10      A.  Yes.
11      **Q.  What do you mean by that?**
12      A.  Well, it means my opinion of value is --
13  there's a certification within every appraisal, and so
14  I certify that my value is not influenced by the
15  outside -- by an outside party.  I didn't take a fee
16  that is contingent upon the outcome.  I wasn't
17  pressured.  I've -- you know, my -- my advocacy by
18  appraisal ethics is limited to advocating from my own
19  opinion.
20      So as I sit here, I'm not an advocate for
21  Mr. Nelson.  He may or may not like my opinion.  I'm
22  only an advocate for my own opinion.  So I can
23  ethically and should explain and defend my opinion,
24  but where that ends up, whether it favors your client
25  or his client, is of no interest to me.

Page 106

1       **Q.  Would it be proper to offer an appraisal**
2  **of your own property?**
3       MR. NELSON:  Object to form.
4       **Q.  (BY MR. SINK)  You can answer.**
5       A.  Okay.
6       MR. NELSON:  You're asking -- I'm sorry.
7  Let me just interrupt.  Are you asking if it would be
8  appropriate for him to offer an opinion as to his own
9  property or --
10      MR. SINK:  Yes.
11      MR. NELSON:  Okay.
12      A.  That would be one of the things that --
13  and I think we discussed earlier -- is we look at
14  everything within the context of intended use and
15  intended user.  So if I was to -- if I'm issuing an
16  opinion of my home value for myself and my wife in
17  order to put my house on the market, then there's
18  nothing wrong with that.  I don't have to not have
19  expertise where I have expertise.
20      But if I was to appraise for a different
21  purpose, if I was to try to get a loan on a property
22  and was to perform that appraisal for a mortgage
23  company, that absolutely would be improper and it
24  would be covered within my certification because one
25  of the certifications is that I can't get any direct

Page 107

1  benefit from the -- from the numbers, so . . .
2       **Q.  (BY MR. SINK)  So help me understand the**
3  **difference between those two scenarios.  Why is there**
4  **a direct benefit in the loan context but not in the**
5  **listing price context?**
6       A.  Well, because I'm representing -- I've
7  got an outside client, a loan company, that has a
8  different motivation than I have.  Their motivation,
9  their intended use, is to manage their risk.  So they
10  have a -- they're looking at a risk management
11  assessment.  I'm looking at trying to get the most I
12  can get for my property.  So we're looking at the
13  problem from two different directions.  So I need
14  to -- when I have a different intended user and a
15  different intended use, I can't -- you know, I -- I
16  can't advocate or appear to advocate, so it would be
17  improper for me to do an appraisal on my own property
18  or -- or my relatives' property or anybody related to
19  me.
20      **Q.  And if I'm misstating this, please**
21  **correct me.  But it sounds as if in the loan context**
22  **you represent a client in front of a third party?**
23      A.  Typically, yes.  And the client and
24  intended user are defined in every assignment.
25      **Q.  Is there any subjective element to an**

Page 108

1  appraisal process?
2       A.  Well, the opinions are all based on the
3  gathering of data objectively.  So by definition,
4  there's -- there is nothing subjective.  However,
5  within the reasoning process, you're going to come to
6  an opinion that might have a wider range of influences
7  that's -- that's going to bring you to the same
8  number.  So I'm going to issue an opinion, and it is
9  objective by definition, and I'm going to use a
10  recognized scientific method that has been established
11  in the appraisal industry and have been recognized and
12  used for many, many years, even before I started,
13  which was a long time ago.
14      So in that case, subjective is -- is not
15  a good word to use.  However, every report, the final
16  result is that appraiser's opinion.  So, you know,
17  your opinion is formed on the -- based on the way you
18  analyze the data, and everyone -- you know, you can,
19  and probably should have multiple opinions for the
20  same assignment.
21      **Q.  I guess the question is if -- if**
22  **appraisal is based on objective inputs --**
23      A.  Correct.
24      **Q.  -- and a scientific method --**
25      A.  Right.



Page 109

1     Q.  -- why would you be precluded from going
2  in front of a lender and providing an appraisal of
3  your own house?
4     A.  Because I could benefit.  I mean, I could
5  benefit by the loan amount.  So, I -- you know, I
6  could -- I would be in a position -- I'm hired as --
7  in a position of trust with that bank as an
8  independent third party, and that's why they hire
9  appraisers, so they don't have their staff people do
10  the report that are on a bonus schedule based on how
11  many loans they produce.  They want a third party
12  input.  And if I did my own house, it could be --
13  again, whether I individually could be objective, I
14  can be, actually.  But if it appears to be -- if the
15  appearance is not arm's length, then -- if it doesn't
16  appear to be right, then it's not right.
17     Q.  So it's possible in that context,
18  although you would not succumb to this, that the
19  interest, the self-interest could influence the
20  judgment of the appraisal report?
21     A.  Oh, well, human -- humans are influenced
22  by their own motivations.  We try everything that we
23  can to keep that out of it.
24     Q.  But it sounds like there is an
25  objective -- or objective inputs, correct?

Page 110

1     A.  Yes.
2     Q.  There is an established scientific basis?
3     A.  And methodology.
4     Q.  And methodology.  And there is some
5  unique judgment and opinion exercised by the
6  appraiser?
7     A.  Absolutely.  Well stated.
8     Q.  So if you get three appraisers for the
9  same home, you may get three different appraised
10  values?
11     A.  Likely.
12     Q.  And what would explain that difference,
13  in your experience?
14     A.  It's going to be the way they view --
15  view the market and view the input.  So an appraiser
16  may feel through their experience that a certain
17  element of the house is going to have more influence
18  over a buyer than I might feel.  So we, in that case,
19  would have a difference of opinion.  The range
20  should -- depending on the price of the home, the
21  range should be fairly close.
22     Q.  And what do you mean by fairly close?
23     A.  Well, and again, that depends on the type
24  of property.
25     Q.  Let's assume a residential property.

Page 111

1     A.  A residential property in an active,
2  homogeneous subdivision, I would doubt very seriously
3  that there would be a 2 to 3 percent difference.
4     Q.  Do you know whether appraisers or any
5  other industry association has undertaken to evaluate
6  the reliability of appraised values against actual
7  sales prices?
8     A.  Yes.
9     Q.  And do you have a sense of what the
10  results of those analyses are?
11     A.  Well, I mean, for years -- and this is in
12  residential appraisals -- Fannie Mae has been
13  gathering data from appraisals -- appraisers
14  nationally, and they've got a computer model, and they
15  feed all of that information into that computer model.
16  So there's -- in their mind, recognized areas of
17  deviation and standards or that they feel are
18  excessive above and below.  And if you submit a report
19  to a lender and it goes through their model, and
20  they've got an issue with one of your adjustments or
21  something within the model, you'll get a letter from
22  Fannie Mae asking you to explain it.  So big brother
23  is definitely in our industry.
24     Q.  Well, apart from the institutions, the
25  government institutions, do you undertake an

Page 112

1  evaluation over whether your appraisals have an error
2  rate against specific sold property values?
3     A.  I mean, do I look at my appraisal in a
4  case where I've got an appraisal and it has sold at
5  some recent point to see how close I was to the actual
6  sales price?  Sure.  If I have that information, I
7  sure look at it.
8     Q.  Do you compile it?
9     A.  No, I don't.
10     Q.  It is fair that -- to say that a house
11  could sell for less than an appraised price?
12     A.  Sure.
13     Q.  It's fair to say that a house can sell
14  for more than an appraised price?
15     A.  Exactly.  Because you've got -- what is
16  not covered in the -- in the definition of market
17  value is a motivation of the buyer and the seller.  So
18  it's assumed it's under typical market circumstances,
19  but if that seller, when you did that report you had
20  no knowledge of this, if that seller is about ready to
21  lose their home in foreclosure, they may react
22  differently.  Or if that buyer comes out from
23  California and his kids need to be in school on
24  September 1 and he absolutely needs a home and there's
25  one on the market, he's not typically motivated.  So

Page 113

1  the buyer and seller motivation are always part of
2  every transaction.
3       Q.   And that has to be judged at the time of
4  sale, presumably?
5       A.   Well, that -- that, at the time of sale,
6  what we have is an estimate of value.  That's what we
7  provide, an opinion of value.  When the home sold,
8  it's -- you have a price.  Price is a fact.  Opinion
9  of value is an opinion.  So, ultimately, whenever a
10 property sells, it establishes a fact.  That doesn't
11 say that you've taken that fact and haven't -- you
12 know, if you're trying to compare it to somebody else
13 or some other property, you -- you don't necessarily
14 know that motivation or what was involved or if other
15 goods and services were involved or financing
16 concessions were involved.  In the state of Colorado
17 we're a recording state.  It's where there's a
18 documentary fee.  So if a property sells for -- with a
19 recorded deed for 230,000, that's public record.  So
20 that becomes -- that's a fact.
21      Q.   So as part of an appraisal, you're
22 attempting to gauge what the likely price will be
23 under certain assumed conditions?
24      A.   Correct.
25      Q.   Does -- for lack of a better term, an

Page 114

1  appraisal report have a shelf life?  Is it --
2       A.   Absolutely.
3       Q.   And what is it?
4       A.   The day you do it, that's it, one day.
5  And not if there's a fire that afternoon.  So it's
6  good for the day you do it; the day I look at the
7  property.  Typically, unless I've got another
8  instruction, which I do from time to time, the date of
9  value for me is typically my date of inspection of the
10 interior/exterior inspection.  But if I'm doing an
11 estate appraisal and they say I need you to do it as
12 of the date of death, I can do a retrospective
13 appraisal, so my inspection and the date of value
14 could be different.  But typically that's only in a
15 special circumstance.
16      Q.   So when you do an appraisal, are you --
17 you're looking at, among other things, comparable
18 sales when you can?
19      A.   Yes.
20      Q.   So there's some reasonable lookback
21 period, presumably?
22      A.   Yes.
23      Q.   And what usually is that window?
24      A.   Well, that depends on the market.  So in
25 this particular case, in these files, you know, we're

Page 115

1  going to try to gather information within -- within
2  12 months.  And the more data you have in the
3  neighborhood, the shorter you like your time frame.
4  So if I -- if I can -- for the reports I'm doing in my
5  market now, my first look is always 180 days.  I look
6  at six months.  If I don't have enough data, I expand
7  that.  But I always try to work within six months, if
8  I can.  It's not always possible, but that's my
9  starting point.
10      Q.   Is it possible that over a 180-day window
11 that there are some general market trends that are
12 affecting prices?
13      A.   It's likely.
14      Q.   Do you account for the direction of that
15 trend as part of the appraisal?
16      A.   Yes.
17      Q.   How?
18      A.   Well, and it depends on, again, the
19 severity of the swing, but one of the things we do, as
20 I mentioned earlier, explained I'll do a market
21 analysis that shows, let's say for instance in a year
22 period the property went up 12 percent, the
23 neighborhood went up 12 percent.  Now, we're going to
24 delve into a specific neighborhood.  There's certain
25 things that are going to contribute to that, depending

Page 116

1  where you are.  But seasonal adjustments are common.
2  So let's say, for instance, the quarter around
3  Christmas, we may have slightly lower prices in a
4  neighborhood, and then starting in the spring they --
5  they increase.  So we can go back and will go back and
6  analyze over a five-year period if there's a -- if
7  there's a change -- a differential in seasons.  If
8  it's a general increase in the market or decrease in
9  the market, then -- and it's identifiable and
10 supportable with data, then we need to make an
11 adjustment.
12      So if I -- to make it simple, if I was to
13 use -- going to today's value, and I used a comparable
14 property that was six months old, I had proven a
15 12 percent annual inflation, increase, I would make a
16 1 percent a month increase adjustment.  So I would
17 adjust that -- I would say whatever that 200,000
18 property, I would make an adjustment of $12,000.  So
19 now in my adjustment grid I have a positive $12,000,
20 which the objection is, is at the end of the grid it
21 gives a prediction based on that comparable what that
22 property is going to sell for.  So time is something
23 we consider, yes.
24      Q.   So as you're picking up comparables
25 within, for example, the standard 180-day window, you

Page 117

1  may have to adjust the comparable price based on some
2  either seasonable or larger market trend?
3      A.  Right.  And, typically, not necessarily
4  larger, at least for me.  It needs to be specific,
5  because, you know, I can say, you know, I don't know
6  what the number was, but let's say, for instance,
7  Denver went up 10 percent last year.  I'm not going to
8  use 10 percent, regardless of the appraisal, because
9  everything is different.  Different price ranges have
10  different movements in price, different areas,
11  different influences.
12          So I'm going to have to have -- but for
13  me to make an adjustment for time -- and that's what
14  we call a time adjustment -- then I'm going to have to
15  have specific market information for that area.  So
16  what's fairly common, and what I'll do a lot of
17  times -- let's say, for instance, I've got properties
18  that have sold within -- I've got 180 days, and I've
19  got three properties that sold within the last two
20  months, and I got three properties that sold five or
21  six months ago, I'll say I'm only going to make
22  adjustments to those that were sold over three months
23  ago, because I don't have enough current information
24  to say that the more recent sales should be adjusted.
25  Because I won't know that until, you know, later.  So

Page 118

1  I just won't make an adjustment there.  However, I'll
2  consider the general trend in my reconciliation.
3          So as I'm looking at the -- let's say I'm
4  looking at the value of -- the indicated value of six
5  homes in my sales comparison, if the market is on a
6  generally or rapidly upswing market pressure, I'm
7  going to give more weight to the indicated value for
8  the more recent sales.  So that's how we . . . The
9  science and the logic work together.
10      Q.  You mentioned earlier that there were
11  three general ways of conducting an appraisal?
12      A.  Yes.
13      Q.  Would you list those for me again,
14  please.
15      A.  Cost approach, the market or sales
16  comparison approach and the income approach.
17      Q.  And when someone uses the phrase
18  comparative market analysis, is that different from
19  that second form?
20      A.  Well, a comparative market analysis is
21  what a broker -- a real estate broker's version of an
22  appraisal.  So a comparative market analysis would be
23  typically something prepared by a real estate broker
24  for their client that doesn't raise to the level of an
25  appraisal.

Page 119

1      Q.  In your experience and opinion, is a
2  comparative market analysis less reliable than an
3  appraisal?
4      A.  It depends on who does them.  I've seen
5  some awfully competent Realtors.
6      Q.  Do you perform comparative market
7  analyses?
8      A.  Yes.
9      Q.  When would you decide to do that?
10      A.  When I'm listing a property.  When I'm
11  working in the real estate field as a broker, I won't
12  do -- I can't do an appraisal, because I'm their
13  advocate.  So I can't be your advocate and your
14  appraiser.  But I will do a comparative market
15  analysis and give you an indication of what I think
16  you should put your house on the market for.  I'm
17  going to use the same exact techniques, but we're
18  under no illusion that I'm independent.  I work for
19  you.
20      Q.  So the comparative market analysis is
21  more of an advocacy related piece?
22      A.  Well, that -- that's the document or
23  broker's opinion of value.  So if -- and I don't want
24  to put words in your mouth, but if you're talking
25  about a sales comparison, that is -- that is done in

Page 120

1  most appraisals within the market approach.  So
2  that -- that's a part of the market approach.  A sales
3  comparative analysis is a term commonly used by
4  brokers.  Maybe I got way off on a tangent.
5      Q.  Well, I guess I'm trying to distinguish
6  between what a broker does and what an appraiser
7  does --
8      A.  Ah, okay.
9      Q.  -- when they provide these --
10      A.  Okay, yeah.
11      Q.  -- related pieces?
12      A.  Yeah.  As a broker -- again, as a broker,
13  if I'm acting as a broker, I'm going to have possibly
14  a different methodology than someone that didn't have
15  30 years of appraisal experience at the same time in
16  the appraisal of thousands of homes, where I'm dealing
17  with 15 homes a year as a broker.  You know, and
18  that's the level of their experience.  No classroom,
19  no nobody looking over their shoulder for 24 hours --
20  2400 hours checking their opinions of value.
21          So the typical broker doesn't have the
22  same level of education or -- as far as the technique.
23  However, the typical broker is belly to belly with the
24  buyer and seller.  So they have very strong
25  information and good information that gives them a



Page 121

1  good feel of value. So a lot of times the broker is
2  going to come to the same opinion that I come to; we
3  just get there a different way. So I don't
4  automatically discount a broker's opinion, because
5  there's some very good brokers, as I've said.
6      Q. But is it fair to say that a comparative
7  market analysis includes additional inputs beyond what
8  an appraisal includes?
9      A. Probably less.
10     Q. Fewer inputs?
11     A. Less input, less information.
12     Q. And are some of those inputs not publicly
13 reported? You indicated they get stronger
14 information, they're there face to face.
15     A. Like, for instance, as an appraiser, I
16 buy data that I have to pay for on an annual basis,
17 whereas as a broker I wouldn't have to buy that data.
18 So if I don't pay for it, I don't see it.
19     Q. Do you know what inputs go into a
20 comparative market analysis?
21     A. Well, again, it depends on the broker.
22 Because the one thing about the real estate community
23 is there's no uniform standard. So we have a uniform
24 standard of appraisal practice, so it's predictable as
25 to how an appraiser is going to complete the process.

Page 122

1  Within the broker, there's no -- there's no recognized
2  methodology, published methodology, that they're held
3  accountable to. So they are going to base their
4  experience -- base their opinion on their experience.
5  Some of them have vast experience; some of them less.
6  Same with appraisers, but at least the methodology is
7  consistent.
8      MR. SINK: We'll go off the record.
9      THE VIDEOGRAPHER: Going off the record.
10 The time is 12:29 p.m.
11     (Recess taken, 12:29 p.m. to 1:26 p.m.)
12     (Ms. Frenkel entered the deposition.)
13     THE VIDEOGRAPHER: We are back on the
14 record. The time is 1:26 p.m.
15     Q. (BY MR. SINK) Good afternoon.
16     A. Good afternoon.
17     Q. I'm going to direct your attention again
18 to the expert reports beginning at Exhibit 319. We're
19 generally talking about appraisals, particularly the
20 market value appraisal component of your expert
21 reports.
22     A. Okay.
23     Q. For each of the reports, who is
24 responsible for conducting the appraisal?
25     A. Well, the appraisal is the responsibility

Page 123

1  of anybody that signs it. So JoAnn and I jointly
2  conducted the appraisal.
3      Q. And what was her role in conducting the
4  appraisal?
5      A. She's a certified general appraiser as
6  well. And her -- I hired her primarily because she's
7  a Denver-based appraisal -- appraiser. And we -- you
8  know, the science of appraisal and the techniques are
9  the same across the board, but you want -- definitely
10 wanted to have geographic competency. So I hired a
11 co-appraiser, so two of us looked at each of these
12 cases where she's the local Denver expert, and so I
13 relied on her for geographic competency.
14     Q. What do you mean by geographic
15 competency?
16     A. Well, different market factors,
17 especially in residential properties, have an
18 influence on value. And I use an example in my
19 hometown in Colorado Springs. There's a road that
20 runs through Colorado Springs; Nevada Avenue becomes
21 Highway 115. On the west side of 115 is the Broadmoor
22 Hotel, Country Club of Colorado and so forth. On the
23 east side are some houses that were built at an
24 identical time, and they're in different school
25 districts. So one is in Harrison, and one is in

Page 124

1  Cheyenne School District. Same house, same square
2  footage, same builder, same lot size, there's $50,000
3  difference in value. It's simply because one is on
4  the other side of the street in the Cheyenne Mountain
5  School District than the other.
6      And so that's something that you can't
7  get from a statistical model. I mean, if you run
8  statistics in a one-mile area around, you've got, you
9  know, $50,000 differences. If you live in the market,
10 you know exactly what it is. There's a school
11 boundary line that goes down below, and one side
12 they're more valuable than the other. So you simply
13 don't select comparable properties from the other side
14 of the street because it's not truly comparable. So
15 that's an example of geographic competency.
16     If a Denver appraiser came down to
17 Colorado Springs, they may inadvertently select one
18 from across the street because it's very close
19 geographically, but it's not truly comparable because
20 of a market difference that they were unaware of. So
21 whenever I appraise outside of my primary area, I
22 always affiliate with the local appraiser so that that
23 doesn't happen to me.
24     Q. What is your primary area?
25     A. El Paso County.

Page 125

1    Q.  So geographic factors are the sorts of
2  things that you pick up over time while practicing in
3  an area?
4    A.  Exactly, yes.
5    Q.  What was your role in the appraisal
6  process?
7    A.  Well, on each of these properties, I was
8  there at the inspection, saw the house myself,
9  reviewed -- was there for the interview with the
10  owners, went and discussed with JoAnn about selection
11  of comparable properties.  I drove each of the
12  comparables and looked at them, and then she prepared
13  the document.  I reviewed the document, and we made
14  changes as we agreed upon, and then finalized the
15  document.  So we co-authored the document.  It's on
16  her form.  She generated the document prior to my
17  review.
18    Q.  Before we were discussing three different
19  methods of conducting an appraisal.  Do you prefer one
20  method over another?
21    A.  The appraisal problem is going to dictate
22  what you use.  So if -- we use what's ever relevant.
23  So, for instance, in most residential properties, the
24  income approach is not relevant just because people
25  don't buy and sell based on the rental income.  They

Page 126

1  want to live there.
2        In income property, when I'm doing a
3  small shopping center or office building, the income
4  approach is the primary indicator of value, because
5  people do buy commercial property for their income
6  stream.  So whatever -- and residential, if I'm doing
7  a 50-year-old house, I typically am not going to do
8  the cost approach, unless it's a very unique house,
9  because depreciation is hard to estimate in a
10  50-year-old house.  They've been updated four or five
11  times.  So what is the effective age of that house.
12  That becomes the question.  So in that case, the cost
13  approach is not relevant, because the buyer is not
14  looking at that saying what could I replace that house
15  for.
16        In a newer home like these, in several of
17  these, the cost approach is relevant, because there's
18  other builders in the area that are selling
19  properties, similar properties, these are newer
20  properties.  So depreciation is much more
21  quantifiable.  There's limited depreciation.  So in
22  newer properties the cost approach is often used as a
23  supplement to the market approach.
24    Q.  If you had sufficient information and you
25  conducted an appraisal based on each of the three

Page 127

1  methods for the same property, should they arrive at
2  approximately the same value?
3    A.  They should correlate.  If done
4  correctly, they're going to correlate.
5    Q.  And what do you mean by correlate?
6    A.  Well, I mean, if I came out to a
7  property -- if I was using three approaches and all
8  three were -- were valid, and I had a cost approach
9  that came out at 700,000 and a market and income
10  approach that came out at 600,000, I would know that I
11  had made a mistake.  I mean, I've -- I've got to
12  figure out what I did wrong, because that's not close
13  enough.  If it came out -- if they came out at
14  610,000, I go, okay, that makes sense.
15    Q.  What would be close enough?
16    A.  It's property by property.  So if it --
17  if it doesn't appear to be within the same -- you
18  know, if it's a $70,000 property, 50,000 is certainly
19  not close.  But if it's a $700,000 property, 680 is
20  close, so it's -- it's relative to the property.
21    Q.  Is there a percentage range you could --
22    A.  No, no.  It's -- we do, and you ask if
23  you'd do that on the same property.  That's -- you
24  typically do multiple approaches if you can, if
25  they're relevant, because one checks the other.  If

Page 128

1  you're coming out at some way bigger or smaller number
2  on one of your approaches, the first thing I tell the
3  appraisers that I train is find out what your mistake
4  is, because there's nothing wrong with the
5  methodology, so you're not applying it correctly.
6    Q.  So a wide range between two approaches
7  would indicate that at least one of their approaches
8  has not been done appropriately?
9    A.  Yes.  You've missed something, so further
10  review.
11    Q.  You mentioned a moment ago that your
12  preference was to conduct a cost approach when it came
13  to new builds?
14    A.  Well, in new build homes, typically if
15  you have the information, you can do -- you do a cost
16  approach or I do a cost approach typically, and that's
17  not every case.  But if it's in an area that there's
18  no competition, then it doesn't matter what the cost
19  approach says, because sometimes in unique houses --
20  people will build their dream house, nobody else is
21  going to build that dream house, so its cost is not
22  relative to the market.  So I -- you know, I rarely
23  use the word always or whatever.  There's -- there's
24  circumstances I can think of that that might not be
25  appropriate.  If you have something specific you'd



Page 129

1  like to ask, then I'm happy to answer it.
2          (Deposition Exhibit 333 was marked.)
3      Q.  Happy to do so.  I'd like to direct your
4  attention to Exhibit 333.
5      A.  Okay.
6      Q.  That appears to be an e-mail chain, from
7  what I'm judging is your e-mail address.  Is that your
8  e-mail address?
9      A.  Yes.  That's between JoAnn and I.
10     Q.  And that's Joann's e-mail address?
11     A.  Yes.
12     Q.  And if you look towards the bottom of
13 254, it appears that in July of 2018, you indicate, "I
14 typically like a cost approach on a new or near new
15 home due to builder competition; however, if you can't
16 develop land value, you can't."
17     A.  Correct.
18     Q.  So why do you prefer in this situation a
19 cost approach?
20     A.  As I explained earlier, if the home is
21 new and it's in a competitive neighborhood, I always
22 like to look at a cost approach, if I can.  And --
23 because buyers in their -- in their selection process
24 are comparing different builders.  So the builder's
25 cost -- their pricing is related to their cost, so

Page 130

1  therefore, if I can do a cost approach, it gives me
2  another indication of value.  But as I mentioned
3  earlier, the formula for the cost approach is the
4  depreciated value of the improvements plus the
5  estimated land value.
6          So if you can't get to the land value
7  because you don't have properties that you can
8  establish a reliable land value, then you can't do a
9  cost approach.  It becomes -- it becomes a not
10 reliable number.
11         So in this particular case, JoAnn gave me
12 the initial submission without a cost approach.  I'm
13 going, I want a cost approach if we can do it.  And
14 she said there's no land sales.  I can't find any land
15 sales.  Well, then there's the answer.  I mean, I'm
16 not going to -- you don't force it.  If it's there and
17 it's reliable, a reliable indication of value, I want
18 to use it, but if for whatever reason I can't use it,
19 I can't use it.
20     Q.  In one circumstances -- you've talked
21 before -- let me rephrase -- you've talked before
22 about how certain approaches are better suited for
23 particular situations.
24     A.  Correct.
25     Q.  So when you're looking at, in this case,

Page 131

1  residential homes that have been newly built, you
2  prefer to do a cost approach?
3      A.  Well, the primary is typically the sales
4  comparison approach.  That's going to be the primary.
5      Q.  Then why do the cost approach?
6      A.  Because I want to check myself.  I want
7  to get the answer through a totally separate valuation
8  to make sure I didn't fly off on a tangent in the
9  market approach.
10     Q.  And those two results should be close?
11     A.  They're going to give you an indication,
12 right.  So, you know, if it's wildly different, if,
13 for instance, I'm coming up with independent costs,
14 I've got good land sales and I've got third-party cost
15 data, and it's telling me this property with a
16 reasonable profit should be selling for 500,000, then
17 why is everything selling for 600,000.  What's wrong?
18     Q.  Do you have a higher degree of confidence
19 when you're able to run both?
20     A.  As -- you know, the more -- the more data
21 I have, the more availability and applicability of the
22 approaches, the better I like it.  If I can look at a
23 problem two different directions or three different
24 directions, that's ideal.  It's not always
25 possible, but it's ideal.

Page 132

1      Q.  So I'm going to direct your attention to
2  Exhibit 319.  And on page 3 of that written report, in
3  the Market Value section, the last sentence says, "We
4  concluded that the current market value via the sales
5  comparison approach was $450,000, as of the date of
6  value."
7      A.  Correct.
8      Q.  Do you know whether you ran a cost
9  valuation in this case?
10     A.  I'm guessing I didn't, or I probably
11 would have said also the cost approach, but I can
12 verify.  There's not a cost approach.  The cost
13 approach in the Exhibit 320 would appear on page 4.
14 And we did not do it.
15     Q.  So I'm going to direct your attention to
16 Exhibit 331 and 332.  And this is the expert report
17 for the Gilchrist case.
18     A.  Okay.
19     Q.  And, again, directing your attention to
20 page 3 of that report in the Market Value section.  It
21 also appears there that you relied on the sales
22 comparison approach; is that correct?
23     A.  Let me verify.  That is correct.
24     Q.  And you did not run a cost valuation?
25     A.  I did not do a cost approach.

Robert Myers  03/26/2019
JAMI BORGMANN, ET AL. v. WEYERHAEUSER

Pages 133..136

Page 133

1    Q.  Now, I'm going to direct your attention
2  to Exhibit 321 and following.  This is the large
3  report.  This is Exhibits 321 through Exhibit 326.
4    A.  Okay.
5    Q.  And directing your attention to page 6,
6  there's a market value chart for five of the homes.
7    A.  Okay.
8    Q.  And in some cases it says it was reached
9  by the use of the sales comparison approach, and in
10 some cases the cost approach to value.
11   A.  Correct.
12   Q.  Did you run both a sales comparison
13 approach and a cost approach for all five of these
14 houses?
15   A.  I would assume not because of my saying
16 the word "some."  But I on 4632 Colorado River, there
17 is a cost approach and a market approach.  That's
18 Exhibit 322.  On Exhibit 323, there is a cost approach
19 and a market approach.  324, there's a cost approach
20 and market approach.  325, there is a cost approach
21 and market approach.  On all of them, I did a cost
22 approach and market approach.
23   Q.  So when you say "in some cases" --
24   A.  I should have said in all cases.
25   Q.  In --

Page 134

1    A.  In this particular report.
2    Q.  In the report found at Exhibit 321, did
3  you prefer one approach over the other when you
4  determined market value?
5    A.  Typically -- I mean, there's going to be
6  language in each of the reports, but I don't recall at
7  any time where the cost approach was the strongest
8  indicator of value.  The sales comparison approach
9  mirrors the buyer's reaction of the buyer's market.
10 So a typical buyer does a sales comparison approach.
11 They just don't know that they're doing it.  They look
12 at five houses.  They mentally compare features, and
13 they make an offer on one of the houses, so they've
14 done what we do, they just don't put numbers by it.
15      So since it mirrors the typical buyer's
16 actions, then I typically give that the most weight.
17 However, in lack -- with lack of market data -- in
18 these cases there was no lack of market sales data for
19 these homes.  But I've had cases where I've got a
20 unique property; there's nothing to compare it with.
21 It's a unique property.
22      So I'm going to determine marketability
23 and say, well, would somebody build up here.  Yeah,
24 it's a beautiful view, it's a really nice place.
25 Someone may come in and build another house.  In that

Page 135

1  case, the cost approach is more reliable than the
2  market approach.  So -- but in none of these cases
3  that I recall, without reading every line of every
4  report, it's not my recollection that the cost
5  approach was the favorite approach in any of these.
6    Q.  So in those instances, which I believe
7  are the Sparrow report that's Exhibit 319 and the
8  Gilchrist report that's Exhibit 331 where you did not
9  run a cost valuation as well, do you recall why you
10 didn't?
11   A.  Yeah.  I think your -- your e-mail helped
12 me recall it was because there was no land comps.  So
13 that was our conversation back and forth between the
14 two of us.  So if you can't get to the land value, you
15 can't do a cost approach.
16   Q.  And why couldn't you get to the land
17 value in those two cases?
18   A.  There was no supportable sales out there
19 for raw land that we could compare to.  So, you know,
20 if that's not available, you know, you're not -- you
21 can't do a cost approach.  So some of these cases --
22 and it happens in, I want to say, rural areas because
23 these properties aren't actually rural, but they're
24 away from Denver, you know, there -- there may not be
25 a subdivision right next door that have had lot sales.

Page 136

1  It happens really often in an urban area.  So we
2  may -- I may have a new house in an urban area.
3  There's no way I can do a cost approach because the
4  last land sale I can verify was 50 years ago.
5    Q.  And where do you go to look up the land
6  sales value?
7    A.  We -- the multi-list service has land
8  sales that we use for -- through the Realtors.  And we
9  also do our own search of properties within -- through
10 the assessors' records.  So we're looking throughout
11 that neighborhood for any -- any sales and transfers
12 that are valid transfers that we can use for sales
13 comparables.  But one of the reasons that we rely on
14 the multi-list service, not to say that we won't use
15 other sales, but we know that one of the components
16 of -- of market value was completed.  It was offered
17 to the market.  It was -- it was put out to the
18 general market, so it was exposed to the market for a
19 reasonable exposure time, where if you put them out of
20 the county records, you don't know that maybe it was
21 never on the market or there was some sort of
22 transaction if you can't verify it.
23   Q.  Directing your attention to Exhibit 319.
24 In this report, as within all of your reports, you
25 list out some of the background information you



Page 137

1  considered or reviewed in the preparation of your
2  opinion?
3      A.  Yes.
4      Q.  The first bulleted item on that list is
5  "Multiple conversations with Mark W. Nelson regarding
6  the property and the formaldehyde damage that was
7  discovered in the home."  Do you see that?
8      A.  Yes.
9      Q.  Do recall how many conversations you had
10  with Mr. Nelson regarding the property and the
11  formaldehyde damage?
12      A.  Not precisely.
13      Q.  Do you recall roughly how many?
14      A.  Prior to being engaged, maybe five or
15  six.
16      Q.  Do you recall any information that was
17  conveyed to you about the formaldehyde damage by those
18  conversations?
19          MR. NELSON:  I'm going to object to the
20  extent it calls for work product.  I'm not going to
21  prevent you from asking him questions about
22  communication between my office and him, but I am
23  going to instruct him not to answer to the extent that
24  the communication was substantive in nature and it was
25  not something that you relied upon as a basis for any

Page 138

1  of your opinions.
2          THE DEPONENT:  Okay.
3      Q.  (BY MR. SINK)  So as I understand your
4  report in 319 and following, you're providing a list
5  of materials that you considered in preparing your
6  opinions; is that correct?
7      A.  Yes.  Partial list, yes.
8      Q.  So I am only asking for the information
9  that you considered in preparing these reports.
10      A.  Okay.
11      Q.  Among the things listed on this report
12  and other ones are conversations with Mr. Nelson
13  about, among other things, formaldehyde damage,
14  correct?
15      A.  Correct.
16      Q.  What information about formaldehyde
17  damage was conveyed to you that you considered and
18  relied upon in the preparation of this report?
19      A.  Well, the first thing that I --
20          MR. NELSON:  I'll just interpose the same
21  objection.
22          Again, you can answer the question with
23  that caveat.
24          THE DEPONENT:  Okay.
25      A.  Well, the first thing that we -- he spoke

Page 139

1  to me about is just the general concept of the -- of
2  the -- of the case and that there had been truss
3  systems manufactured at Weyerhaeuser that were
4  delivered into a number of different markets.  He
5  represented clients that had those floor systems and
6  that those people I think at that point in time when
7  we talked, maybe -- yeah, at least this person and the
8  first one in March had been displaced from their home,
9  moved out, and that repairs were underway at that
10  point in time.  So, in general, he talked about the
11  overall problem.  And then we -- we talked in concept,
12  whether I felt that there was a possibility that that
13  could have market damage or damage to the property
14  over and above the damage to repair.
15      Q.  (BY MR. SINK)  Were you given any
16  information that you considered or relied upon about
17  possible health risks associated with formaldehyde?
18      A.  I read the complaint.  So it was
19  forwarded to me during one of those conversations, so
20  it talked about health issues.
21      Q.  Any other information that was provided
22  to you for consideration?
23      A.  I didn't receive any medical records or
24  anything specific to any of the individuals regarding
25  an individual's particular health issue.  I -- you

Page 140

1  know, in general the -- it was my -- through my own
2  research, formaldehyde is considered cancer causing,
3  so that was -- that's a level of contamination or
4  exposure that's, you know, understood with exposure to
5  formaldehyde, so -- but I didn't get any information
6  from Mr. Nelson's office saying this person had this,
7  this person had that.  I didn't receive any of that.
8      Q.  I didn't ask you when we went through the
9  background questions, but I suppose I should ask now.
10  As part of your education, formal or informal, do you
11  have any background in chemistry?
12      A.  No.
13      Q.  Do you have any background in biology?
14      A.  No.
15      Q.  Do you have any background in medicine?
16      A.  No.
17      Q.  Do you have any background in
18  engineering?
19      A.  No.
20      Q.  You mentioned that you did some
21  additional reading about formaldehyde.
22      A.  Sure.
23      Q.  Do you recall what that reading was?
24      A.  Just in general.  I mean, I was -- the
25  word formaldehyde was used, and I had been exposed to

Robert Myers   03/26/2019
JAMI BORGMANN, ET AL. v. WEYERHAEUSER

Pages 141..144

Page 141

1  other cases that weren't real estate before when I was
2  in the -- in the 1980s in the manufactured housing
3  industry.  Big problem in the manufactured housing
4  industry, and at that point in time, we were selling
5  homes that emitted great quantities of formaldehyde,
6  and they were recalled and products were recalled and
7  building standards were changed and people were dying.
8  There was a bunch of issues.  This was back in the
9  '80s, so I was generally familiar with the effects,
10  the possible effects of formaldehyde.
11      Q.  Did you place any of the materials you
12  reviewed regarding formaldehyde damage in your expert
13  file?
14      A.  I may or may not have.  Probably not.
15      Q.  Do you know, based on the reading that
16  you did, whether formaldehyde has a perceived safe
17  exposure level?
18      A.  I don't have specific knowledge of that.
19      Q.  Do you know whether these houses would
20  have been above or below any acceptable level?
21      A.  I know what the owners told me, that they
22  were above before they moved out, and they were below
23  when they moved back in.
24      Q.  Did you --
25      A.  But that's -- you know, that knowledge

Page 142

1  came from the owners of the home.  So -- and like I
2  said, I got some specific reports back.  But as I've
3  stated, I'm not an engineer or a biologist.
4      Q.  So you didn't independently evaluate
5  those?
6      A.  No, no.
7      Q.  On the third bullet point in 319 and
8  again in the other reports, it lists a "Review of
9  miscellaneous publications, news articles, memos and
10  correspondence relating to the description of the
11  Weyerhaeuser TJI floor system with Flak Jacket
12  Protection installed."
13      A.  Uh-huh.
14      Q.  Did you provide copies of those materials
15  in your work file?
16      A.  Some of them I did.  I saw some of those
17  articles today.
18      Q.  Do you recall any ones that you did not?
19      A.  No, I don't recall anything I didn't do a
20  year ago.
21      Q.  No.  I mean, do you recall any ones that
22  you didn't put in the work file?
23      A.  Not that I recall.  But I -- but there
24  may have been.  I Googled it.  I read everything that
25  I could get my hands on.  I printed things that -- I

Page 143

1  printed some of the things that -- from Weyerhaeuser
2  itself.  I put it in the work file so I could
3  reference it later.  But I wasn't -- I didn't only
4  read what Weyerhaeuser put out.  There was blog
5  information and people talking about it and this and
6  that on the Internet, so I just read what I -- read
7  what was out there.
8      Q.  Do you recall, whether it's in your work
9  file or not, any particular publications, news
10  articles, memos or correspondence that you relied upon
11  in forming your opinion?
12      A.  Other than the acknowledgement by
13  Weyerhaeuser that there was a problem, no.
14      Q.  How did this information influence your
15  determination of market value, rental value, or stigma
16  damage?
17      A.  Well, market value and rental value, it
18  had no influence, because they were both done.  Both
19  of those values were reached under the hypothetical
20  condition that there was no damage to the property.
21  So on those two values, they were as if there was no
22  damage to the property.
23      So as far as stigma damage, very much
24  influenced my opinion of stigma damage.  Because the
25  article where -- that I read where Weyerhaeuser said,

Page 144

1  A, we have a problem, we did this, we quit
2  manufacturing these.  There are, I believe, 3,000 or
3  5,000 homes affected, and they're addressing the
4  homeowners, and people are being moved out of their
5  house and they're correcting the problem.  Well, that
6  influenced my opinion as stigma, because I know that
7  those homes, where those people live, that has to be
8  disclosed if they sell their property.  So that
9  disclosure is an issue for market -- for market
10  stigma.
11      Q.  Can you recall, as you sit here today,
12  any other specific documents or materials that you
13  relied upon in forming your stigma opinion?
14      A.  Well, you know, I also looked at -- I
15  looked at the Denver Post and the news, and, you know,
16  the incident was covered.  There was a lot of coverage
17  around it.  There were TV cameras up in the
18  subdivision taking pictures of houses and taking
19  pictures of people walking in and out of the model
20  homes.  So there was -- there was a great deal of
21  media coverage when these and other people were being
22  moved out of their homes, and it was being addressed.
23  So in and around the time that I was doing the
24  appraisals, there were news accounts of issues related
25  to the formaldehyde.  So it was pubic knowledge.



Page 145

1    Q.  And how did that influence your
2  determination of stigma?
3    A.  Well, the public knowledge is a big
4  influence, because that -- you know, it's informing
5  the public that there's a problem.
6       So in addition to the owners having
7  disclosed -- having to disclose that there was an
8  issue, people independently looking for homes are
9  seeing it on the news.  So they're saying, hey, I
10  mean, natural reaction, we've got this subdivision
11  over here, and they've got a big problem with their
12  floor systems, do we want to go buy a new home there.
13  It's, obviously, at least in my opinion, obvious to me
14  that that's going to affect the market reaction to
15  that subdivision or -- and/or that individual home
16  once it's disclosed.
17    Q.  Does the general press coverage help
18  determine the amount of stigma or the fact of stigma?
19    A.  Well, the fact that there's going to be a
20  market reaction or would be at least at that point in
21  time a stigma.  So without -- in a vacuum with no
22  disclosure, no publicity, and -- and nothing --
23  nothing that a buyer would perceive as negative, there
24  would be no stigma.
25    Q.  But can you determine from the press

Page 146

1  coverage itself what the amount of stigma would be?
2    A.  No.  Not that -- the fact that there was
3  press coverage and the fact that, in essence,
4  Weyerhaeuser admitted that there was a problem, and
5  the fact that when these people sell their houses they
6  have to disclose that, that led me to my opinion that
7  there was stigma.
8       So measuring that stigma was a different
9  step.  And actually, in our original conversations,
10  going back to your first question, my first
11  determination was to see if I felt there was stigma at
12  all, because if I didn't feel that there was, then
13  our -- we would have stopped our relationship right
14  there.  I mean, there's -- wouldn't have accepted the
15  assignment.
16    Q.  I just want to follow up on a couple of
17  things you said.  So one of the things I believe you
18  said was based on the press coverage you determined at
19  that time there would be stigma?
20    A.  That plus the Weyerhaeuser admission and
21  that, you know, basically you've got certain homes
22  that are being identified in -- in the public as
23  having a problem.
24    Q.  So that's how you make the determination
25  of whether there's stigma?

Page 147

1    A.  Yes.
2    Q.  When you say at that time it establishes
3  that there would be stigma, is there a time window for
4  stigma?
5    A.  As -- I can't answer a general question.
6  I mean, that's a very general question.  I mean -- and
7  in this particular case, because formaldehyde and real
8  property, as opposed to mobile homes, had not been
9  really out there, as far as any published studies,
10  that I found.  There's nothing to measure whether --
11  how long the stigma would last if stigma lasts, if it
12  stays forever.
13       I can only go by common sense, and common
14  sense to me says if it's something that can affect
15  your health, it's going to hang on for a while.  If
16  it's some other thing, you know, your property had
17  water damage 18 years ago and they corrected it, well,
18  that's different than a disclosure that says, hey,
19  just letting you know, your kids could be in danger.
20  That's -- so -- but a direct answer to your question
21  is I don't know.  I don't know -- there is no
22  longevity, and certainly nothing that I found with
23  formaldehyde that's going to give me the answer to
24  that question.
25    Q.  We'll drill down to it when we get there.

Page 148

1  But as we go through the report, there's several
2  analogies that you draw to other cases you've
3  testified in or other events where you've found
4  there's stigma --
5    A.  Right.
6    Q.  -- damage, correct?
7    A.  Correct.
8    Q.  And at least some of those cases the
9  stigma value diminished over time; is that right?
10    A.  Yes.
11    Q.  And how did you learn that to have been
12  the case?
13    A.  Well, in -- in those -- in those
14  particular issues, and I believe -- and I think I
15  talked about -- let's see.  I believe I talked about
16  asbestos being one -- or let me see here.  Okay.  And
17  the paragraphs you're talking about are on page 4 of
18  319, and probably page 4 of the other reports as well,
19  where we talk about -- or I talk about stigma
20  introducing the concept as a market fear, and then
21  comparing it to other market conditions, market fears,
22  mold is a condition, similar because it's a -- there's
23  a fear of health.  And for the most part being exposed
24  is unknown.  And the reaction has been to the market,
25  where almost every real estate agent executes a mold



Robert Myers   03/26/2019
JAMI BORGMANN, ET AL. v. WEYERHAEUSER
Pages 149..152

Page 149

1  disclosure during their -- the sale, whether seller
2  knows of any mold or not mold.  So the public is very
3  aware of that.  So if there is -- is identified mold
4  in a property, that certainly immediately can -- can
5  have some stigma.
6      **Q.  Well, I think -- I think going through**
7  **page 4 line by line is fair.  So let's pause that now**
8  **and we'll go back to the beginning and then we'll work**
9  **our way there.**
10     A.  Okay.
11     **Q.  In the same introductory materials, again**
12  **in that bullet point, the third bullet point, with the**
13  **sentence that begins, "The information reviewed**
14  **includes a description of possible health risks**
15  **related to the emission."**
16     **You mentioned before you read the**
17  **complaint and that you had a general conversation with**
18  **Mr. Nelson about the formaldehyde issues in the case.**
19  **What information, if any, did you rely on regarding to**
20  **possible health risks related to the emission of**
21  **formaldehyde?**
22     A.  I think that was probably more based on
23  my experience in the '80s when formaldehyde was such a
24  big issue in the manufactured housing industry and
25  things were being recalled, people were dying in

Page 150

1  mobile homes, and it was a big issue.  And those
2  issues -- I mean, there's been big litigation cases on
3  those.  But they're not real property, they're
4  personal property.
5      **Q.  Why does that matter?**
6      A.  Well, it doesn't matter -- well, it
7  matters in that personal property is going to increase
8  or decrease -- well, personal property always
9  decreases in value, unless there's a scarcity involved
10  like a rare car or something like that where typically
11  over history real property appreciates.  So land
12  appreciates in value, your car depreciates in value.
13  So a mobile home is more like a car.  So I say trying
14  to do an analogy of this home and in those cases where
15  there was formaldehyde in those homes, the were total
16  losses.  So you had a house that you paid $10,000 for,
17  a junk dealer would give you a thousand dollars or
18  $500 for the mobile home.  Almost a hundred percent
19  loss.  That's not an analogy for this case, because no
20  way does that happen in real estate.  These homes, in
21  my opinion, will -- will have stigma damage, but it
22  doesn't come anywhere close percentage-wise to what
23  happens in a manufactured home or -- or any kind of
24  personal property.
25     So the fact -- the only thing I took out

Page 151

1  of the mobile home cases that I was aware of and did
2  any research on was that there was a big effect on the
3  sales prices and value of that property, but I
4  couldn't do any direct correlation between that and
5  real estate.
6      **Q.  So is it fair to say that you took from**
7  **that mobile home experience that there would be an**
8  **impact, but you couldn't determine the amount of the**
9  **impact?**
10     A.  Well, there was an impact, up to a
11  hundred percent loss.  But I'm not taking that hundred
12  percent and saying, well, it's a hundred percent in a
13  mobile home, therefore, it's a hundred percent in a
14  house.  That's -- it doesn't -- in my mind, it doesn't
15  track that way.  So that percentage, the loss is
16  consistent, the stigma is consistent, but not the
17  measurement of the stigma.
18     **Q.  On page 2 of Exhibit 319, and I believe**
19  **this is consistent with the other reports, but you can**
20  **correct me if you believe I'm in error, you provide a**
21  **value for the property as of the date of the**
22  **inspection, and in this case it's February 22, 2018;**
23  **is that correct?**
24     A.  Okay.
25     **Q.  Why did you pick that date?**

Page 152

1      A.  That's the date of my -- my last
2  inspection.  So typically the date -- that's the date
3  I can verify that the house is as it is at that
4  particular time.  So as we've -- a radical example of
5  things that can happen that other appraisers don't
6  think about is I did a house in Mountain Shadows
7  subdivision in Colorado Springs in July of 2015, I
8  believe, and I went to -- you know, I went to a golf
9  tournament and came back, and that house had burned
10  down the next day.  Well, obviously, the value is not
11  the same after it burned down than it was before.
12     So the language in our reports always
13  says, I'm going to give you the date of value, and
14  that's a date that I can verify, personally verify,
15  that that house was there and in the condition it was
16  in when I inspected it.  So after that, they could
17  finish a basement -- they could -- the house could
18  burn down, they could make it better, they could do
19  any number of things to the home.  So for me to give
20  you a new value, I need to go look at the house,
21  again, and verify what condition it's in.
22     **Q.  And in this particular case it's been**
23  **over a year since the last appraisal?**
24     A.  That would be correct.
25     **Q.  And how comfortable would you be at this**



Page 153

1 point in time relying on the appraised value from
2 February 22, 2018, as --
3     A.  A hundred percent comfortable.
4     Q.  As the current appraised value?
5     A.  No.  As the date -- as of February 2018.
6 I've not been asked to do a new appraisal on any of
7 these properties, so I could not speculate as to what
8 their current values would be.  Certainly market
9 conditions have changed.
10     Q.  Beginning at the bottom of page 2 in
11 Exhibit 319, there's a section called Summary of
12 Events.
13     A.  Okay.
14     Q.  Do you see that?
15     A.  Yes.
16     Q.  Some elements of the Summary of Events
17 are the same across reports, it seems to be.  Is that
18 fair?
19     A.  Yes.
20     Q.  And some of the Summary of Events are
21 different as they're tailored to the particular home
22 buyer; is that correct?
23     A.  Yes.
24     Q.  Where did you get the information to
25 support or describe the events listed in the summary

Page 154

1 of events?
2     A.  I believe it's in the complaint.
3     Q.  Any other places that you can think of?
4     A.  Other than my interviews with the people,
5 so -- and that was prior -- all of my interviews and
6 discussions with the people themselves were prior to
7 issuing any of the reports, so there were a number of
8 various stories from the -- from the owners of the
9 homes.
10     Q.  So is it fair to say that this reflects
11 your summary of the allegations of the complaint and
12 your interviews with the home buyers?
13     A.  That would be fair.
14     Q.  Did you conduct any kind of independent
15 assessment of the events described in the summary of
16 events?
17     A.  No.
18     Q.  At page 3 is a description of the methods
19 of remediating the joists; is that correct?
20     A.  Yes.
21     Q.  Where did you get this understanding of
22 the remediation methods?
23     A.  I believe I got the general -- or the
24 information from Mr. Nelson's office.
25     Q.  Was this in written form or orally

Page 155

1 communicated?
2     A.  I don't recall.  I really don't.
3     Q.  Do you have an opinion on the
4 effectiveness of any of these three forms of
5 remediation?
6     A.  I have an opinion as to the market
7 perception of the three.
8     Q.  And what is that opinion?
9     A.  Well, in general, the least amount of
10 market resistance is reflected in my responses when
11 the floor joists were replaced.  The next level of
12 resistance, higher resistance, was where they
13 encapsulated cryoblasted -- or cryoblasted the -- the
14 formaldehyde often -- mechanical removal.  And then
15 the encapsulation or painting over the joists had the
16 greatest market resistance in -- in my interviews and
17 survey.
18     Q.  And you've anticipated my next question.
19 How did you derive your view of market responses to
20 those three forms of the mediation?
21     A.  Well, a number of different ways, but one
22 was by direct interview with other appraisers that --
23 just talking in concept about the problem, nothing
24 specific about any of these cases, but in concept.
25 And then I did a survey with a -- 21-question, I

Page 156

1 believe, survey.  I think that's right.  Somewhere in
2 that neighborhood.  And I used a service called Front
3 Range 360 to distribute the survey using the vehicle
4 of Survey Monkey, and I got a hundred responses back,
5 and we sent the -- the survey out to the brokers in
6 the Denver metro area.  So I got a, what I consider, a
7 very reasonable number of responses back.  And the
8 questions, as I'm sure we'll go through individually,
9 but they started with how much experience do you have,
10 do you work this market area, have you heard of this
11 problem before, and then down to, how -- you know,
12 what would you do as a listing agent or would you
13 disclose it, what kind of impact do you think it might
14 make on an offer that you're advising a client to
15 make.  So that's -- I gathered information from that,
16 plus independent comments that I got back on the
17 survey where people, you know, wrote over and above in
18 the comments.
19         And from that, I weighed that information
20 to reach an opinion of value with my general knowledge
21 of the market.  And reached an opinion, like an
22 opinion based -- trying to balance everything, the
23 fear, the lower potential exposure to the market
24 through brokers that won't show their property at all
25 or tell their people that we're not going to look at

Page 157

1  that. So, obviously, there would be a lower number of
2  market participants, what effect that would have.
3        But I also considered that at that
4  particular time when I was doing these reports, the
5  Denver area was a very hot real estate market. And
6  that, in general, prices were going up. There was
7  strong demands for housing, so that tempered some of
8  the results that in a different kind of market I might
9  have had a much more -- a greater opinion of stigma in
10  all three of these cases.
11        So in a market, say, for instance if I
12  felt that the cryoblasting in the end after
13  consideration of everything, my professional opinion,
14  I feel that is a 10 percent market detriment in a
15  different market, in a market. You know, in 2009,
16  that might have been a 30 or 40 percent difference.
17  But the market is so strong that that is included in
18  my opinions.
19        Q.  On page 3 of Exhibit 319, the end of that
20  summary background you note that the cosmetic damage
21  resulting from the repair was not fully completed at
22  the time of my inspection and contractors were present
23  working on repairs.
24        A.  Right.
25        Q.  Did that play a factor in any way in your

Page 158

1  assessment of the various categories of value?
2        A.  No. Because I -- again, all of these
3  reports were based on the hypothetical condition that
4  there was no damage to the property. So I'm -- I
5  looked at every property as if it was totally repaired
6  free of any market -- free of any formaldehyde, former
7  formaldehyde. It never happened. That's a
8  hypothetical condition to give me a baseline value.
9        Q.  So if we move into the next section of
10  market value on page 3, it appears that that
11  assumption is what you set out in that first sentence;
12  is that right?
13        A.  Yes.
14        Q.  And you made that same assumption of no
15  structural or cosmetic damage for all of the homes?
16        A.  Yes.
17        Q.  Why did you do that?
18        A.  Because that's what gave me the baseline.
19  I'm -- I'm -- I'm trying to measure the damage, so I
20  can't start with a property that's damaged, and then,
21  you know, work the problem the other way. So
22  basically what I've -- what I've done is -- is through
23  my market analysis and cost analysis, I can look at
24  that -- I can look at the property -- the properties
25  are all basically new or in near new condition. So

Page 159

1  I'm looking at that and saying, okay, that worker is
2  not there, this garage is done, this floor covering is
3  down. What would be normal market reaction to the
4  model home or a home very similar. So that's the
5  definition of a hypothetical condition. In our
6  industry, it's something that you -- you're -- you're
7  appraising a property based on a condition that you
8  know is not correct. So I know that there was damage,
9  but I appraised it as if there was no damage.
10        Q.  Would it have changed your assessment in
11  any way if there was cosmetic or structural damage
12  present in the house that was unrelated to the
13  remediation of the Flak Jacket?
14        A.  Yes. If I was aware of something -- you
15  know, something wrong with the house that was not
16  related, then that would need to be accounted for,
17  which would be -- it gets more tricky -- if these
18  homes weren't new, if these homes were five years old,
19  then that would have been a big question, what was
20  caused -- what was caused by the structural damage,
21  and what was caused by deferred maintenance or a kid
22  throwing a rock through a window or whatever. That
23  would have been a more complex problem, but you're
24  right, that is a separate question.
25        Q.  Did any of the homeowners in any of these

Page 160

1  reports provide you with information about other
2  sources of cosmetic or structural damage?
3        A.  Other than -- I mean, the damage -- they
4  pointed out where there was -- where there was -- or
5  they felt was cosmetic damage, and they told me where
6  they had callbacks for certain items that might have
7  been fixed. When I was in the house, they said, well,
8  we -- this door wouldn't hang straight, and they came
9  back three times and they got it right. Well, it was
10  straight when I got there. But, you know, they told
11  me about the building process and the repair process,
12  which, if I was to summarize all nine of them, I would
13  say it was a nightmare for everybody. But having
14  somebody in your house while you're moved out is a
15  nightmare.
16        Q.  Were there any unfixed structural or
17  cosmetic items in any of the houses that were pointed
18  out to you that were identified as unrelated to Flak
19  Jacket?
20        A.  Not -- not that I recall. All of these
21  properties were appraised as if they were in near new
22  condition.
23        Q.  When you did your walk through the homes
24  , did you take photographs of the interior of the
25  homes?

Robert Myers   03/26/2019
JAMI BORGMANN, ET AL. v. WEYERHAEUSER

Pages 161..164

Page 161

1    A.   Yes.
2    Q.   Did you take photographs of the entire
3  interior of the home or just the basements?
4    A.   Oh, no.  No.  In the rooms of the homes.
5  They're in the reports.  The photos are in the
6  reports.
7    Q.   When you do comparable sales analysis and
8  you look at comps that you're selecting, are you able
9  to access equivalent photographs of the comps?
10    A.   Not a hundred percent of the time, but
11  typically, yes.  Most Realtors take photos of the
12  interior of their listings.  So when we go into the
13  MLS, Multi-List Service is what that means, by the
14  way.  Sorry.  When we go into the MLS for 6250
15  Northglenn Street, you can print or view all of the
16  photos for that property.
17         So most of the Realtors, for marketing
18  purposes, take a good number of photos.  So that's --
19  other than in our -- we have a separate verification
20  process that we call either the selling agent or
21  listing agent to try to determine the condition of the
22  home, in their opinion, but then most of the time we
23  have photos that we can -- we ask and -- we ask them
24  their opinion, but we also can formulate somewhat our
25  own opinions based on the photographs.

Page 162

1    Q.   In the process of determining the market
2  value via the sales comparison approach, do you ever
3  look at other people's appraisals if they're
4  available?
5    A.   Not normally.  The only time I typically
6  look at someone else's appraisal is if I'm in a review
7  situation to where I'm reviewing it for some reason.
8  But their -- another appraisal would have little
9  influence -- I mean, it doesn't have anything to do
10  with me.  First of all, I can't think of a time where
11  they had been done on the same day.  So we're going to
12  have a different date of value, but -- you know,
13  obviously, I've seen other appraisals done on the same
14  property that I've done in -- almost a hundred percent
15  in divorce cases, but not before I do mine.  I don't
16  like to look at them.  I don't like to be influenced
17  by it.
18    Q.   So as I understand the reports, the
19  market value piece, done through the appraisal
20  reports, was to establish a baseline against which to
21  measure a calculation of diminution in value for
22  stigma?
23    A.   Yes.
24    Q.   We'll come back to the stigma piece.  The
25  rental piece, however, that was also performed with

Page 163

1  the assumption of no diminution in value?
2    A.   Yes.
3    Q.   Why?
4    A.   Why did we do a rental piece?
5    Q.   No.  Why did you make that assumption in
6  the rental context?
7    A.   Because I'm assuming -- we did it as if
8  it was a market rent.  We're not saying, well, this
9  would be the market rent, only it doesn't have any --
10  the market rent with no carpet or walls are half torn
11  down.  So for the same reason we do the market value
12  with the same hypothetical condition, we're doing it
13  as if the property was in good condition.  So without,
14  you know -- I guess the easiest answer is that was the
15  assignment, but -- and the reason for the market rent
16  is for you guys' purpose.
17    Q.   So you calculated a rental value for
18  every home, correct?
19    A.   Yes.
20    Q.   Are you opining as to whether any
21  particular home is claiming rental damages?
22    A.   I don't know that any of them are or all
23  of them are.
24    Q.   The rental value you've calculated is for
25  the entirety of the home; is that right?

Page 164

1    A.   As if undamaged, yes.
2    Q.   If you were going to rent out, say, a
3  bedroom or a basement in a home, that would alter your
4  rental value, correct?
5    A.   Well, no.  Probably not.
6    Q.   Why not?
7    A.   Well, because if you're going to rent a
8  partial -- a part of the home -- and I'd have to check
9  on the zoning of these, but I'm going to say that that
10  would be an illegal use in all of these cases, because
11  they're all single-family detached homes.  So one of
12  the bases that we establish market value is on the
13  highest and best use.  And one of the tests for
14  highest and best use is legality of use.  So if it's
15  an illegal use, I can't consider the income from it.
16  You -- you can lease the entire home, but you can't
17  have five people -- five families live in a one-family
18  house, according to the zoning regulations.
19    Q.   Imagine, for the sake of argument --
20    A.   Okay.
21    Q.   -- that it is not an illegal use --
22    A.   Okay.
23    Q.   -- to sublet a portion of one of the
24  affected homes.
25    A.   Okay.



Page 165

1     Q.   The rental value you've provided would
2  be -- assumes a rental of the entire house, correct?
3     A.   Correct.
4     Q.   So if you were going to determine the
5  rental value of a sublease of a portion of the home,
6  you would need to do an additional calculation; is
7  that right?
8     A.   Yes.  Plus I'd have to have additional
9  market comparables where that condition was present.
10 So I had three other homes that were renting one
11 bedroom, and I could maybe determine what the one
12 bedroom was worth.
13    Q.   Would some of the factors be -- or at
14 least would one of the factors be the amount of square
15 footage being rented?
16    A.   That would likely be a factor.  Normal
17 square footage, bathroom -- access to a bathroom,
18 entrance.  Those are all things that are considered.
19 I mean, I've done the type of report -- or the type of
20 rental you're asking about is not uncommon around
21 colleges, and I've done, you know, homes that have 11
22 tenants in them.  Each one of them have a bedroom.  So
23 typically, you know, square footage is one of the big
24 drivers, but maybe as a separate entrance is a big
25 driver, a separate bathroom is a big driver.

Page 166

1     Q.   Can you think of any other big drivers?
2     A.   Yeah.  Parking.  If you've got 11 people
3  in a unit, and if you're the guy that doesn't get the
4  parking spot, it sucks.
5     Q.   But that's not the assessment you
6  undertook here?
7     A.   No, no.  And I didn't do -- there were no
8  fractional interests.  So the only -- the lease -- the
9  leased value, the fee simple value of the property,
10 and the fair market value of the home as a whole, that
11 was the engagement.
12    Q.   What information did you examine to
13 determine the lease value of the entire home?
14    A.   We used other rental comparables within
15 the neighborhood, and then compared them.  Same as the
16 sales comparison, we do a rental comparison.
17    Q.   And that rental comparison, is that based
18 on actual rents charged?
19    A.   Yes.
20    Q.   And how do you get actual rents charged?
21    A.   Oh, we call and try to find rentals.  The
22 MLS breaks out rental properties in many markets.  So
23 you can get -- you can do an MLS sales search and you
24 can do a rental search.  And oftentimes the MLS
25 Realtors will list their properties through their --

Page 167

1  you can get leases through Zillow, and there's a
2  number of places where you can find what something is
3  renting for.  So in each one of these reports, I
4  believe, there are rental comparables, the rental
5  comparables are cited in each one of these reports, I
6  believe.
7     Q.   Would you, for sake of illustration for
8  Exhibit 320, would you please point me to where the
9  rental comparables are set forth?
10    A.   Okay.  Page 7.
11    Q.   So I -- if I'm reading this line
12 correctly, there's a line about a third of the way
13 down the chart titled Data Source?
14    A.   Yes.
15    Q.   So in three of the boxes it indicates for
16 the comparables that the data source is Zillow and the
17 county.
18    A.   Right.
19    Q.   Do you know if Zillow is providing actual
20 rental prices in those cases or estimated rental
21 prices?
22    A.   I don't know.  That could be asking
23 rental prices.
24    Q.   And that would be different than actual
25 rental prices?

Page 168

1     A.   Well, if we didn't -- and to my
2  knowledge, we didn't examine any actual leases,
3  because that's unlike -- lease is unlike sales,
4  they're not -- it's not a public record that I can
5  verify that amount.
6     Q.   So I'm sorry.  When we were talking a
7  moment ago about looking for rental values on the MLS,
8  that -- that doesn't give actual --
9     A.   Some do.  I get -- in our MLS I can get
10 actual rental values and -- in my MLS.  So I'll have
11 the date of the lease and the lease amount.  But
12 that's, evidently in this particular case, we're
13 citing Zillow as the source, so these are -- and I
14 don't -- I'm not sure exactly how the search was done,
15 but my use of Zillow before, I'm assuming these are
16 asking prices within the neighborhood.
17    Q.   Do you know how you weighed the various
18 asking prices to determine a rental value?
19    A.   Okay.  In this particular case, the -- on
20 page 7, down in the comments to market data, we talk
21 about the ranges from 1980 to 3500, depending on the
22 condition, location, length of lease, views and
23 owner/manager type.  The preferred locations are
24 towards the golf course and 112th Avenue.  And then it
25 talks about owners have various viewpoints on the



Page 169

1  amount of rent to charge. It's not always based on
2  market rents. So we expanded the search in this area
3  for properties of a similar size and similar
4  neighborhoods. Highest rents were for corporate and
5  short-term leases, which is always -- typically the
6  case.
7          And the rents advertised were close to an
8  estimate by Zillow, but the source may not represent
9  the market due to the predictability of the model, of
10  the Zillow model. Renters do not anticipate garage
11  parking; therefore, this adjustment is minimized.
12  Other adjustments, based on what little data was
13  available, larger homes and more bedrooms and
14  bathrooms tend to get more rent than smaller homes.
15  Unfinished basements less than finished basements. So
16  those are the basic things we're looking at.
17          So if we look at this particular one,
18  we're looking at a size of 2,400 compared to a
19  3,100-square-foot house, a bigger house, that rented
20  for 2,700. So we are weighing that size, the size
21  difference and the bathroom difference, and then a
22  garage difference in saying, based on this data, this
23  lease was 2,700, but when compared to our subject, it
24  would indicate a lease rate of $2,536, the same
25  estimate that goes down below.

Page 170

1          And our -- our gross range was from -- on
2  these particular sales -- from 2,400 to 2,900. The
3  adjusted range 2,536, 2,606 and 2,454, and we selected
4  a market rent from the -- towards the center to the
5  adjusted range of 2,500 a month, so that's how we did
6  this one.
7      Q.  So in any case where you relied on MLS
8  data, it would show MLS data in the data source?
9      A.  Yeah. Well, we're going to -- to give
10  you the -- the source for this particular -- for this
11  particular -- for any particular appraisal.
12      Q.  And if the source came from MLS, the --
13      A.  It would say MLS, yeah.
14      Q.  So in this case it sounds like you would
15  find a comparable listing on Zillow or some other --
16      A.  Right.
17      Q.  -- asking source, and then make
18  adjustments based on components similar or dissimilar
19  to your house?
20      A.  Yes. These -- there's very -- there's
21  not a lot of rentals in the Denver market. Rentals
22  are at a premium. We're at a premium at this point in
23  time. These are three properties that were on the
24  market. You're certainly not going to get more than
25  the market, and -- but there's also a floor at the

Page 171

1  market to where there's a minimum that you're going to
2  get. In this particular case, we were towards the
3  minimum amount on this particular house as opposed to
4  towards the top amount, basically, because this house
5  is smaller and it has at least one half bath less than
6  the comparable properties.
7      Q.  If one lists a house for rent, is it fair
8  to say that you're not guaranteed that you're going to
9  rent it at all?
10      A.  Well, in this market in Denver, if you
11  list it for the indicated market rent or around what
12  the other rentals are going for in the area, it's a
13  very strong rental market, so it would be likely you
14  would rent it.
15      Q.  Do you know what the vacancy rate is in
16  the home market now in the Front Range?
17      A.  I don't -- I can't speak for the whole
18  Front Range, but it's probably, for a single-family,
19  detached housing, close to 99 percent in my market.
20      Q.  And it wouldn't surprise you if it were
21  similar along the Front Range?
22      A.  Yeah. This is overall -- all things
23  considered, the Denver market is better than my
24  market.
25      Q.  If the data form -- and I know this one

Page 172

1  does not -- but if the data source on page 7 indicated
2  both MLS and Zillow --
3      A.  Right.
4      Q.  -- should I read that as including actual
5  rental rates and Zillow rates?
6      A.  Well, it -- I mean, if it was the same
7  property, it would just be confirmed from multiple
8  sources.
9      Q.  And if there was a different price on the
10  MLS versus the Zillow listing, how would you account
11  for that or weigh the two?
12      A.  We do that through our verification,
13  because on the MLS there's a Realtor involved. So if
14  they're representing the property, we'll ask them.
15      Q.  And if you can confirm the MLS price,
16  does that take priority over the Zillow price?
17      A.  We're always going to go with the best
18  information we have, regardless of the source. So
19  we're going to weigh the source of any information,
20  which is why you see on here public record as well as
21  Zillow. Well, the public record verification is --
22  that's where we get our square footage and our garage
23  counts and that sort of thing. People put their house
24  on Zillow may say they've got 3,000. The county says
25  they have 2,700, we'll use the 2,700.

Page 173

1    Q.  Do the county records give you a rental
2  rate or a rental price?
3    A.  No, no.
4    Q.  If you were to look both at a Zillow
5  listing and an MLS report and you confirmed the MLS
6  details with the broker, would you prefer the
7  confirmed MLS price over this Zillow price?
8    A.  Yes.
9    Q.  Why -- why would you do that?
10    A.  I always -- I always prefer confirmed
11  information.  We try to confirm everything by a third
12  party.  So if sometimes you can't, because people
13  don't return phone calls or whatever, but if I've got
14  a piece of information that I have confirmed multiple
15  places, MLS, the county record ties out, and the
16  Realtor tells me the same thing, I think that's a good
17  piece of information.
18    Q.  Did you determine the rental values of
19  the homes as of the same date as the appraised value?
20    A.  Yes.
21    Q.  Do you have a private lease database?
22    A.  No.
23    Q.  Do you know if JoAnn does?
24    A.  I don't.  There's not one that exists, to
25  my knowledge.  Individual property managers are going

Page 174

1  to have their own leases.
2    Q.  Did you access any of those in this case?
3    A.  No.  Their data is proprietary, so . . .
4    Q.  You've indicated that you looked at
5  county records to determine a rental price estimate.
6    A.  No.  I mean, county records to -- to look
7  at the information we confirmed, information -- like,
8  for instance, the county record doesn't say anything
9  about rental, but it says the square footage in the
10  bedrooms and baths in most cases.  So that way we know
11  that -- we know the subject is 2458.  We measured it.
12  So I know what that one is.  But if Zillow, like, for
13  the second one said 3,300, and the county records
14  showed 3,100, we're going to use a county record
15  because it's more reliable.
16    Q.  So you looked at county records for
17  recorded facts about the house?
18    A.  Descriptive facts, yep.  Address,
19  bedrooms, baths, finished basement, non-finished
20  basement.
21    Q.  It appears that you looked at two online
22  listing sites, Zillow and Rent.com.
23    A.  Okay.  Yes.
24    Q.  And it also appears that, on occasion,
25  you looked at MLS information?

Page 175

1    A.  Yes.
2    Q.  Are there any other sources than those
3  four that you looked to to determine your rental price
4  estimate?
5    A.  No.  I mean -- in this particular case,
6  I'm going to say, no, but that -- you know, that
7  doesn't mean that in any particular case we wouldn't.
8  So some of the times, for instance, and not in this
9  particular case, I drive down the street and I see a
10  For Rent sign that's got a telephone number on it, I
11  call them, so that's the source.
12    Q.  Do you -- in this case, as to these five
13  reports --
14    A.  We didn't do that here.
15    Q.  Do you have -- in this case, as to these
16  five reports, do you have any memory of any additional
17  sources that you used?
18    A.  No, not that I remember.
19    Q.  Would the rental price of the home change
20  because of how the house was affected by the Flak
21  Jacket joists?
22    A.  You mean could there be stigma as far as
23  rental?
24    Q.  Yes.
25    A.  I don't have -- I wasn't engaged to study

Page 176

1  that.  Common sense tells me no.  My -- there might be
2  a little bit, but I -- I know the rental market is
3  different and that when somebody needs a place to rent
4  and live and they can -- they would care a lot less
5  about their health as to whether they could keep their
6  dog in the backyard.
7    Q.  Do you know whether there's similar
8  disclosure requirements for rental properties?
9    A.  You know, it's -- I don't work in the
10  rental real estate market.  It's my general
11  understanding is that a landlord would have an
12  obligation to disclose or a Realtor would.  And I
13  believe the owner -- I don't know that there's a
14  specific law that says the owner must disclose.  But
15  if there was an issue with that tenant later, I'd say
16  that there might be a law that found the owner in
17  violation of something.
18    Q.  But as you sit here today, you're not
19  aware of a similar disclosure obligation?
20    A.  No.  And -- and don't have any -- I can't
21  give you any legal opinions; I'm not a lawyer.
22    Q.  But you do have an understanding, to be
23  fair, about the rental or the disclosure obligation
24  for the -- of seller?
25    A.  Oh, absolutely.  And my own obligations,



Page 177

1  because I'm a broker.  So I know what I must do by
2  Colorado law.  That's -- it's my business, so I'm not
3  being a lawyer; I know what I can lose my license for.
4       Q.  But you don't have a similar
5  understanding for rental income?
6       A.  I don't.  And, you know, and it's not --
7  you know, it's not rocket science.  Some of my friends
8  that are in property management could answer that
9  question.  I've just never gone into that area of real
10 estate, so never attempted to be a property manager,
11 so I'm not as familiar with that side of the coin.
12      MR. SINK:  I think we're at a natural
13 breaking spot if you want to take a break.
14      THE VIDEOGRAPHER:  Going off the record.
15 The time is 2:46 p.m.
16      (Recess taken, 2:46 p.m. to 2:59 p.m.)
17      THE VIDEOGRAPHER:  We are back on the
18 record.  The time is 2:59 p.m.
19      Q.  (BY MR. SINK)  Page 3 of your report,
20 Exhibit 319, you include a definition of stigma; is
21 that correct?
22      A.  Yes.
23      Q.  And you relied on The Appraisal of Real
24 Estate, Twelfth Edition, for that definition; is that
25 correct?

Page 178

1       A.  Correct.
2       Q.  Why did you choose that definition?
3       A.  That's The Appraisal of Real Estate in
4  their multiple editions are -- by the Appraisal
5  Institute, they're basically the appraiser's Bible.
6  It's the definitive source of all things appraisal.
7  Kind of like a dictionary.
8       Q.  So as you attempt to evaluate stigma
9  impact, if any, the approach as set forth in The
10 Appraisal of Real Estate would be the definitive way
11 to proceed?
12      A.  Well, I mean, the definition was listed
13 by the Twelfth Edition and then all of the recognized
14 methods are within the Twelfth Edition that we've
15 talked about as far as the -- the approaches to value
16 and so forth all are outlined within their stigma, and
17 so the measuring of stigma is discussed within the
18 Twelfth Edition also.
19      Q.  And are the methods of measuring stigma
20 as set forth in the Twelfth Edition equally as
21 definitive as the definition of stigma itself?
22      A.  Well, there's -- there's recommended and
23 accepted methods to determine and estimate stigma.  So
24 within the recognized methods, there's -- I think I
25 discuss them in there, but there's three or four.

Page 179

1  There's a -- there's a sale/resale or paired sales
2  analysis.  There's straight statistical analysis, and
3  then there's interview.  All are recognized as -- as
4  methods to use.
5       Q.  And those are all set forth in The
6  Appraisal of Real Estate book?
7       A.  And in Dr. Bell's textbooks as far as
8  diminution of value.  So those are all recognized
9  methods that we use.
10      Q.  So do you cite to Dr. Bell anywhere in
11 the report?
12      A.  You know, I don't think so.
13      Q.  If I were going to go and try to evaluate
14 the method of determining stigma, is there any place
15 that I should go and look beyond The Appraisal of Real
16 Estate handbook?
17      A.  Well, I think those are the two
18 definitive sources, but The Appraisal of Real Estate,
19 which is the text, if you will, is going to have the
20 data, the approaches, and the thought processes behind
21 it.  So I think that would be your best source.
22      Q.  And you didn't cite to Dr. Bell but
23 you've mentioned him.  Is his approach different from
24 the --
25      A.  No.

Page 180

1       Q.  -- appraisal Bible?
2       A.  No.  It's just -- maybe because it's a
3  textbook about that subject, it's -- you know, it's an
4  entire book on the subject, as opposed to three pages.
5       Q.  Are you aware of any conflict between The
6  Appraisal of Real Estate Book and Dr. Bell's
7  methodology?
8       A.  No, not really.
9       Q.  The definition as provided is a stigma is
10 an externality that negatively impacts the value of a
11 property or properties in proximity to it?
12      A.  Correct.
13      Q.  What do you understand that definition to
14 mean?
15      A.  Basically, a stigma is caused by, you
16 know, something outside of the property itself that is
17 going to affect the value.  In this case, it's a gas.
18 It's not part of the real estate, but it's -- it's --
19 it's within the walls of the property, but outside of
20 the definition of real estate.  So stigma could be --
21 you know, it could be -- like we've talked, another
22 example is an oil stain or an oil spill on a property,
23 an oil spill next to a property, you know, or a
24 fracking right next door to you, not on your
25 property, but right next door to you.

Page 181

1        So anything that would affect the value
2  from outside the real estate proper or the defined
3  real estate, the bricks and sticks and legal
4  description of the lot.  So gas is emitting from the
5  property or something like that would be included.
6       Q.  So what is your understanding of the word
7  externality in the definition?
8       A.  Externality is out -- is anything
9  outside, so it's an outside force that has an impact
10 on value.  And it can be tied to the property or on
11 the property.  But one famous example used for stigma
12 is the Manson house -- sold -- it was a $5 million
13 house at the time, or whatever.  It sold for
14 $2 million because all of those people got killed
15 there.  So it didn't really have anything to do with
16 the property, but what happened in the property caused
17 a public perception and caused the property value to
18 diminish.
19      Q.  Do you know whether the mere presence of
20 formaldehyde in the Flak Jacket joist is an
21 externality?
22      A.  Formaldehyde is in everything, so it's --
23 formaldehyde is something that's a product of almost
24 every building product in -- these chairs, and
25 everything in this room.  So there's the formaldehyde

Page 182

1  in almost -- like I said, it's in glues, so it's in
2  almost every building product.  It's the level of the
3  formaldehyde that's a problem, not formaldehyde in and
4  of itself.
5       Q.  If the joists had had the same amount of
6  formaldehyde but they had not -- the formaldehyde had
7  not off-gassed --
8       A.  Right.
9       Q.  -- would it have been an externality?
10      A.  Well, I guess what you're saying is if --
11 which all wood products have formaldehyde -- had those
12 joists had formaldehyde emissions that were in the --
13 within the public safety standards, there would be no
14 stigma, there would be no disclosure.  There would
15 be -- you know, there wouldn't be a problem.
16      Q.  You were provided copies of some air
17 sampling tests in this case; is that right?
18      A.  Yes.
19      Q.  Did you review any of them?
20      A.  Again, I looked at them and -- and saw
21 the results.  Again, that's -- I'm looking at it from
22 a nonscientific background, so I'm relying on other
23 experts.
24      Q.  Did your review of those reports
25 influence your calculation of stigma in any way?

Page 183

1       A.  No.
2       Q.  You mentioned you looked at other expert
3  reports.
4       A.  Yes.
5       Q.  Which expert reports?
6       A.  I looked at a report by a real estate
7  attorney -- I'm trying to think of his name --
8  Mr. Levine -- Mr. Levine.  So I looked at his expert
9  report, and that was related to disclosure.
10      Q.  And did you base any opinion you had in
11 this report based on his report?
12      A.  I got his after I issued my report, but
13 he agreed with me, so . . .
14      Q.  But strictly speaking, you didn't rely on
15 it?
16      A.  I didn't rely on it, because I didn't
17 have it before I issued my report, but his opinion
18 mirrored mine on the issues that we were commonly
19 discussing.
20      Q.  The next sentence under the stigma
21 section after the definition says, "It is assumed as a
22 basis for my opinion that all emissions of
23 formaldehyde gas will be remediated and that the home
24 will be restored to a marketable condition when turned
25 over to the owners for occupancy."

Page 184

1       A.  That is correct.
2       Q.  Why did you make that assumption?
3       A.  Well, because without that assumption, I
4  would have been assuming a total loss.  So they
5  were -- it was my understanding at the time that
6  Weyerhaeuser had a recommended fix, three recommended
7  fixes, that the builders were executing those, and the
8  evidence, when I was there, both through my visual
9  inspection and from the homeowners, the discussion
10 that the work was either completed or under the way to
11 restore the home, so that's why I made that
12 assumption.
13      Q.  Based on your understanding of stigma
14 damage, can stigma damage be repaired?
15      A.  Physical damage is repaired, which is
16 what I think I was referring to here.  The physical
17 damage was being repaired.
18      Q.  So is stigma damage separate from any
19 physical damage?
20      A.  Yes.
21      Q.  So stigma damage may persist even after
22 the physical damage is repaired?
23      A.  Yes.
24      Q.  Can you take steps to reduce stigma
25 damage?

Page 185

1    A.  I'm going to say -- and I don't know in
2  this specific instance, because I don't have
3  anything -- I mean in theory, yes.
4    Q.  In your experience, what are some things
5  that people have done to reduce stigma damage?
6    A.  Radon mitigation.  Radon, the big
7  problem, stigma was associated with it in the 1980s,
8  1990.  It became -- you know, we didn't even know it
9  was there as the real estate community.  And then they
10 found it, and all of a sudden it's another thing
11 that's going to kill you.
12    So it got publicized, and the scientific
13 community came up with a solution, which is Radon
14 mitigation.  So we -- in the real estate community, we
15 do Radon tests.  And if Radon was discovered and
16 measured past the acceptable level, then the contracts
17 would provide that the seller provide a Radon
18 mitigation.  So the Radon mitigation over the years
19 became an accepted standard.
20    So what was a stigma in the '80s with
21 regard to Radon became a non-item in 2015.  I mean, it
22 was -- in the 2000s, because Radon mitigation was so
23 common, and it was proven.  It was proven to work.
24 So -- in that particular case there was an issue that
25 caused stigma that the scientific community solved the

Page 186

1  problem.  There was enough market evidence over time
2  that it worked, that I, as a real estate broker, I
3  test all of my houses that I'm selling or when I'm
4  representing a buyer I recommend that they get a test,
5  but they -- after the test, if it comes in high, we
6  get a Radon mitigation system, and I -- I can't
7  remember the last person that walked away from the
8  table, and it didn't affect the negotiation other than
9  the cost of the system, which we typically put -- at
10 that point in time we put the cost of the test and the
11 system on the -- on the seller.
12    Q.  So I want to explore that example.  For
13 example, we'll come to some other ones.  I know there
14 are some other ones.  Can -- can a human unaided
15 detect Radon?
16    A.  No.
17    Q.  Do you know --
18    A.  Not that I -- I don't know -- not that
19 I've heard of.
20    Q.  I think you mentioned before that people
21 didn't know about the Radon and didn't know --
22    A.  Right.  Right.  Yes.
23    Q.  Did you contribute to the concern about
24 Radon, that it was effectively odorless?
25    A.  Yes, sure.  It -- you know, it relates to

Page 187

1  fear.  And whether it's rational fear or not rational
2  fear, stigma and fear are almost synonymous.  I mean,
3  stigma is a fear.  Whether it's of a market condition
4  or something, it's a market fear.
5    Q.  So stigma is a market fear whether
6  rational or not?
7    A.  Right.  It's not rational to think that
8  Charles Manson is going to kill you if he's in jail
9  and all of his people are in jail, but still the house
10 sold for $3 million less than market value, but it's
11 still a market fear.
12    Q.  Do you know, as the term stigma is used
13 in The Appraisal of Real Estate Twelfth Edition,
14 whether stigma also includes physical damage to the
15 house?
16    A.  There are always two separate damages.
17 That's two separate categories of damage.  And within
18 the concept of real estate, I'll give you to the cost
19 approach.  There's -- there's three different types of
20 depreciation, and that's -- one of the terms is
21 external.  It's called an externality.
22    So the first cause is physical
23 depreciation, the aging of the property.  The second
24 is functional obsolescence or depreciation.  So you
25 have something that doesn't function in a house, a

Page 188

1  bedroom right off a kitchen or a bedroom you can't get
2  to, and that's either deemed curable or not curable.
3    And that definition comes from if the
4  cost to cure that problem either enhances the value or
5  brings that value back to the -- to that place that's
6  curable.  If it exceeds the value of the contribution,
7  it's not curable.
8    And then there's external.  So -- and
9  it's called an externality, which is why the book
10 calls it an externality, or the definition.  And
11 that's anything from the outside that affects the
12 property.  So that would be environmental damage, that
13 could be a gas station right next to the property.
14 There -- it could be -- you know, there's a number, a
15 waste, a dump right next to your property, not on your
16 property, but what's external to your property affects
17 the value, and so those are the three types of
18 depreciation.  So within the appraisal world, physical
19 and external are always separate.  They're separate
20 types of depreciation.
21    Q.  And, again, I appreciate that you didn't
22 write the definition.
23    A.  Right.
24    Q.  But I want your help in parsing it.
25 Because one of things it seems to me is trying to

Page 189

1  distinguish between the injury that can be repaired at
2  some price versus the lingering effect that is -- sort
3  of endures past the repair.
4      A.  Right.
5      Q.  And you've assumed in all of your
6  reports, correct, that the repair has been done and
7  that it's been effective?
8      A.  Yes.
9      Q.  So let's imagine a case where you have a
10  homeowner and there are two lots and there are several
11  tall trees on the neighbor's property, and the trees,
12  occasionally, as sometimes trees do, shed limbs on
13  your neighbor's property.  So strictly speaking, that
14  is an externality --
15      A.  Yes.
16      Q.  -- it's a tree on another side.  If the
17  limb falls and it falls on your house, it might cause
18  roofing damage, correct?
19      A.  Which is another -- would be an
20  externality or stigma related to the property.
21  There's a risk from an outside source.
22      Q.  And so if, for example, a potential home
23  buyer saw the trees, had reason to believe for maybe
24  building permits that there had been several occasions
25  where tree -- limb and branches had fallen and damaged

Page 190

1  the house, that might create a stigma of the view?
2      A.  There would be -- there could be,
3  especially depending on the size of the tree, there
4  could be something measurable.  It could affect -- if
5  could affect an offer, someone concerned about the
6  safety of their house.
7      Q.  But I suppose in that case, that you
8  could pay your neighborhood enough money to cut down
9  every tree on the property line?
10      A.  And that would eliminate the externality.
11      Q.  So in cases where the externality itself
12  is eliminated --
13      A.  Yes.
14      Q.  -- does the stigma go away?
15      A.  And in your example it would go away.
16      Q.  Would it always go away when you
17  eliminate the externality?
18      A.  No.
19      Q.  Why not?
20      A.  Well, I guess if you eliminate the
21  externality.  I mean, with -- in this particular case,
22  if -- if it was -- if they basically came in and
23  rebuilt the entire home and there was absolutely
24  nothing, there was nothing on the property that
25  remotely resembled formaldehyde, and they built the

Page 191

1  property over, there would not be an externality.  But
2  in this particular case, in all of the cases, some of
3  the agent remains.
4      Q.  But if I understand you correctly,
5  formaldehyde is in all homes, whether there is Flak
6  Jacket or not?
7      A.  Right.
8      Q.  And in this particular case, the concern
9  is the off-gassing formaldehyde from this product?
10      A.  Correct.
11      Q.  So if you, first of all, removed all of
12  the formaldehyde and then second of all tested to make
13  sure that all of the formaldehyde is gone, why
14  wouldn't that in that case eliminate the externality?
15      MR. NELSON:  Object to form.
16      Q.  (BY MR. SINK)  You can answer.
17      A.  Okay.  I always get confused with that.
18  Because we're -- we're alleviating -- the fact that it
19  was partially released or removed or encapsulated or
20  however it was dealt with, that doesn't mean the
21  potential buyer is going to buy that argument.  I
22  mean, in one of these cases, in particular, where the
23  highest resistance is -- is where they've painted over
24  the product.  Well, I've lived in many houses I've had
25  to repaint.  So when do my kids stop dying?  You know,

Page 192

1  when do they start, when the paint wears off a little
2  bit?  Does the gas come back again?
3      Again, I said sometimes those fears can
4  be rational or irrational, but a market fear is a
5  market fear.  And if it's -- if there's an indication
6  or a preponderance of evidence that there is an actual
7  fear there, then it's going to be my opinion that
8  there's going to be some reaction.
9      Move the clock forward 20 years,
10  hopefully I'm alive, and we have market data and new
11  sales in the subdivision, and -- and you say, well,
12  now what's your opinion.  Well, with new data, as with
13  the Radon gas data, my opinion would change.  So my
14  opinion 20 years ago on Radon gas is different than it
15  is today.
16      Q.  You mentioned in your answer, given the
17  circumstances, irrational fear though it may be, it
18  would still lead to, quote, summary reaction.  What
19  does that mean?
20      A.  Some reaction.  Sorry.
21      Q.  Thank you.
22      A.  You almost thought I was talking about a
23  legal term, didn't you?  Summary.  No, I don't know
24  any legal terms.
25      Q.  The antenna perked up.

Page 193

1       You indicated that at the end of the day
2   market data would influence how you would evaluate
3   stigma damage; is that fair?
4       A.  Yes.
5       Q.  What kind of market data would you be
6   looking at?
7       A.  Well, again, looking forward ten years
8   and more than isolated incidents -- ten years from now
9   we're going to have histories on every property that's
10  involved in this and all of the other properties that
11  were affected.  So at that point in time, I'm going to
12  be able to do a statistical analysis, and it's going
13  to tell me whether there's anything left in the
14  market, if there's any stigma at all.  Maybe there is,
15  maybe there isn't.  I don't know.  But until we have
16  stood the test of time and had empirical data that's
17  going to give me -- you know, lead me to a conclusion,
18  you know, I just don't have that data.
19          That's the -- the challenge in this case,
20  and I think I even used those terms, the challenge in
21  this case is to quantify the damage, because it's
22  not -- it hasn't happened.  When I -- when I deal with
23  a flood case, I can go out and look at sets of data on
24  three California floods, and -- and where there have
25  been scientific studies, I can say this is -- this is

Page 194

1   how this market reacted, and based upon this and other
2   factors, I think my market is going to react this way.
3          But in this case, I have nothing that --
4   other than mobile homes, which tell me there can be up
5   to a hundred percent loss due to formaldehyde.  And
6   I -- it's my opinion that that is not credible.  So
7   the only data I have I disagree with.  I don't think
8   it applies.
9       Q.  So you've come back to a topic we talked
10  about earlier, and I want to explore it relative to
11  what you're talking about in terms of market data.  I
12  can understand why market data would be useful to
13  evaluate the impact, if any, of a particular condition
14  on a home.
15      A.  Sure.
16      Q.  You mentioned, though, that as part of
17  that it would also need to stand the test of time.
18  And I guess my question is, is there a certain amount
19  of time that needs to go by, or is it just a certain
20  number of sales?
21      A.  I'd say it's -- I don't necessarily think
22  it's time related.  However, you know, you may get
23  different answers in different time frames, if there
24  is enough measurable data, even in a short period of
25  time.  Let's say, for instance, I had 20 sales of

Page 195

1   these homes, and I was able to go out of -- and
2   conduct a study, and again, I'd have to go back and
3   retrospectively look at what those houses may have
4   been worth without effect of the damage.  But I would
5   at least have 20 sales that I could rely on a number
6   that would give me some sort of rational number.  One
7   or two -- one or two sales doesn't make a market.
8   There's a -- kind of a saying that we use in the
9   statistical analysis or, you know, paired sales
10  analysis where -- what a paired sales analysis is, is
11  you've got two properties that are identical to each
12  other, with the exception of one item.  So maybe a
13  one-car garage versus a two-car.
14          So logically if one sold for -- the
15  two-car sold for $7500 more than the one-car and
16  everything else was equal, your conclusion could be
17  that the adjustment for a garage is 7500 a stall.  But
18  what we caution our appraisers is one pair does not
19  make a pair.  So we have to have more data than one
20  piece of data, because what we don't have in -- and
21  what we need to get a reliable conclusion is we -- we
22  don't know the typical motivation for that individual
23  sale.
24          When I'm -- when I'm projecting the most
25  probable and likely result, I'm looking at the market

Page 196

1   as a whole and understand that I could have someone
2   that came in and paid more for a property, and I could
3   have someone that the effect was much greater than I
4   anticipated.
5          But over time, with a number of sales --
6   and I say over time because usually you don't get 20
7   sales in a two-month period -- that would give me a
8   different indication if everybody is bailing and
9   selling at the same time, that might lead me to a
10  totally different conclusion.  But if I had enough to
11  do a different type of statistical analysis, it would
12  further -- then I would have two measures.  I used
13  interview.  I would have statistics and interview.  I
14  would be much more comfortable with two measures
15  than -- and three, if I could use paired sales.  As
16  many -- just like an appraisal, as many directions I
17  can look at a problem, it adds to my confidence.
18      Q.  When you were saying 20 sales, would you
19  be using those 20 sales to do a twin paired sales
20  analysis in an ideal world?
21      A.  Well, I -- I could do both.  I could --
22  with 20 good sales, I could do a statistical analysis,
23  and I could probably find some paired sales.
24      Q.  And would you need all 20 to also be
25  paired sales, or would only a subset need to be paired



Page 197

1   sales?
2       A.   Well, the pair would be -- my -- the pair
3   would be natural.  If 20 of these homes sold, and they
4   were all affected, I could take 20 homes that sold in
5   the same neighborhood of the same square footage that
6   didn't -- that weren't affected.  That's a paired
7   sale.  So then I've isolated the damage.
8       Q.   So you would need 40 total sales?
9       A.   No.  I mean, 20 -- I'm just using a
10  number.  But 20 -- a reasonable number of market
11  sales -- in a statistical world, I need enough sales
12  to reach saturation.  And that means where my results
13  are predicted, where they're repeating, they keep
14  repeating.  So -- or in a large number of cases.  So
15  to use 20 sales, if I had 20 actual verified sales of
16  these properties, and maybe with different ones I'd
17  have some with -- some with total floor replacements,
18  some with mechanical replacement, some with
19  encapsulation, and they sold and I was able to take
20  market sales in the same time frame of the same model,
21  which is possible here, because it's the same builders
22  in these areas at the same time, the difference
23  between those two -- that each one of those is a pair.
24  So I would theoretically have up to 20 pairs, maybe
25  six for each condition.  I would -- I would find that

Page 198

1   would be adequate for me to form a very good opinion.
2       Q.   You mentioned that you'd like to have
3   multiple data points.  I think that's understandable
4   why people want more data rather than less.
5       A.   Right.
6       Q.   What happens, though, if you were able to
7   get enough twin paired sales analysis results and they
8   were inconsistent with, say, the survey and interview
9   method?  How would you -- how would you sort through
10  those two alternatives?
11      A.   Well, I would probably -- if the
12  statistical data -- and I could do, say, an adequate
13  number of pairs, and if it was at odds with my survey
14  method, I'm going to suspect that my -- my survey --
15  my interpretation of the survey results were not
16  correct.  I'd be -- I'd relook at my opinion as far as
17  my interpretation of the data and the survey method,
18  because I think the -- because that's the difference
19  between a qualitative statistical analysis and a
20  quantitative analysis.
21           So in a qualitative analysis, there are
22  actual verifiable numbers.  And in a qualitative
23  analysis, there's my interpretation of the -- of
24  the -- of the events on an emotional or a different
25  level.  So given hard numbers, hard numbers win.

Page 199

1       Q.   And I want to make sure I've got that
2   down for the record.  In the qualitative approach,
3   there's more personal judgment and subjective input?
4       A.   Right.  There's -- there's judgment in
5   both, but you're -- in qualitative it's much more
6   reliant on the reader's interpretation.
7       Q.   And if I recall correctly, as you work
8   through this in all of the reports, you set out from
9   the Twelfth Edition of The Appraisal Real Estate three
10  different methods, and it seems to suggest that the
11  twin paired sales analysis is the preferred approach,
12  the statistical one is helpful, and then the one you
13  used if you can't get access to the other two is
14  survey and interview; is that roughly right?
15      A.   I think that's -- that's an accurate
16  assessment.
17      Q.   On page 4 of your report, you list
18  several examples.  We talked already about Radon.  I
19  think that's the first example you use.  The next one
20  you point out is the lead paint.
21      A.   Lead-based paint.
22      Q.   Correct.
23      A.   Yes.
24      Q.   Explain to me how that changed over time.
25      A.   There -- in -- in lead-based paint, back

Page 200

1   prior to 1978 or in the '70s, that was a very strong
2   market concern.  And almost all paints, until -- there
3   were paints still in 19 -- up to 1992 that had
4   lead-based -- were lead based.  So it was a known
5   health hazard, known enough that in '78 the federal
6   government required disclosures at that point in time.
7           Since that time, over the years,
8   manufacturers quit using lead in paints, homes have
9   been painted over 25 times.  And although the
10  lead-based paint disclosure is still required in
11  95 percent of them, the owners don't know if there's
12  lead-based paint.  I mean, if it's a new home you do,
13  because there's no lead-based paint.  So if a home was
14  built in the mid '90s through today, so for almost the
15  last 20-some years, there's no lead-based paint, so
16  you know that.  But if you buy a 1950s, there may be.
17  But, typically, the original owner of the 1950s house
18  is long gone, and it's on its fifth owner, and those
19  people just simply don't know, so they mark, I don't
20  know, and the buyers don't -- I mean, there doesn't
21  seem, at least in my estimation, working belly to
22  belly to the buyers, that doesn't seem to be a real
23  fear today.  Just because it's -- you know, over the
24  last 20 years, the problem has really been kind of
25  eradicated due to different building -- building

Page 201

1 practices -- materials.
2      Q.  Do I understand that from the last
3 sentence of that paragraph that the strictly enforced
4 lead-based paint disclosure diminished the stigma
5 impact of lead-based paint, in your opinion?
6      A.  Well, I think it -- it gave the buyers a
7 comfort level.  So yes, I guess it diminished the --
8 it diminished it because they knew that not only --
9 you know, it wasn't an, oh, you're -- if you don't --
10 if you don't disclose this, you know, some day
11 somebody will sue you.  If you don't disclose
12 lead-based paint, you could be subject to an immediate
13 fine, and a big fine.
14      Q.  So as I understand, there are -- and I'll
15 list them out -- Radon, lead-based paint, repaired
16 flood-damage homes, methamphetamine manufacturing, and
17 soil movement, structural damage, and, I believe,
18 mold.  There are -- those are various areas that you
19 have some experience with, correct?
20      A.  Right.
21      Q.  And in your experience, there's some
22 stigma damage associated with those events, correct?
23      A.  There -- there can be in any of those
24 events.
25      Q.  Or at least in some cases there once was

Page 202

1 stigma damage?
2      A.  Sure.
3      Q.  In some of those cases the stigma damage
4 diminished over time?
5      A.  Yes.
6      Q.  And would you agree that in all of those
7 cases the best source of the amount and length of
8 stigma damage would be actual market data?
9      A.  Sure.  I mean, again, you know, time --
10 time is the tester.  So with -- with all of these
11 cases, there's been different types of studies done
12 based on a condition that happened years ago, and you
13 can measure five years of market reaction or ten years
14 of market reaction, and then the statistics become
15 meaningful.
16      Q.  The next example you talk about is the
17 mobile home piece.
18      A.  Right.
19      Q.  I think we've talked about that one in
20 detail already.  I don't know if you have anything you
21 want to add on that one?
22      A.  Not really.
23      Q.  Anything else that we haven't talked
24 about that would form a part of your opinion?
25      A.  No, no.  Just general -- my -- my opinion

Page 203

1 is -- is based on my experience working with buyers
2 and working with sellers and listening to their
3 objections.
4      Q.  The next paragraph you identify some of
5 the fears a typical buyer might have if purchasing a
6 house that it had the Flak Jacket installed.
7      A.  Uh-huh.
8      Q.  One of which is whether the formaldehyde
9 levels are currently acceptable, and one would be a
10 fear that they'll increase again after purchase; is
11 that right?
12      A.  Yes.
13      Q.  Have you given any consideration or done
14 any testing about whether -- if the builder or
15 Weyerhaeuser provided periodic air sampling that that
16 would impact at all the stigma damage to the house?
17      A.  I don't have an opinion on that.  I just
18 don't know.  You know, those type of things, although
19 may be very effective, the news media tends to cover
20 those things a lot less than they do the original
21 event.  So, you know, hey, we fixed it, hey, we fixed
22 it, they don't care anymore, so the public doesn't
23 know.
24      Q.  So it sounds like one of the major
25 drivers of stigma is publicity?

Page 204

1      A.  Well, in this case it's definitely -- you
2 know, the market -- the general market knows there's
3 an issue.  And it's -- they also know that they don't
4 know about it.  I mean, they don't know enough about
5 it.  I mean, I've done a lot more research about this
6 than the average real estate broker, and I'm not
7 sitting here claiming to be an expert.
8      Q.  And when you say you're not sitting here
9 claiming to be an expert, you're not claiming to be an
10 expert about the --
11      A.  Scientist.
12      Q.  -- impacts of formaldehyde?
13      A.  Right.  Yeah.  I think I share the fears
14 of my uneducated broker brethren.  I don't know.  I'd
15 be -- I'm concerned that, you know, there's no --
16 there's no guarantees about anything.  But there was
17 an issue severe enough to have people moved out of
18 their house, and then the -- the company that created
19 the problem came up with a solution.  And I think
20 there's a natural skepticism as to whether -- whether
21 that solution is going to be adequate, and there's no
22 data that says it is going to be adequate.
23      Q.  So when a homeowner has a home that is
24 potentially subject to stigma impact, when does the
25 homeowner actually experience the injury?  Is it when



Page 205

1 they sell the home and sell it at a reduced value?
2      A.  Well, that's -- I mean, it could be
3 earlier than that.  Let's say, for instance, they
4 needed $30,000 equity to send their kid to college,
5 but they're going to stay in the home, but their home
6 appraises for less because of the stigma or there's
7 a -- it appraises for less than it should, now they
8 don't have $30,000 equity, now they can't send their
9 kid to college.
10      Q.  But it's --
11      A.  Ultimately, it's the access to their
12 equity, whether they want it today or tomorrow.
13      Q.  And so the damage is measured as of the
14 moment they try to access the equity?
15      A.  Well, the damage, in my mind, is measured
16 as of the date I did the appraisal.  I can't -- I
17 don't have a crystal ball, so I can only -- I'm trying
18 to capture my opinion of the damage as of that date.
19      Q.  But if the appraisal is seeking the
20 likely value of the home, and that the price of the
21 home isn't fixed until the date of the sale --
22      A.  That's correct.
23      Q.  -- then it would seem that the stigma
24 impact also wouldn't be fixed until the date of the
25 sale?

Page 206

1      A.  Yeah.  It's -- exactly.  Ultimately,
2 there is going to be or there may be or may not be.
3 But in these cases, if these properties transfer, then
4 in theory an analysis could be done to see if there
5 was -- what the actual stigma damage done, which would
6 be to take the sales price -- now I've got a known
7 price -- and compare it to similar properties in the
8 neighborhood that sold without the stigma.  At that
9 point in time, the differential would be attributed to
10 the stigma.
11      Q.  Okay.  And that's where, then, we come
12 back in to the twin paired sales analysis?
13      A.  Sure.  And at that point I've got -- you
14 know, I've got great market data then, because I've
15 got price, not value.
16      Q.  Page 6 of your report -- and, again we're
17 looking at 319, but I think this is the same across
18 reports.  This is where you set forth three recognized
19 methods.
20      A.  Okay.
21      Q.  And then the first one is the paired
22 sales or sale/resale analysis.  Is there a difference
23 between paired sales analysis and sale/resale
24 analysis, or are those just two different names?
25      A.  Well, it's actually -- it can be the

Page 207

1 same.  A sale/resale analysis is -- is typically done
2 to measure time.  So that's the example I used earlier
3 where I -- I buy my house today and I sell it exactly
4 one year from now.  It's truly a paired sale, because
5 it's the same house, but a paired sale could be
6 another house, a sale/resale analysis is the same
7 house.  So I bought it for a hundred, and I sold it
8 for 106, and therefore a 6 percent appreciation in 12
9 months.  So that's a sale/resale.  But a paired sale
10 may be a sale/resale.  A sale/resale is always a
11 paired sale.  Whatever.
12      Q.  So what information would you need to
13 conduct a paired sales analysis of the Flak Jacket
14 homes in Colorado?
15      A.  I need a lot of verified sales of homes
16 that were impacted, repaired and sold in the open
17 market.
18      Q.  And where would you get that data?
19      A.  Well, first of all, I'd have to have -- I
20 mean, it would likely be given to me by somebody if
21 there was a legal action or something involved.  Then
22 I might be able to have that information given to me
23 as far as these -- these homes were affected and they
24 sold, and there's a claim for damages, then I could
25 look at those particular homes.

Page 208

1      But, I guess, the issue here, from a
2 general market appraisal perspective, is this is not
3 a -- this is nothing that's recorded.  I mean,
4 there -- the only reason a buyer knows that these
5 places are affected is because the seller is going to
6 disclose it to them.  But I don't know, when I'm --
7 when I'm out appraising a property, unless I happen to
8 be appraising one of these properties or one in the
9 neighborhood and I was going to use one of these for a
10 comparable, I would have no way of knowing whether
11 they were affected or not, so I wouldn't know.
12      Q.  You said sales in the open market.  Do
13 you know whether builder sales are sales in the open
14 market?
15      A.  Builder sales.  I would consider those
16 open market.  They're exposed by the builder.
17      Q.  So you would need an identification of
18 affected houses?
19      A.  Yes.
20      Q.  And that information isn't public,
21 correct?
22      A.  Correct.
23      Q.  But you could get it in discovery?
24      A.  I'm assuming I could.  Those are your
25 rules.



Robert Myers   03/26/2019
Pages 209..212
JAMI BORGMANN, ET AL. v. WEYERHAEUSER

Page 209

1    (Deposition Exhibit 334 was marked.)
2       Q.  I'm going to show you Exhibit 334.
3       A.  Right.
4       Q.  And this has a Bates stamp at the bottom
5   that indicates that it comes out of your working file?
6       A.  Right.
7       Q.  If I turn to the page after the exhibit
8   letter -- well, let me step back up.  Do you know why
9   it's labeled Exhibit 1?
10      A.  I don't.
11      Q.  On the next page is a list of -- appears
12  to be location addresses, city, state, ZIP code, and
13  it has the header, Weyerhaeuser Colorado Homes with
14  Flak Jacket joists.
15      A.  I received this list from Mr. Nelson's
16  office.
17      Q.  And I'll represent to you that, based on
18  rough math, there are roughly over a thousand houses
19  on this list.
20      A.  Right.
21      Q.  Did you look at this in any way for your
22  formation of your opinions?
23      A.  I was not engaged to.
24      Q.  If you had wanted to do a paired sales
25  analysis, would that have been useful information to

Page 210

1   use?
2       A.  Well, I mean, it's a starting point.  If
3   I was to research each one of these sales and see if
4   they sold after -- repair could determine that some
5   way through verification, that would be the start of
6   the analysis.  I'd have addresses.
7       Q.  But that was beyond the scope of your
8   engagement in the case?
9       A.  Oh, yes.
10      Q.  What other information would you need
11  beyond a list of affected houses?
12      A.  Okay.  Let's just say if we were going to
13  pick ten of them, okay, I would go through the same
14  process I did on these nine.  So I would have to
15  verify that they had sold, verify the terms of the
16  sale, inspect the property, appraise the property, try
17  to determine what the market value was as unaffected
18  at the time.
19          And then at that point in time, I would
20  have more information, so I would know within an
21  individual subdivision that if I'm using -- if I'm in
22  one of these subdivisions, and I'm looking at a
23  comparable property and it's not on this list, then I
24  know it's a clean sale.  So then I could use that for
25  a paired sale with the subject property, but . . .

Page 211

1       Q.  So you would pull the sales data from
2   MLS, presumably?
3       A.  If it went through MLS, but yeah --
4       Q.  Where else would it be?
5       A.  -- that --
6       Q.  Sorry.  Where else would it have gone?
7       A.  Well, if it sold through a broker, it
8   would be in MLS.
9       Q.  And then do builder sales go through MLS?
10      A.  Not all of them.
11      Q.  Do they record those with the county?
12      A.  Those sales are recorded.
13      Q.  So --
14      A.  What's not recorded, it's what's in the
15  sales price.
16      Q.  What does that mean?
17      A.  Well, that means their base model is --
18  I'll use an example -- $500,000, and that was the list
19  price in the MLS, and it sold for 640.  Now, what they
20  did was totally finish the basement, put in a new
21  backyard and add 150,000 in options, but I don't have
22  that information in public record.
23      Q.  So the county record would give you the
24  sales price?
25      A.  That's it.

Page 212

1       Q.  And then, presumably, MLS would give you
2   the sales price and additional data?
3       A.  Well, at least a way to get additional
4   data through the verification.  I've got two agents'
5   names.  That's my starting point.
6       Q.  So you would use the data you could get
7   from the MLS process?
8       A.  Yes.
9       Q.  You'd get the data you could use from the
10  county.  And then you would identify affected homes
11  and their sales price, if they had been sold?
12      A.  Right.
13      Q.  And then you would look for similar
14  sales, to the extent you could determine them, and you
15  would -- if they weren't on the list, you would assume
16  they were unaffected homes, and you would match them
17  up and try to determine the impact, if any?
18      A.  Right.
19      Q.  Do you know how many, approximately, Flak
20  Jacket homes have been sold in Colorado in the last 18
21  months?
22      A.  I don't know -- a number of 12- to 1500
23  jumps into my mind, but I have no -- I'm not sure -- I
24  don't know.
25          MR. NELSON:  Are you asking him new?

Page 213

1  Post-remediation, is that what you're asking?
2        MR. SINK:  Yes.
3     A.  Oh, post-remediation, no idea.  I'm sure
4  there's been some.
5     Q.  (BY MR. SINK)  So the next paragraph on
6  page 6, I understand that there's the scope of your
7  engagement.  But you also say there's not a
8  statistically reliable number of sales of homes
9  post-remediation?
10    A.  Right.
11    Q.  How did you decide that there weren't
12 enough?
13    A.  I couldn't find any verifiable sales.
14    Q.  And what did you do to look?
15    A.  Well, first of all, these were all new
16 homes.  So within the subdivision, I was not finding
17 any people that bought homes and sold them four to
18 five months later.  So there were not a lot of actual
19 sales at all of properties directly after they bought
20 them, so and at this point in time, all of these --
21 these people were moved into their house and out of
22 their house, most of them, within less than a month
23 after they moved in and closed.
24       So I would be looking for sales where
25 people closed on houses and moved out and -- you know,

Page 214

1  and sold those -- those houses sold on the open
2  market, and then tried to determine if they were
3  affected or not.  So I found no, I guess -- I want to
4  use the word easy, but no clear path to getting that
5  data through traditional -- through traditional means.
6     Q.  You used in your description verifiable
7  data.  What do you mean by verifiable data in this
8  context?
9     A.  Well, all of the data that we use, we're
10 going to -- we try to verify as much of everything
11 that we use.  So, for instance, we -- on these
12 particular houses, we have what -- we have what the
13 county shows the square footage at, and we have what
14 the builder may show the square footage as, but we
15 measure it ourselves.  We verify the data.  So because
16 it's not unusual for a builder to say, I'm going to
17 build you an Ashworth model, and then at some point in
18 time they go, no, I really want the expanded bedroom
19 or something, so the square footage is bigger than
20 what the builder says, or the county measures it
21 wrong.  So we -- that's an example of verification.
22       When we use a sale for comparison, we
23 call one of the agents to verify the sale to make sure
24 that they put $600,000 in the MLS; that's the accurate
25 sale.  What were the sales concessions?  What -- what,

Page 215

1  if any, were the strengths of the house, what sold the
2  house.  What was -- you know, what were the buyers'
3  reactions.  So we're trying to get that feedback.
4  That we're verifying what we see in the MLS and the
5  pictures.
6        We know that you can do a lot with
7  pictures.  So we try to get one of the agents to say,
8  yeah, okay, or even that it was an arm's length
9  transaction.  Oh, yeah, well, it wasn't in the book,
10 but he sold it to his sister.  Well, we're throwing
11 that sale out.  So that's why we verify.  But -- so --
12 to an extent that we can, we verify as much
13 information as we can.
14    Q.  So I'm -- judging from what you said
15 earlier, and you can correct me if I'm wrong, that as
16 you have more sales to account for, some of your
17 concerns about an error or a mistake here and there
18 sort of diminish the more sales you have?
19    A.  Sure.  Because that -- you know, in
20 statistics, it works -- you know, those corrections
21 correct back towards the mean.
22    Q.  And then I can appreciate that sometimes
23 records have mistakes and that it's always better, if
24 you can, to talk to people to confirm the data that
25 they entered.  I guess the question is:  Do you

Page 216

1  consider MLS, without confirmation, to be a reliable
2  data source?
3     A.  It's reliable, but it's not -- you know,
4  we try to take the extra step, but sometimes you
5  can't, sometimes the agent won't call back.  And so if
6  the data otherwise appears to be reasonable and we
7  can't do that, and it's consistent with the public
8  record, we'll use those sources, and I'll go ahead and
9  use that sale.  And in the -- everything in the
10 subdivision selling for 400, and this particular sale,
11 which I can't verify, sold for 475, and it's the
12 outlier, I'm not using it unless I can verify, because
13 I can't -- I've got to answer that question for myself
14 as to why it's different.
15    Q.  Is there any -- again, understanding the
16 desire to verify data, is there any particular reason
17 why county data would be unreliable?
18    A.  Yeah.
19    Q.  What's that?
20    A.  Well, the input of the data is -- is
21 oftentimes completed by people that are less than
22 motivated to be accurate.
23    Q.  So do you find MLS data to be more
24 reliable than county data?
25    A.  I do.  Because they -- because there's



Page 217

1 kind of a watchdog. If you're reporting -- if there's
2 inaccurate data in your MLS, other Realtors will call
3 you and report to you and say, hey, you've got that
4 wrong, fix it, but I don't know -- I mean, I -- the
5 county is -- they're better and better.
6        All of the counties are better, and I
7 think that there's -- would be few discrepancies in
8 these particular homes just because they're new. And
9 like square footage and things, they coordinate with
10 their building department, but homes that are 25 years
11 or older, and the drawings are scratched out in ink
12 and the numbers are faded, you know, I've had
13 two-story houses that I go out and look at and they're
14 ranch-style.
15     **Q.  So other than the information we've**
16 **talked about of affected homes, MLS records, verified**
17 **if possible, county records, verified if possible,**
18 **what other information would you need to conduct a**
19 **paired sales analysis?**
20     A.  Well, I -- you know, in all of these
21 cases, we actually got the options list, everything
22 these people put in the property, and we have their --
23 we have our contracts. We have all of the lists.
24 So we know what went into these houses. So -- and we
25 have a builder's price list. So, you know, we can

Page 218

1 kind of -- if we're using a comparable property and we
2 see a similar option, we know it's a finished
3 basement. Similar to our subject, we know it's -- the
4 builder charged X amount of dollars. So we can kind
5 of piece that together.
6        But when you're just out in the market
7 and you're saying this sale -- well, if I'm -- if I'm
8 going -- if I'm using a sale that I'm not going in and
9 looking at the home, which on the other side of the
10 paired sale -- my subject property I look at. But if
11 I'm using a paired sale, I want as much information as
12 what's included in that as possible, because these
13 sales prices, the way builders price their product,
14 they can vary greatly. I mean, their options can be
15 25 percent of the purchase price.
16     **Q.  So the list of affected homes, MLS data,**
17 **verified, if possible, county information, verified if**
18 **possible, builder information, including price list**
19 **and feature list. What other information would you**
20 **need to conduct a paired sales analysis?**
21     A.  Motivation of the buyer and seller.
22     **Q.  And how would you get that information?**
23     A.  The Realtor.
24     **Q.  If you were doing a large statistical**
25 **survey, how would you get that information?**

Page 219

1     A.  I wouldn't. That's a statistical survey
2 and not a paired sale. So in statistics, I'm going to
3 use a standard deviation. But in paired sale, I'm
4 actually -- if I'm trying to do an exact matched pair,
5 I'm matching as many features as I can match.
6 Hopefully -- you know, theoretically in the books,
7 there's one feature. There's that one-car garage. It
8 never works that way. There's always more than one
9 feature. But at least if you can adjust for that,
10 then you still get close to the answer.
11     **Q.  Is it the case with buyer motivation**
12 **that, again, the more homes you can conduct a paired**
13 **significant analysis for, the less significant any one**
14 **buyer motivation might be?**
15     A.  Exactly, yeah. Because if you -- if
16 you're doing -- you know, if you do two, you could
17 have, you know, some buyer motivation or seller
18 motivation that was -- was abnormal in one or both
19 cases. But if you do ten, you're going to find eight
20 regular sales.
21     **Q.  So the -- I think that leads us then to**
22 **the next -- sorry, before we do that. Any other**
23 **sources of data you would want to conduct a twin**
24 **paired sales analysis?**
25     A.  Off the top of my head, no, but . . .

Page 220

1     **Q.  The next category is a statistical**
2 **analysis. What do you mean by sort of a statistical**
3 **analysis?**
4     A.  This is the analysis that I would conduct
5 five years from now. When I've got this list, I could
6 track all of the sales that were affected within a
7 subdivision, and when they resold, I can see how they
8 looked to the rest of the market, and are they -- you
9 know, do -- are they above or below the mean, you
10 know, and how much.
11     **Q.  And so if you have a universe of**
12 **approximately a thousand homes that are affected, how**
13 **many sales of affected homes would you want to look at**
14 **to to have a reliable statistical sample?**
15     A.  Well, I'd have to -- it's by area. So a
16 thousand -- I mean, you know -- that would be a
17 massive undertaking to do something that big. But if
18 you're -- let's say the sub -- whatever problem I'm
19 trying to solve for in the subject property, and let's
20 say it's any one of those, if I didn't have enough in
21 that subdivision, I would look for similar
22 subdivisions with similar economic drivers, and then
23 use sales from them.
24        So if I've got a -- and it happens in
25 Denver all of the time. Let's say there's a $600,000,

Robert Myers   03/26/2019
JAMI BORGMANN, ET AL. v. WEYERHAEUSER

Pages 221..224

Page 221

1 2,500-square-foot house in Aurora, and there's one in
2 Westminster, and there's one in Arvada, and they're
3 similar size, similar age, I'm going to conclude that
4 the market dynamics are similar, and I would take
5 sales from any of those that are affected to do my
6 analysis, but I couldn't necessarily do -- oh, I
7 looked at one property in Littleton, I believe, that
8 has a different market dynamic than the rest of them.
9        I mean, it was a different area,
10 different motivation, same builder -- I think it was a
11 Richmond home -- but -- but kind of a different buyer;
12 the difference between the suburban buyer and the
13 urban buyer, the buyer that buys around Wash Park and
14 the buyer that buys in Aurora.  So I wouldn't compare
15 those, but -- so that's -- you know, I would take as
16 many sales as I could in similar areas, and then try
17 to get them as close as I could to match, and then do
18 the matching.
19        Q.  Assuming you could get the comparable
20 houses to line up --
21        A.  Right.
22        Q.  -- do you have any sense if there were
23 affected houses -- a thousand affected houses, how
24 many you would want to look at for your sample size to
25 conduct a statistical analysis?

Page 222

1        A.  Well, I guess, until I reached
2 saturation.  You know, I'm going to find -- you know,
3 there's going to be something that's going to come
4 out, and, you know, it will be all over the board
5 until -- until my standard deviation narrows, and the
6 data points are closer to the middle, and that
7 changes.
8        Q.  In your experience, do you know by
9 order -- is it half the houses, is it less than half
10 of the houses?
11        A.  Well, I mean in a straight -- in a
12 statistical analysis, in a straight regression model,
13 you know, your -- your standard deviation is -- is
14 like 12-1/2 to 15 percent on the other side of the
15 line and then on both sides of the line you've got
16 your outliers.  The tighter that gets, the better the
17 data.  But at a minimum, you've always got 25 percent
18 of the properties outside of the standard deviation.
19        Q.  Even if you've got a saturated sample
20 size?
21        A.  Right.  Yeah.  I mean, just by -- just
22 because of the way you gather your data.  You know,
23 because as the -- as the standard deviation gets
24 tighter and your dots get closer together, there's
25 still numbers on the outside of the standard

Page 223

1 deviation, so . . .
2        Q.  So you don't have an opinion as to what
3 the -- approximately what a reliable sample size would
4 be?
5        A.  No.  I mean, they toss a number around in
6 statistics class as 21 data points, but I don't know.
7 The people that are experts in statistics, like my
8 daughters, tell me that's not necessarily so.  It's
9 based more on the quality.  If the quality of the data
10 is great, 21 might be good.  If the quality is not
11 great, you may need a hundred.
12        Q.  But is it fair that somewhere between 21
13 and a hundred is probably the --
14        A.  Yeah.  And, of course, that's the
15 statistical analysis as opposed to the paired sale,
16 because I wouldn't need nearly that many paired sales.
17        MR. SINK:  Well, I think we want to talk
18 about the survey method that you did conduct, but I
19 think it's just at 4 o'clock, so I want to give
20 everyone a chance to take a break, if you would like.
21        MR. NELSON:  Yeah.  And just so we can
22 plan our evenings, how long are you going to go?
23        MR. SINK:  We're off the record.
24        THE VIDEOGRAPHER:  Going off the record.
25 The time is 4:05 p.m.

Page 224

1        (Recess taken, 4:05 p.m. to 4:13 p.m.)
2        THE VIDEOGRAPHER:  We are back on the
3 record, and the time is 4:13 p.m.
4        Q.  (BY MR. SINK)  So we've been discussing
5 in the context of Exhibit 319 twin paired sales
6 analysis and statistical analysis as two additional
7 models of evaluating potential stigma; is that right?
8        A.  Correct.
9        Q.  Would your answer to any of my questions
10 change if we were talking about a different report
11 that you've issued in these cases?
12        A.  No.
13        Q.  The method you used in these cases to
14 define stigma report -- excuse me.  Let me start over.
15 The method you used in this case to determine your
16 calculation of stigma damage was the survey and
17 interview method, correct?
18        A.  Yes.
19        Q.  And you used the -- how many surveys did
20 you conduct?
21        A.  Formal survey, one survey, a hundred
22 responses.
23        Q.  And how many interviews did you conduct?
24        A.  Oh, I spoke to probably -- well, a lot of
25 different people in the market.  I'm going to say



Page 225

1  probably 30 or 40 appraisers at different times,
2  different brokers.  So maybe interviews to get general
3  feed -- feedback, maybe 50.
4      Q.  So just so I can get the numbers down,
5  you interviewed some appraisal -- appraisers --
6      A.  Right.
7      Q.  -- and some brokers?
8      A.  Correct.
9      Q.  How many appraisers would you say you
10  interviewed?
11      A.  More than brokers, like 40 to 10 or
12  something like that, because the brokers were captive,
13  they were taking my classes.  Or the -- the appraisers
14  were captive.
15      Q.  So you interviewed approximately 10
16  brokers?
17      A.  Yeah.  And that was outside and not in a
18  classroom setting.  And the appraisers, we talked
19  about the concepts within the appraisal classes.
20      Q.  And so the appraisers you interviewed
21  were students of your courses?
22      A.  Students.
23      Q.  And the ten brokers, how did you find the
24  ten brokers?
25      A.  Oh, just through broker context, and

Page 226

1  I'm -- I'm in constant contact with different brokers.
2      Q.  Your question put me in mind of a
3  question I forgot to ask earlier, which now Mark is
4  now going to tap his fingers at me.  In the courses
5  you teach for either licensure or continuing
6  education, do you have course materials you used?
7      A.  Sure.  Every -- every course has a -- a
8  book or -- workbooks or books.
9      Q.  Did you prepare any of those materials
10  yourselves?
11      A.  I wrote one of the classes, the
12  Distinctive Property class.  The other classes were
13  written by others, and I taught them.
14      Q.  Would that material have whatever
15  information that you teach regarding survey and
16  method?
17      A.  I don't -- I've not taught survey and
18  method.
19      Q.  Were those materials --
20      A.  Statistics and modeling?
21      Q.  Yes, sir.
22      A.  Yes.  There is a -- there is a text for
23  that.
24      Q.  Do you still have access to that text?
25      A.  Yes.

Page 227

1      Q.  You conducted approximately 50 interviews
2  to form your opinion in these cases?
3      A.  I got responses back.  That's how many
4  people I'm -- over three or four classes, that's how
5  many people were involved in the discussions.  So they
6  weren't specific sit-down interviews saying, what do
7  you think about this issue.  There were general
8  discussions and getting feedback from the room.
9      Q.  Were they verbal discussions then?
10      A.  Verbal, yeah.
11      Q.  Did you take any notes about the results
12  of those discussions?
13      A.  No.  I didn't do a statistical
14  calculation of their responses.
15      Q.  But did you make any handwritten notes
16  about the comments they were making?
17      A.  No.  But, I mean, some of their comments
18  appear in here.  I mean, their -- the general comments
19  and -- and the purpose of that is to -- the purpose of
20  those at that time was to either -- you know, without
21  measuring anything, affirming or -- or debunking my
22  hypothesis.
23      Q.  So the interviews -- did you rely on the
24  interviews in determining the amount of your stigma
25  calculations?

Page 228

1      A.  No.  I mean, other than the strength of
2  the reactions.
3      Q.  So how did you measure the strength of
4  reactions from the interviews?
5      A.  Oh, just from the -- from the reactions
6  in the room.  And, you know, like people would say,
7  well, if you're just painting over it, there's no way
8  I would live in that house ever.  That was the strong
9  reaction.
10      And then measuring going back to maybe
11  talking -- the question about replacing the joist
12  systems, I got comments back as to, yeah, well, that
13  wasn't the way the house was designed, what about the
14  structural integrity of the house.  And then my
15  comment would be back, well, the -- assuming, you
16  know, that the fixes are engineered, so they're -- you
17  know, engineered and inspected when they go back in
18  the home.
19      So with that assumption, what's your
20  thought process.  And they said the home wasn't
21  designed that way, so there are bound to be problems.
22  That was the general response from a lot of different
23  respondents that -- highly negative response to --
24  to the encapsulating, painting over the problem.  And
25  skepticism to cryoblasting or mechanical removal.

Page 229

1    Q.  How did those responses correlate, if
2  they did, to the calculation of the amount of the
3  stigma damages?
4    A.  They didn't, other than -- I mean, I'm
5  weighing all of those responses, and the responses
6  from the survey, and then it's not a scientific
7  calculation, it's my interpretation of the data and
8  all of the information that I've gotten, what it tells
9  me.  So, for instance, I know you're going to have
10  specific questions, but to give an example, in a case
11  where 50 percent of the brokers say, I will not sell
12  this property at any price, that's a very strong
13  reaction.  So that tells me relative to the other
14  methods of -- of remediation, that it has the
15  strongest market reaction; therefore, it's going to
16  have my highest damage estimate, because that's going
17  to be reflected in the market.
18    So that -- so relative -- in relative
19  terms, the interviews or discussions I had with
20  appraisers and brokers were very much the same as the
21  formal -- as the formal survey that I completed where
22  it was obvious through the statistics and the number
23  of responses that the greatest risk, market risk, or
24  market input was to the homes that were painting over
25  the property.

Page 230

1    The second greatest amount of concern was
2  with cryoblasting, and then the least amount of
3  concern was with the replacement.  However, there was
4  still measurable market resistance with the
5  replacement.
6    Q.  So is it fair to say that the interviews
7  helped you rank the concerns associated with the
8  various forms of remediation?
9    A.  Yeah.  It kind of confirmed it, because
10  what I've got is I've got two different sets of market
11  participants.  Brokers are, without a doubt, the most
12  influential market participant.  And the reason I
13  selected brokers is because their clients rely heavily
14  upon their recommendations.  So in -- by a large
15  percentage, buyers -- a high percentage of buyers and
16  sellers use real estate advice.
17    By another -- now, there is the
18  for-sale-by-owner market, but it is a much smaller
19  marketplace.  So most of them rely on professional
20  assistance.  So the influence of those
21  professionals -- my influence over my buyers, my
22  influence over my sellers is significant.  They --
23  they hired me because they trust me.  So that's why I
24  picked brokers.
25  But -- but appraisers are independent, and they have

Page 231

1  their own opinions.
2    So when I got virtually the same type of
3  response from appraisers, that's a second source -- it
4  wasn't a formal source, but a second source that what
5  I was reading from the brokers wasn't wildly off base,
6  that I'm engaging what other people that are paid to
7  anticipate market trends are thinking about this
8  particular problem, without any specific verification,
9  and, you know, I'm limiting -- as limited.
10    My survey is my survey.  It didn't talk
11  about anything.  My discussions were very general in
12  nature, because I can't talk about anything specific
13  to appraisers either.  So they were general in nature,
14  and what would your concerns be, and what would your
15  thoughts be.  If you were appraising the property,
16  what would you be thinking.  So that -- the two sets
17  of market participants, they confirmed my own
18  hypothesis that there was -- that there is most
19  likely -- there is stigma, in my mind, most likely
20  stigma, to these properties in some form.
21    Q.  As a broker, do you ever advise a client
22  not to buy a house?
23    A.  Yes.
24    Q.  Under what circumstances?
25    A.  Well, first of all, if I feel that

Page 232

1  there's -- if there's anything within that purchase
2  that I feel is going to affect their potential
3  investment in the property, I'm going to strongly
4  advise they walk away.  If there's any life safety
5  issues, unresolved life safety issues.  We do an
6  inspection on every property.  If there's a leaking
7  furnace or something that would cause harm to the --
8  to the buyer, and the seller doesn't agree to fix it,
9  we walk, or they continue without me.
10    Q.  So if the house is in a marketable
11  condition --
12    A.  Right.
13    Q.  Do you ever tell -- as a broker, do you
14  ever tell a client not to buy a house?
15    A.  Well, if it's in a marketable condition,
16  sometimes you talk to the client not to buy the house
17  at the price that they're asking for it, because it
18  may not be worth what they're asking.  So sometimes
19  negotiations break down over price.  More often than
20  not, that's the case.
21    Q.  So as a broker, you might advise your
22  client as to a fair price.  Would you ever tell a
23  client not to buy at a price if the client wanted to
24  buy at the price?
25    A.  No.  And, typically, I always let people



Page 233

1  buy.  It's a misnomer about being a salesman.  I've
2  never sold a house.  People buy houses.  You can't
3  sell something that costs 500,000.  I let the buyer
4  buy, which is why I'm still in business after
5  40 years.
6      Q.  So I want to understand a little bit
7  about the sequence of how these things went down.  You
8  talked to brokers, correct?
9      A.  Yes.
10     Q.  You talked to appraisers in your courses,
11 correct?
12     A.  Right.
13     Q.  And you conducted a survey at some point
14 in time?
15     A.  Right.
16     Q.  Is that the order that those events
17 happened in?
18     A.  Yeah.  They're simultaneous.  I was --
19 some of my questions were -- were designed around
20 responses that I've gotten back from the appraisers.
21 So some of the questions I may not have thought of,
22 you know, that I thought was germane to the discussion
23 might have come from an appraiser or somebody that
24 said, well, yeah, but if you're talking to these
25 brokers, who is answering your survey, all of the

Page 234

1  rookies that don't have any time to do anything.
2      So I asked the question, how long have
3  they been in practice, that was one of my questions.
4  So I wanted to see is it -- am I getting responses
5  from somebody that really had no experience, or am I
6  getting responses from agents that are seasoned.  In
7  this case, agents that were seasoned by a long margin
8  responded to this.
9      Q.  So who were the first people that you
10 spoke to as you undertook this assignment?
11     A.  Well, the first person I spoke to was my
12 wife, who is a broker and a sounding board and
13 co-owned my -- my company.  She's been a broker for
14 40 years also, so that was the first person, but --
15 I'm going to say after I accepted the assignment, I
16 probably taught a class right after that.
17     So the first person -- at least maybe the
18 first and -- first and second would be appraisal
19 classes, and then -- and then reaching out to other
20 brokers that I talked to in the industry.  One of the
21 reasons I talked to brokers was I wondered if anybody
22 had heard about it.  In my market, very few had.  I
23 know there are cases in Colorado Springs, but it's not
24 nearly as publicized as it was here.
25     Q.  And then after you spoke to brokers and

Page 235

1  after you spoke to the appraisers, roughly, that's
2  when you then conducted the online survey?
3      A.  Yes.
4      Q.  Just so I have it, you didn't record any
5  notes from your interviews with brokers, correct?
6      A.  Correct.
7      Q.  You didn't record any notes from your
8  interviews with appraisers, correct?
9      A.  Correct.
10     Q.  Did you prepare any questions or talking
11 points in advance before interviewing the brokers or
12 the appraisers?
13     A.  No.
14     Q.  As part of those interviews, you
15 presumably provided them some information about the
16 product, correct?
17     A.  Right.
18     Q.  And you provided them some information
19 about the remediation, correct?
20     A.  Right.
21     Q.  And where did you get that information
22 from?
23     A.  Oh, I got that from my research into the
24 case, and what -- what I had known so far is that
25 there were trusses that emitted excessive levels of --

Page 236

1  dangerous levels, according to the readings, of
2  formaldehyde gas.  People bought their new homes, they
3  were displaced, moved out, and there were three
4  different remediations being done, A, B, C, what do
5  you think about it.  Do you think -- what -- then it
6  was a free discussion.
7      Q.  And did you -- do you have any record of
8  the information you provided them about either of the
9  formaldehyde issues or the remediation?
10     A.  No.  I mean, it was -- it's summarized in
11 this report.  The type of remediation and -- that
12 under my understanding was approved.
13     Q.  But there's not a place where I can go
14 and look and see what summary --
15     A.  No.
16     Q.  -- you gave about formaldehyde?
17     A.  No, no.
18     Q.  There's not a place I could go look to
19 see what information you gave them about remediation
20 and its effectiveness?
21     A.  Right.
22     Q.  At some point in time, you set up an
23 online survey; is that right?
24     A.  Yes.
25     Q.  And you used Survey Monkey?

Page 237

1    A.  Correct.
2    Q.  Why did you pick Survey Monkey?
3    A.  Oh, because the person that I was -- the
4  person that I was consulting with and asking about how
5  to do an online survey said, hey, you know, there's
6  this program out here called Survey Monkey you ought
7  to look at it, so that's --
8    Q.  And who was the person you were
9  consulting with?
10   A.  It could have been my daughter, Kristin.
11  She conducts surveys all of the time, and I think she
12  may have told me about Survey Monkey.
13   Q.  Were there any reference materials or
14  source books that you consulted in how to conduct a
15  statistically valid survey before you created the
16  Survey Monkey survey?
17   A.  I mean, there's -- there's what -- just
18  my general understanding of -- of conducting surveys
19  in that you're -- I mean, you attempt -- I'm
20  attempting to extract information that's -- that's
21  meaningful to -- to the situation.  It gives me
22  information that I can weigh in -- to formulate my own
23  opinion, but in a non-biased manner.  I tried to be as
24  non-biased as possible.  So who I sent it to, I sent
25  it to the entire board.  I mean, it went out to a lot

Page 238

1  of different people.
2         I got surveys back from everybody.  So I
3  think they were -- nobody had to sign them.  Nobody
4  had to say, well, I'm Joe Smith, this is my opinion.
5  Totally a blind survey.  And then I went through the
6  questions with -- with both of my daughters to see if
7  they saw anything that appeared to be biased and felt
8  the questions were fair for what I was trying to
9  determine.
10   Q.  Just for the record, were your daughters
11  retained to provide assistance on this matter?
12   A.  Dinner.  No.
13   Q.  Apart from consulting your daughters, do
14  you recall looking to any reference materials or
15  guidance on how to conduct a valid survey?
16   A.  No.
17   Q.  So you opted for Survey Monkey at the
18  recommendation of one of your daughters?
19   A.  Yes.
20   Q.  Did you look at any other alternatives?
21   A.  I didn't.
22   Q.  How did you determine what universe of
23  people you wanted to survey?
24   A.  That's, as I discussed earlier, I decided
25  to survey the brokers, first of all, because I knew I

Page 239

1  could get access to them through a company that has a
2  full e-mail list of them, which is Front Range 360.
3  And I used that company in my advertising, so I called
4  to see if they also did the Denver market, and they
5  did.  So I knew I had access to the -- to the members
6  of the Realtor Associations in -- in the Denver area.
7         And so I wanted to have people in the
8  area that worked within the counties that were
9  affected.  So one of the questions I asked, I think
10  the second or third question I asked, is whether they
11  worked in these particular areas or they had
12  experience in these areas, and then I asked if they
13  had heard about the problem.  So I wanted to determine
14  what their level was, any kind of information before
15  anything, so I really didn't have -- there's a
16  description in my survey that talks about the -- about
17  the issue in kind of an informative way and says,
18  okay, here's a summary of what it is, and then there's
19  questions after that.  But everything before that was
20  to try to make sure that I was getting a reasonable
21  sample of responses from across the brokerage
22  community.  And I selected the brokers because they
23  have influence over buyers and sellers.
24         (Deposition Exhibit 335 was marked.)
25   Q.  Do you recognize Exhibit 335?

Page 240

1    A.  Yes.  That's communication back and forth
2  with my guy from Front Range 360.
3    Q.  So this is the group that you were
4  referring to that you used to distribute the survey;
5  is that right?
6    A.  Yeah.  And they also worked out the
7  kinks, and they worked with it, and I don't.  So when
8  I -- you know, I sent -- sent them the information,
9  and then they reduced it into a readable format.
10  There's logistics problems with, you know, you type
11  something on Word and that doesn't necessarily compute
12  to go out into the survey and so forth, so they worked
13  through those technical issues for me, so I could get
14  the questions out to the people I wanted to.
15   Q.  Do you know -- what was the name of the
16  distribution list that the surveys went to?
17   A.  Well, it went to Board of Realtor
18  members, so not all brokers, just those that belonged
19  to the Board of Realtors.
20   Q.  Do you know, approximately, how many
21  people the survey was sent to?
22   A.  I think a thousand or more.  It could
23  have been more than a thousand.
24   Q.  Did you have confirmation from them as to
25  how many people they were sending it to?



Page 241

1    A.  I did, at that point.  You know I -- it
2  may be in here somewhere as to how many it actually
3  went out to, what's their -- what their group was.
4       Q.  I don't see it in this e-mail.
5       A.  It's not in this e-mail, but it's a --
6  you know, and, again, this is from memory, but I
7  roughly think I got about a 10 percent response, and I
8  got 102 responses.
9       Q.  Do you think they provided you any more
10  details about the nature of their distribution list?
11      A.  Did they or would they?
12      Q.  Did they?
13      A.  I mean, I don't know how many -- I know
14  they have e-mail lists for everybody that belongs to
15  the metro boards.  So I don't know what that
16  membership is.
17      Q.  Do you know if they provide you in
18  writing what the approximate number of Realtors were
19  that it went to?
20      A.  I don't -- I don't recall.
21      Q.  So you provided them with typed-out
22  questions; is that right?
23      A.  I wrote the survey questions, yes.
24      Q.  And then they uploaded it into Survey
25  Monkey somehow?

Page 242

1       A.  Yeah.  They put it in -- they reformatted
2  it, so that when it went out, it went out the way it
3  needs to so it could be read.  I mean, this
4  particular -- I don't know -- I printed this off, this
5  thing you've got right here, and this is the way my
6  initial one went to them.  And by the time they got
7  done, you could pull that survey up and it was nice
8  and neat and you could read it, but this is the way it
9  printed out originally.
10      Q.  So how could you look at survey results?
11  Did you go to a website and log in?
12      A.  Yes.  Yeah.
13      Q.  Do you still have access to the survey
14  results?
15      A.  I do.  I looked at them this morning.
16      Q.  And why did you look at them this
17  morning?
18      A.  Because I knew I was going to have a
19  deposition.
20      Q.  And what particular things in the survey
21  results did you look at, just re-familiarizing
22  yourself --
23      A.  Yeah.  I just wanted to read -- read
24  everything again, because it's been a year, so . . .
25      Q.  Did you -- did you have to pay for the

Page 243

1  Survey Monkey service?
2       A.  No.  It was free.  360, I paid them.
3       Q.  Okay.  And what did you pay them?
4       A.  Not much.  It was a couple hundred
5  dollars, 2- or $300.  It wasn't very much.  A lot
6  cheaper than a mail-out.
7       Q.  So you anticipate that there are other
8  forms of surveys, right?
9       A.  There are other types of survey
10  companies?
11      Q.  Well, that too.
12      A.  I'm sure there are.
13      Q.  Sure.  But I -- you can survey by mail,
14  correct?
15      A.  Oh, yeah, other types of surveys, whether
16  it's mail or phone or whatever, yeah, there are
17  different types.
18      Q.  So you could also attempt to survey
19  recent home buyers, correct?
20      A.  If you can compile a list.
21      Q.  You could also try to survey potential
22  home buyers somehow, correct?
23      A.  Well, again, you run into -- I mean,
24  those people are out there, but -- and I was thinking
25  about all of the things you're thinking about.  And

Page 244

1  I -- when it kept coming back to the same answer, how
2  do I -- who are those people, what are their e-mail
3  addresses, what's their phone number, what's their
4  name, who keeps a list of who is looking for houses
5  today, or thinking about selling.
6       Q.  But you could theoretically conduct a
7  telephone interview?
8       A.  Well, again, if you've got -- if you can
9  get the phone numbers for your target.
10      Q.  Do you have any experience conducting
11  telephone interviews?
12      A.  No.
13      Q.  Do you have any experience conducting
14  mail interviews --
15      A.  No.
16      Q.  Excuse me.  Mail surveys?
17      A.  Not surveys, no.
18      Q.  How many times have you done an e-mail
19  distribution survey before for your professional work?
20      A.  None.  This is a first.
21      Q.  You referenced, and it's contained in
22  Exhibit 319, but not part of the official report, a
23  copy of a printout from what appears to be the Survey
24  Monkey information, correct?
25      A.  Yes.

Page 245

1      Q.  And it starts with a page that says, page
2  1, General Information about you at the top.
3      A.  Okay.
4      Q.  Is that right?
5      A.  Yes.
6      Q.  And if you thumb through until the back,
7  you get to a page -- I'm going to say it's about
8  15 pages later -- with a bunch of hyperlinked words,
9  including agent suggests builders, et cetera; is that
10  right?
11      A.  This page right here?  Is that what
12  you're looking at?
13      Q.  No.  I'm a few pages further back.  I
14  apologize.  These don't have Bates numbers on them.
15      A.  Okay.
16      Q.  At the end of the comment section is a --
17      A.  Oh, that's -- these are all of the
18  comments, okay.  Yes, this one.
19      Q.  So is it fair, again, that the first page
20  reads page 1, general information about you, correct?
21      A.  Right.
22      Q.  And the last page has several words with
23  hyperlinks and some of those include taken,
24  mitigation, buyer's agent, correct?
25      A.  Yes.

Page 246

1      Q.  And that was a printout of the web Monkey
2  Survey results?
3      A.  Well, I think this was the questions.
4      Q.  Okay.
5      A.  I'm -- I'm looking for the -- well, no,
6  there it is.  I'm trying to read the results.  In
7  the -- yeah, this is -- it shows 101, how many skipped
8  and . . .
9      Q.  So I'll ask you some questions about it.
10  But these -- these appear to be at least the survey
11  questions, right?
12      A.  These are, right.  These are, correct.
13      Q.  And it shows you for -- in this printout,
14  for example, how many people answered a particular
15  question?
16      A.  Right.
17      Q.  Do you know how this document was
18  created, how it -- how it came to be printed out?
19      A.  Well, I printed it off of the survey and,
20  you know, there was -- there's a results page on
21  the -- on the survey, and I printed it out to put it
22  in the work file, and, you know, as it printed out and
23  I'm looking at it, it's just -- it doesn't give you --
24  it's not presented in the same format as I was looking
25  at it on the screen.  It didn't print the same way as

Page 247

1  the screen was showing me.  So, I mean, on the screen
2  you've got graphs and pie charts and this many
3  responses and that, and then actual numbers, 32
4  responses, 51 percent this way and that, and that
5  document is somewhere.
6      I mean, I don't know if it's in -- I've
7  sent that document.  I don't know if you have it, but
8  I have sent a better document than this, and I also --
9  it is still available, and I have -- I can access -- I
10  mean, I don't have it on me, but I can give you the
11  web page and the password to get into it.  So
12  certainly you can look at everything.  I'm happy to
13  give it to you.  It's just not a -- these are the
14  questions, and I'm not sure I can read the answers,
15  so . . .
16      Q.  Do you know the web page URL right now?
17      A.  No.
18      Q.  Do you have a user log-in name?
19      A.  I do, but I don't have it.
20      Q.  Do you know what the --
21      A.  It's at my computer at home, and it's one
22  of those where you log in, and you've logged in so
23  many times it remembers it, so I've got to figure out
24  what it is, because I don't know.
25      Q.  Fair enough.  I -- I will tell you, and

Page 248

1  we'll come to it in a moment, that I do have an
2  additional printout of the results, and we'll --
3      A.  Okay.  Maybe that's -- maybe that is
4  going to be closer to what I was looking at, because
5  this is -- these are the questions that printed out,
6  and it was attached.  And when I printed it, it just
7  didn't look like I thought it was going to look.
8      Q.  So before we get to those, I want to just
9  ask you some additional questions about this document.
10      A.  Sure.
11      Q.  This document it appears that you cannot
12  read the survey results, correct?
13      A.  I can't determine what they are here.
14      Q.  So you printed this document, and then
15  you put in your work file?
16      A.  Right.
17      Q.  And at some point in time, you realized
18  that you couldn't -- it wasn't displaying the survey
19  results, right?
20      A.  Yeah.  After I printed it.
21      Q.  How long after?
22      A.  Oh.  Well, it was in my work file, and
23  then I was printing some documents, and it was well
24  after I had sent my work file in, so I went back in to
25  the Monkey, and I just, rather than do the print,

Page 249

1  which is that's what you get, I -- I did cut -- I did
2  page, you know, screen shots, pasted them on to a Word
3  document so I could read them.
4      Q.  When did you do that?
5      A.  A couple of weeks ago.  I may have done
6  it before, too.  I thought I had done the screen shot
7  thing twice, but I couldn't find it the second time,
8  so I did it again.
9      (Deposition Exhibits 336 and 337 were
10  marked.)
11      A.  That's -- I can read this one.
12      Q.  So that's 336 and 337.  I want to show
13  you -- I've handed you two exhibits, 336 and 337.  I
14  want to talk about 337 first.
15      A.  Okay.
16      Q.  If you would look at 337 and go back to
17  319, also Exhibit 319, which is the report.
18      A.  Yes.
19      Q.  And you go back into that section that
20  talks -- that has the survey questions in it, but not
21  the responses.
22      A.  Okay.
23      Q.  If you would compare those documents to
24  three -- to Exhibit 337.  I'll give you a moment to do
25  that.

Page 250

1      A.  337 is which one?  Oh, this one.  Okay.
2  So I'm comparing this to which?
3      Q.  That content, the unnumbered content of
4  the survey questions in 319.
5      A.  Okay.
6      Q.  And those appear to be the same
7  documents, correct?
8      A.  It appears to be the same, yes.
9      Q.  So I've marked it separately so that we
10  can have a page-numbered version.
11      A.  Oh, good.  Okay.
12      Q.  So -- but I want to make sure you're
13  comfortable --
14      A.  Yeah.  They -- they appear to be the
15  same.
16      Q.  So now, if we look at 336 and 337 side by
17  side.
18      A.  Okay.
19      Q.  336 appears to be the screen shot version
20  you just mentioned of Exhibit 337, correct?
21      A.  It appears to be, yes.
22      Q.  When did you send out the Survey Monkey
23  survey?
24      A.  Oh, I don't have the date on this.
25  Maybe -- it was -- it was prior to March 30, but after

Page 251

1  February 22, I believe.
2      Q.  I'm sorry.  If you'd say those dates
3  again for me, please.
4      A.  Well, I reference it in a document I
5  dated March 30, and I inspected this report -- Exhibit
6  No. 319, did the inspection on February 22.  So I'm
7  guessing I did the survey or got the results back of
8  the survey between February 22 and March 30, I'm
9  guessing.  That's the best I can -- the time frame I
10  can narrow it down to.
11      Q.  So if you look -- do you know how long
12  the survey was held open for respondents to answer
13  questions?
14      A.  I got the responses, I'm going to say --
15  and it was held open for quite a while, but I maxed
16  out at 100 to 102 responses, I believe, and it was
17  about a week to ten days is how long it took to get
18  everything back.
19      Q.  It appears that Exhibit 337 was the early
20  printout of the survey questions, correct?
21      A.  Yeah, yeah.
22      Q.  And 336 was a more recent printout of the
23  survey, correct?
24      A.  Correct.
25      Q.  In Exhibit 337 it shows 101 people

Page 252

1  answering the first question on the first page,
2  correct?
3      A.  Right.
4      Q.  On 336 it shows only a hundred people
5  answering it, but two people skipping it?
6      A.  Okay.
7      Q.  Do you know why there's a difference
8  between those two?
9      A.  Well, there's some other difference in
10  there, and that could be that there is a break-off in
11  this survey that measured a hundred -- a hundred
12  responses and that you had to pay -- pay them an extra
13  whatever dollars to -- to have the entire survey
14  statistically analyzed for the other two responses.
15  So I'm guessing, which I know I didn't pay extra for.
16  So I'm guessing I got a hundred, because anything over
17  that is extra.  So I'm looking -- let me look through
18  this, but all of these were a hundred or less on this
19  page.
20      And this was early, because I actually --
21  I printed this right after I did it, because I ended
22  up with a 102 responses, so this was probably after
23  the first seven days, and I got one more response.  So
24  this was the first printing, and I had 101 responses.
25      This is the summary that they give me of

Page 253

1  which until -- actually I noticed the same thing this
2  morning, because I knew I had 102 responses, and then
3  there was a hundred, and then there was another place
4  on the web page that said, you know, do you want to
5  pay the extra to get the last two responses analyzed,
6  and I said no.
7      **Q.   If you look at Exhibit 336 and you turn**
8  **to page -- and these are Bates numbers -- Myers**
9  **000176.**
10     A.   176.  Okay.
11     **Q.   There's a yellow bar in the response**
12 **field.**
13     A.   There you go.  That's the one I'm talking
14 about.
15     **Q.   So it provides some additional features**
16 **if you pay for an upgrade fee.**
17     A.   Yeah.  You could get those, the last two
18 responses.
19     **Q.   Do you know if it provides any additional**
20 **services if you pay the upgrade fee?**
21     A.   I didn't pay the upgrade fee, so I don't
22 know.
23     **Q.   But you didn't look into that?**
24     A.   I didn't.  I didn't even notice it until
25 this morning or yesterday.

Page 254

1      **Q.   If you look at Exhibit 336 now, and we'll**
2  **start going through the questions in order.  You**
3  **mentioned that when you provided the data to the real**
4  **estate service to distribute, you provided them**
5  **questions, correct?**
6      A.   I provided them the questions.
7      **Q.   Did you provide them any back --**
8  **additional information or background information to be**
9  **provided that went out with the survey?**
10     A.   No.  Just what was -- the survey was put
11 out, and then the questionnaire, the actual
12 questionnaire, was put out, and then these are the
13 responses we got back.
14     **Q.   Do you have a copy, still, of the**
15 **questionnaire as it went out?**
16     A.   Well, it's on the web page.  So, you
17 know, I think there should be copies of the questions
18 in here somewhere.  This was -- I'm not sure if this
19 has all of it or not, but there was a section in here
20 that I'm looking to see if I see.  There's -- there's
21 a section in the survey that said, okay, this is what
22 happened, these homes have had an issue and people
23 have moved out of their house, their homes are being
24 fixed, they are going to move back in.
25     So the rest of these questions are based

Page 255

1  on your response, if this is disclosed to you after
2  the fact, these questions relate to that.  And that
3  was after -- and I can't remember the exact word.
4  But -- let's see.  Yeah, I think it was probably
5  after -- that little description was after question 6,
6  because I didn't -- I put it in after question 6, if I
7  recall, because I -- I didn't want to tell them about
8  the issue and then ask them if they had heard about
9  it.
10     So I put it after question 6, and then I
11 gave them a little descriptive so that they could
12 answer the rest of the questions.  If you were
13 representing a buyer that knew -- that was, one,
14 affected, so there is a descriptive sentence either
15 somewhere in these thousand pages or -- it's
16 definitely on the site of something I have access to
17 still.
18     **Q.   Do you know whether the e-mail**
19 **distribution that went out to the brokers had any**
20 **description of what the survey was about or anything**
21 **like that?**
22     A.   Just the heading, and the heading was --
23 we went back and forth on that.  I wonder if it's in
24 this letter that you gave me.  No, but there was no
25 description of it.  It was -- there was just a single

Page 256

1  heading like, you know, survey -- I want to see if
2  it's in here.  Sorry.  No, it doesn't show.  I'm
3  just -- oh, there you go.
4      He's telling me -- we're trying to do
5  this thing, and I talk about -- or his advice to me is
6  don't put in -- don't put in the heading Realtor
7  warning as a subject line, because it will -- it will
8  be -- you know, spam flags will go off, and it will
9  get trashed.  So we put something like, important
10 information or something like that was the heading,
11 but that's the only description.  Just -- and the
12 heading of the thing was survey -- you know, important
13 information.  Things you need to know.
14     **Q.   Do you still have a copy of that**
15 **transmittal e-mail?**
16     A.   I'm just reading the one you just gave
17 me.
18     **Q.   No.  I'm sorry.  The e-mail that went to**
19 **the brokers containing a link to the survey.**
20     A.   No.  I mean, the blast went out.  I mean,
21 it -- yeah, the -- I can get that information or
22 whatever from 360.  It's just -- I looked at it.  It
23 was just in an e-mail to me, and then it just had a
24 headline and a link.  That's all it was.
25     **Q.   Did anyone provide you input or edit your**

Page 257

1  survey questions in any way?
2      A.  Well, spelling.  Horrible.
3      Q.  Who did the spelling check?
4      A.  My wife.  She's better.  She was a legal
5  secretary.  I'm a user of services.
6      Q.  Did anyone else provide you with advice
7  as to what the content of the questions should be?
8      A.  No, no.  Again, I've -- I designed this
9  to give me information that would help lead me to a
10  conclusion, or some sort of reasoned conclusion.  So
11  the questions were -- were for my information.  Other
12  than, you know, I mean, I think I mentioned earlier in
13  discussions with Realtors and talking about doing a
14  survey, I think the question came up as to, you know,
15  how do you know whether you're getting somebody that's
16  a new person or not.  So that -- I wrote -- nobody
17  told me to write this question, but I took that input
18  and wrote this question.
19      Q.  Did you run a set of questions by your
20  daughters for input?
21      A.  No.  I ran the results by.
22      Q.  Did you run a set of questions before the
23  Nelson firm before they went out?
24      A.  I'm sure I did, yeah.  I'm sure I sent
25  e-mails with that information.  I cleared everything

Page 258

1  before I sent it out.
2      Q.  Did you receive back any edits to the
3  survey before it went out?
4      A.  That, I don't recall.
5      Q.  If you had received edits, would they be
6  in an e-mail?
7      A.  If -- whatever e-mails that were not work
8  product, I -- that were given to you have been given
9  to you.  I gave all of my e-mails back to their
10  office, and they looked through to make sure that we
11  met the -- their confidentiality rules.
12      Q.  Looking at the first page of Exhibit 336,
13  the first question -- you've mentioned before why you
14  asked the question, you wanted to gauge the experience
15  to see who you were talking to.
16      A.  Uh-huh.
17      Q.  Why did you pick the year ranges, the
18  four-year ranges that are set forth on the page?
19      A.  It just seemed like logical break points.
20      Q.  The results show a percentage response by
21  the year breakouts, correct?
22      A.  Correct.
23      Q.  Do you know whether that response rate by
24  experience matches the industry in any way?
25      A.  Oh, I would say, based on my experience

Page 259

1  of the industry, it's not reflective of all -- at all.
2  There's many, many more at zero to five years than any
3  of the other categories.
4      Q.  Did you weight the value of any
5  particular survey answer based on the years of
6  experience?
7      A.  Well, no, because I don't know who
8  responded to what.  So I don't, for instance, know
9  that a 15-year veteran's response was different than
10  five years.  That wasn't one of the questions.  It was
11  just, I'm trying to get to understand who my
12  contributors are and what their level of expertise is,
13  and so I weighed -- I -- I weighed -- I gave more
14  weight to the reliability of the overall survey based
15  on the relative age and experience of the respondents,
16  than had they all been brand new people, because these
17  are experienced people that have dealt with other
18  issues, so -- so, but I don't have it specifically.
19  Well, the 15-year veterans say that there's a big
20  problem, and the five-year veterans say there isn't.
21  They're all anonymous surveys so I have no way of
22  knowing who is who.
23      Q.  Do you know whether Survey Monkey
24  requests that the respondents submit any -- input any
25  information before they take the survey?

Page 260

1      A.  No.  Because it was -- it came to them,
2  so they were already pre-qualified because they were
3  Realtors.
4      Q.  Did you take the survey yourself?
5      A.  Yes.
6      Q.  So your survey results are in these?
7      A.  Yes.  Oh, no, it's not, actually.  I took
8  it, and it's not in the results.
9      Q.  How did you --
10      A.  I -- I took it and my wife took it.  We
11  took it as a beta test to see if it worked.
12      Q.  Did you take your wife's results out as
13  well?
14      A.  They -- we did ours before they made the
15  survey live.
16      Q.  And how did you take those results out?
17      A.  Well, they -- they didn't make the survey
18  live.  We started out at zero with the survey, but we
19  had to get it up and test to see, send me -- because I
20  wasn't on their e-mail list -- so I said send me an
21  e-mail so I can take the test.  Send my wife one.  So
22  we wanted to go through the same experience that the
23  people taking the survey would include out it looked
24  on my screen, how the questions flowed and that sort
25  of thing.

Page 261

1    So once we got the bugs worked out, which
2    were -- there were a few bugs.  You know, there's --
3    while the answer should be up -- you know, it's --
4    there's a widow -- a widow line, and it's the first
5    line on the next page, and we cleaned all of that up
6    when we took our survey.  And we finally approved it,
7    and then they made it live and sent it out to the
8    Denver market.
9         Q.  If you look at page -- sorry -- before I
10   go there -- do you know whether Survey Monkey has any
11   mechanism in place to keep someone from taking the
12   survey multiple times?
13        A.  I believe they do.  You -- in fact, they
14   do.  I mean, from that e-mail address, from that
15   e-mail, you can only take it once, and then it freezes
16   you out.  Because I tried to take it again after I
17   corrected it, and I couldn't take it until they
18   unfroze me.
19        Q.  But let's say you had two e-mail
20   addresses on the large distribution list --
21        A.  Sure.
22        Q.  -- you would get potentially two links to
23   take the survey?
24        A.  You could.  You could.
25        Q.  And the survey wouldn't know whether that

Page 262

1    was happening or not?
2         A.  No, no.
3         Q.  Do you know whether they have any
4    mechanism in place so that I could forward it to a new
5    e-mail address and they could take the survey?
6         A.  That, I'm sure, is possible.
7         Q.  If you look at Myers 00176 in
8    Exhibit 336.
9         A.  Okay.
10        Q.  There are a list of what appear to be
11   comments.
12        A.  Right.
13        Q.  Did you review the comments in preparing
14   your evaluation of the survey results?
15        A.  Yeah.  I read all of the comments.
16        Q.  How, if any way, did you weight the
17   comments?
18        A.  Well, I -- you know, and I'm sure you've
19   read though these comments.  They kind of create a
20   tone as to what, at least, these respondents are
21   thinking about either the survey.  Some were
22   appreciative to get the information and appreciated
23   getting the survey.  Some told stories about their own
24   buyers and what their -- what their experiences were.
25   Their -- and some have -- you know, observations.

Page 263

1    One, for instance, second from the bottom
2    on 177 says, "The problem is not with the
3    Weyerhaeuser, it's with the new home builder."  So
4    it's different -- people have different responses, and
5    I read them all and have -- all part of -- all of the
6    information is part of formulating my opinions.
7         Q.  But did they -- did you somehow use the
8    comments to weight your stigma calculation?
9         A.  No, no.  I mean I'm -- the comments,
10   although interesting, were -- most of the comments
11   were actually covered in the survey.  I mean, the
12   results -- their opinions are already in the survey.
13   And so -- and also I know that if you take -- if you
14   take the time to make a comment after you've taken one
15   of these surveys, you've probably got some emotional
16   bias or emotional -- more than typical emotional
17   response, so I recognize that also.  It's all thrown
18   into the -- into the analytics.
19        Q.  And when you say "analytics," you mean
20   your internal weighting?
21        A.  Right.  I use the -- I have used the
22   total of my experience and professional judgment to
23   render an opinion.  This is all part of the data that
24   I used.
25        Q.  You mentioned before that you have

Page 264

1    software that helps you do an analysis, a statistical
2    analysis of regression information when you're doing
3    an appraisal, right?
4         A.  Right.
5         Q.  Are you aware that there's software you
6    can use that can do a statistical analysis of survey
7    results?
8         A.  Yes.
9         Q.  Did you use one of those here?
10        A.  Well, this does that.
11        Q.  Well, apart from the percentages that
12   give you -- for the response rate for the answer --
13        A.  Right.
14        Q.  -- but that can -- that can analyze them
15   and give you some degree of a confidence interval --
16        A.  Right, right.  Yes, I'm aware of that,
17   and I did not use that -- those.
18        Q.  Going back.  You mentioned a comment on
19   page Myers 177 that starts off with the word --
20   phrase, "Call me.  The problem is not with
21   Weyerhaeuser, but with the new homebuilders?"
22        A.  Oh, yeah.  Okay.
23        Q.  That suggests to me that the respondent
24   somehow submitted information about their telephone
25   number?



Page 265

1     A.  I had several people that e-mailed me
2  directly or in here asked me to call them, which I
3  did.
4     **Q.  You did?**
5     A.  Sure.
6     **Q.  Do you remember how many people you**
7  **called?**
8     A.  Five or six.
9     **Q.  Do you still have those e-mails of the**
10  **people that reached out to you?**
11     A.  I don't know.  They're in here probably
12  somewhere.  Or like this one on the survey, I just --
13  you know, typically the people that called me were
14  looking for more -- more information or to share --
15  one -- one person that called me was one of the
16  directors of the Board of Realtors in Littleton or one
17  of the -- one of the large boards in Denver, and she
18  got the survey, and she called to me tell me that I
19  needed to be aware that all real estate brokers
20  weren't Realtors.  And I said I was aware of that, but
21  I don't have the e-mail addresses for the ones that
22  aren't,
23  so . . .
24     **Q.  If they were able to reach out to you,**
25  **does that mean your contact information was provided**

Page 266

1  **in the blast e-mail?**
2     A.  I believe my -- I believe my name and
3  information was in the -- it was in the e-mail,
4  because it was in the -- in the survey, because I
5  identified myself and who I was with, because I
6  felt -- because I'm a Realtor, I would get more
7  responses from fellow Realtors than if I was a blind
8  survey.  So I think -- I did put my contact
9  information in there.  Not very many people did, but
10  some did.
11     **Q.  So you know some reached out to you**
12  **separately?**
13     A.  Yes.
14     **Q.  And then do you know whether some people**
15  **provided identifying information through the survey**
16  **itself?**
17     A.  Well, I've got these comments.
18     **Q.  So it's possible?**
19     A.  Oh, they didn't give me their information
20  on the survey.  There's -- all of the responses are
21  here, so I don't see anybody that listed their name or
22  number in here.
23     **Q.  Well, I guess that's my question.  Is**
24  **that comment on page 177, how is this person expecting**
25  **you to call them?**

Page 267

1     A.  Yeah.  I didn't -- you know, I'm guessing
2  probably that I got -- either they thought I knew who
3  they were, or she's e-mailed me separately and asked
4  me to call her as well.
5     **Q.  Adjacent to each comment on the list is a**
6  **hyperlink that says, categorize as dot, dot, dot.  Do**
7  **you see that?**
8     A.  Right.
9     **Q.  Did you click on that link at all?**
10     A.  Well, no.  That's the -- you know, within
11  the last -- there's 24 responses, and the last bullet
12  on there were -- was viewer responses, so all of these
13  say the same thing.  They categorized it, jumped into
14  viewer responses, so they're listed in order, so there
15  should be 24 of them.
16     **Q.  So you think that the hyperlink**
17  **categorized as dot, dot, dot sorts --**
18     A.  That is the viewer responses.
19     **Q.  It also says -- the next hyperlink is**
20  **that you can review the respondent's answers.**
21     A.  Right.
22     **Q.  So that would seem to me that you can**
23  **associate a comment with a particular person's**
24  **response to each of the questions?**
25     A.  In other words, if I -- in my survey,

Page 268

1  this is summary.  But if I'm in the survey itself and
2  I have a comment and I wanted to review this comment,
3  I would hit that, and this comment would come up.
4     **Q.  Right.  But would it also show you the**
5  **respondent's answers to the survey questions**
6  **themselves?**
7     A.  No, not that I know of.
8     **Q.  Do you recall trying to do that?**
9     A.  No, it never occurred to me.
10     **Q.  Okay.  If -- if you could -- you**
11  **mentioned before the people who make comments tend to**
12  **have a higher bias than other people.**
13     A.  Well, they have a stronger opinion.
14     **Q.  Would it be useful to associate comments**
15  **with particular results?**
16     A.  You know, I never thought about it.  I
17  guess, maybe, but maybe not.  I'd have to think it
18  through because I -- you know, I go to great lengths
19  to make it so it's not biased.  So to set up an
20  instrument that would create that, I don't know that
21  that squares.
22     **Q.  Do you know whether these -- that that**
23  **viewer response answer is part of the basic package,**
24  **or is that one of the advanced, upgrade packages?**
25     A.  No.  It has to be basic, because that's

Robert Myers   03/26/2019
JAMI BORGMANN, ET AL. v. WEYERHAEUSER

Pages 269..272

Page 269

1   all I paid for.
2       Q.   On question 2, you asked whether people
3   practiced in certain counties?
4       A.   Right.
5       Q.   Why did you ask that question?
6       A.   Because that's where my appraisals were
7   taking place.
8       Q.   And it indicates that three people
9   responded that they did not practice in that area,
10  correct?
11      A.   Right.
12      Q.   So why is the fact that they practiced in
13  those areas more relevant than whether they didn't?
14      A.   Well, because the -- if they practice in
15  that area, they'd be more likely to associate the --
16  their response with something they knew or read on the
17  media or had in the media.  So maybe they would have a
18  client looking at one of those homes in that area.  If
19  they didn't practice in this area, they were totally
20  out -- maybe they live in Denver but practice in the
21  mountains in Breckenridge where there was no homes
22  that were affected, they wouldn't necessarily have the
23  same information.
24          So again, this was a qualifying question
25  to give me an idea of how -- how strong my response

Page 270

1   from an information point was.  So in both of these
2   cases I have got a -- something that gave me
3   confidence.  I had a large number of experienced
4   Realtors, and I had a large number of Realtors that
5   practiced in the area of my affected houses.
6       Q.   Did you exclude the responses from
7   anybody who didn't practice in one of the
8   designated --
9       A.   No.
10      Q.   -- counties?
11      A.   No, I didn't, because I had no way of
12  doing that.  I don't know what their answers are.
13      Q.   You asked 20 questions in the survey,
14  correct?
15      A.   Yeah.  There were 20 or 24 or 21.
16      Q.   Excuse me.  You're right.  It is 21.
17      A.   Okay.
18      Q.   Were are you limited to 21 questions?
19      A.   No.
20      Q.   Do you know how many questions you could
21  have asked?
22      A.   I -- I don't know.  I asked the ones that
23  I thought were -- that I wanted the information on.
24      Q.   So there weren't any questions you wanted
25  to ask but didn't?

Page 271

1       A.   No.
2       Q.   In question 3 you asked how long you
3   practiced real state in Colorado.  Why did you ask
4   this in addition to question 1?
5       A.   Well, because they could be -- you know,
6   I don't know.  Maybe I've got some -- some people that
7   have practiced in other states and just moved in or
8   something, so I might have an experienced Realtor or
9   experienced Realtors that were really not Colorado
10  brokers.  But again, this -- the results of this
11  question yielded me nothing that I hadn't already
12  looked at.
13      Q.   So my same question for question 1 is you
14  look at the survey responses here, the percentages by
15  the question, the date ranges --
16      A.   Right.
17      Q.   -- does that seem representative of real
18  estate practitioners in Colorado in terms of years of
19  experience?
20      A.   No, no.  In fact, it's not.  It reflects
21  the people that responded to this survey.  So the
22  survey -- again, I'm -- the over 15 years, there's
23  fewer of us gray hairs out there than there are the
24  young people that just entered.
25      Q.   In question 4, you make a statement to

Page 272

1   the individuals or the survey takers, asking whether
2   they're aware that in 2016 and 2017, Weyerhaeuser
3   Company supplied some new homes in your area with
4   defective TJI floor truss systems that emitted
5   formaldehyde causing harm and injury to homeowners in
6   the area, correct?
7       A.   Correct.
8       Q.   So I appreciate that you've been retained
9   in this case to provide an opinion, that that
10  opinion --
11      A.   Right.
12      Q.   -- represents -- is on behalf of the
13  plaintiffs.  To your knowledge, has a case found that
14  the TJI joists were -- are, in fact, defective?
15          MR. NELSON:  Object to form.
16      A.   I was aware that Weyerhaeuser recalled
17  them.
18      Q.   (BY MR. SINK)  Do you -- are you aware of
19  a court ruling establishing that the TJI joists caused
20  harm and injury to homeowners?
21          MR. NELSON:  Object to form.
22      A.   I'm not, no.
23      Q.   (BY MR. SINK)  So you're basing this off
24  of the background work that you did regarding the
25  allegations in this case?

Page 273

1    A.  Yes.
2    Q.  But you didn't choose to use the word
3  allegation or alleged in the question?
4    A.  Correct.
5    Q.  Why not?
6    A.  Probably because I wasn't thinking like a
7  newspaper person, but, you know, I understand that
8  that is probably correct form, and I posed a question.
9  I'm looking for who knew about this -- this problem,
10  and maybe did not word it in a way that would be --
11  obviously, it's -- the court -- it hasn't been tried,
12  so there's no proof of anything at this point.
13    Q.  So question 7 now -- we're going to move
14  forward a couple of pages.  You asked the question:
15  "If you're representing a buyer and knew the home was
16  one of the affected houses that had been fixed, would
17  you advise," and then there are three questions.  In
18  this answer, 73 people answer the question --
19    A.  Okay.
20    Q.  -- and 23 people -- I think it's 23 -- it
21  might be 29 -- skip the question.  Do you see that?
22    A.  Right.
23    Q.  How did you weight the number of people
24  who skipped this question?
25    A.  Well, it probably didn't have -- didn't

Page 274

1  have an opinion, or felt that they didn't -- they
2  weren't -- they didn't have enough information to
3  answer the question.
4    Q.  And when you were making your
5  determination about the impact of stigma value, how
6  did you factor in that response of the 20 some people
7  who skipped this question?
8    A.  Well, I think that as we go on and
9  there's more information, different numbers of people
10  answer the question.  So I would say that when I
11  looked at that, it gave me an indication that -- of
12  the largest -- the largest number percentage-wise of
13  people wouldn't make an offer, but the second largest
14  group said it would have no impact at all at that --
15  and then the middle group said there would be some
16  impact.
17    So by and large, percentage-wise the --
18  the greatest number felt that there was some impact,
19  but some didn't answer, and some felt that there was
20  no damage at all.  So I didn't read anything specific
21  into that, other than the general trend of the answer,
22  the general indication.  The largest portion of -- of
23  people would have some concern, I'm reading, about
24  representing a buyer and advising that buyer.
25    Q.  If 29 people skipped that question,

Page 275

1  that's over a quarter, almost a third of the
2  respondents, correct?
3    A.  Right.
4    Q.  If you -- and you don't know why any
5  particular respondent skipped, right?
6    A.  No.
7    Q.  If those 29 people picked one answer or
8  another, it could completely change the sequencing of
9  those results?
10    A.  That would be highly unlikely, but yes.
11    Q.  I mean, the difference between, for
12  example, don't make an offer and offer the same as a
13  similar home is less than 29 responses?
14    A.  You mean the top two were less than 29
15  responses?
16    Q.  Well, if you look in -- the answer
17  choices give you a helpful number below the bar graph.
18  If you look at the number of responses that selected,
19  don't make an offer on this home, it has 37 responses
20  in favor of that answer, correct?
21    A.  Correct.
22    Q.  And if you look at the respondents who
23  picked -- offer the same as a similar house one block
24  away that was not built by the recalled truss system,
25  there are 19 responses to that question?

Page 276

1    A.  Right.
2    Q.  And the difference between 37 and 19 is
3  less than the total number of people who skipped the
4  question?
5    A.  Right.  That's correct.
6    Q.  Did you make a particular adjustment to
7  how you did the math for this one based on that --
8  those people who skipped the question?
9    A.  I did not.
10    Q.  In question 12, 13 and 14, you describe
11  three remediation methods, correct?
12    A.  Okay.
13    Q.  Is that right?
14    A.  I do.
15    Q.  And did you provide them any additional
16  information about those remediation methods?
17    A.  Just the question is what they read.
18    Q.  I didn't see a question.  I might have
19  missed it.  But I didn't see a question that asked
20  whether the performance of an air sample would
21  influence their decision in any way?
22    A.  It was not asked, you're correct.
23    Q.  Why didn't you ask that question?
24    A.  I don't know.
25    Q.  Did you provide -- in question 13, the



Page 277

1  remediation method is scraped and cry-blasted.  I
2  assume you mean cryoblasted?
3      A.  Correct.
4      Q.  Did you provide them any explanation as
5  to what scraping and cryoblasted means?
6      A.  I think in the -- in that little
7  paragraph we talked about there was just a general
8  description of -- of that scraping of the affected
9  area and power blasting the area.  But again, I'm --
10  that paragraph is in there, but I -- it's not in the
11  results, so I don't remember it exactly or what type
12  of detail.  Not a great -- great detail for certain.
13  It was a small paragraph.
14      Q.  In question 14, the description of the
15  remediation is the floor system was still in place,
16  but had been painted over.
17      A.  Correct.
18      Q.  Did you give them any additional context
19  about the nature of the painting, or whether the
20  product was effectively sealing the formaldehyde?
21      A.  Other than painted over or -- you know,
22  and that is -- I didn't give them any information of
23  what they thought the effectiveness was of that, other
24  than the three methods had been approved by
25  Weyerhaeuser, certified by Weyerhaeuser.

Page 278

1      Q.  What's your understanding of what the
2  encapsulation method consists of?
3      A.  Well, I'm going -- I assume, and having
4  looked at it, it's very similar to encapsulation of
5  asbestos to where they put a material over -- over it
6  to effectively seal it from -- from the outside, and
7  it's a paint-like substance, but it also, you know,
8  has a -- has stronger properties than just paint on
9  the outside of your house.
10      Q.  Do you think maybe a more detailed
11  question would be floor system was still in place but
12  had been encapsulated with paint or some other -- or
13  sealant?
14      A.  It could have been different words
15  chosen, yes.
16      Q.  Do you think that the use of the word
17  paint itself would have influenced how they responded?
18      A.  It's possible.
19      Q.  In question 15 you ask them has there
20  been a defective joist that emitted dangerous levels
21  of formaldehyde.
22      A.  Right.
23      Q.  Did you provide them any context as to
24  what a dangerous level of formaldehyde was?
25      A.  No.  The context was people had to move

Page 279

1  out of their houses.
2      Q.  Did you -- did you give them that
3  information as to --
4      A.  I think that was in the original deal to
5  where this is a situation, people had houses affected,
6  had to move out and be repaired.
7      Q.  And that would have been if there was an
8  additional set of information given to the survey
9  taker, that would have been in that additional --
10      A.  It would have been in that sentence,
11  so . . .
12      Q.  And I guess the same question as for
13  question 16 and 17.  Again, those references to
14  emitted dangerous levels of formaldehyde.  If they
15  were given any information about it, it would have
16  been in that summary question?
17      A.  It would have been there.  In other
18  words, it's strictly -- you know, this is reflecting
19  my opinion, and my opinion of dangerous is if you have
20  to move out of your house, it's probably dangerous,
21  or -- it's probably dangerous.
22      Q.  On question 18, it says, "As a buyer
23  agent, how would you advise a buyer making an offer on
24  an affected home that had the floor system, joist
25  system replaced?"

Page 280

1      A.  Right.
2      Q.  And the number one answer that -- just
3  over 50 percent -- is "This disclosure doesn't impact
4  the value of the home"; is that right?
5      A.  Correct.
6      Q.  This time you had 29 respondents.
7      A.  I had 29 skipped.
8      Q.  You're right.  It's getting late in the
9  day.  I apologize.  73 respondents; 29 skipped.
10          How did you weight this response?
11      A.  As far as the overall response, I can see
12  that about half of the market felt that when the floor
13  system was replaced, they weren't going to make a big
14  deal advising their buyer as far as -- as far as any
15  impact.
16          The other half of the market, to some
17  degree, had an issue with it and would make some sort
18  of -- some sort of adjustment in price, which vary, up
19  to clearly almost 20 percent, or close to 20 percent,
20  again, wouldn't buy the house at all.  So looking at
21  the overall response where -- where the largest
22  portion of the -- of the people surveyed on a
23  percentage basis were -- didn't feel that there was an
24  ongoing issue.  That weighed heavily, in my opinion,
25  of thinking that, although I think there is stigma,

Page 281

1 it's the least amount of stigma.
2      Q.  In the questions that you give, you
3 provide numbers.  For example, the first question
4 says, "Does it impact the value of the home," correct?
5      A.  Right.
6      Q.  Second, "We should offer less for the
7 home," and then you give a specific number, 1,000 to
8 $5,000, right?
9      A.  Right.
10     Q.  Why did you just choose a specific number
11 instead of a percentage there?
12     A.  Well, I wanted to get a feel of if -- you
13 know, 1- to $5,000 on this -- this priced house isn't
14 even a percent.  So I'm trying to get a feel if
15 that -- if that respondent is saying, well, it's
16 affected, I'm going to take advantage of the
17 situation, but I'm not going to let this house get
18 away from my buyer over, you know, a huge deal.  So
19 I'm not going to make a big, you know, 10 or
20 20 percent issue, or I'm not walking away from this
21 transaction, which a lot of them would.
22         So this told me that -- that the -- we
23 should offer less -- a thousand -- which is actually
24 seven of the respondents.  They are almost in --
25 included in the 37 that say there's no effect.

Page 282

1 They've got some -- they're going to try to take
2 advantage of the deal.
3         The three to fives are a lot like that.
4 That's the next step up.  And those guys are saying --
5 you know, and that's a significant amount of money.
6 But they're saying, hey, I've got to have -- I've got
7 to have some market concessions if I'm going to take
8 on the risk of this -- of this product.  And the risk
9 in -- of -- of when I turn around and sell a
10 product -- or a property after I'm done, am I going to
11 have an impact on my value.  And then it gets higher
12 over -- over 5 percent is another eight and then 13
13 that wouldn't sell a property at all for any price.
14     Q.  If you look at -- and, again, we're still
15 looking at the initial report -- although it's in all
16 reports --
17     A.  Right.
18     Q.  -- of the survey results -- at page 10,
19 you begin to do some calculations as to how you think
20 some of these survey results would translate into a
21 specific percentage in diminution, correct?
22     A.  Right.
23     Q.  And on page 10, you indicate, "Assuming
24 the floor system is replaced, 40.47 percent indicated
25 that the reduction in value would be from 3 percent up

Page 283

1 to not making an offer," right?
2      A.  Correct.
3      Q.  That 40.47 percent, though, doesn't
4 factor in the 29 people who skipped the question.
5      A.  And we -- we keep coming back to that.
6 That's not significant to me.  It's pretty consistent
7 throughout the whole survey, that that many people
8 didn't answer.  So maybe 30 people started the survey
9 and didn't finish it.  I -- you know, I -- that's --
10 I'm measuring actual 70 -- 70 respondents is a
11 significant number and gives me a reliable statistical
12 answer, so I'm -- I'm not as concerned with that 20
13 that didn't answer at all as you appear to be, but
14 that's just my opinion.
15     Q.  Is it fair to read of the people who
16 responded --
17     A.  Of the people that responded.
18     Q.  -- that approximately 70 percent thought
19 the home should sell for 5 percent of a reduction to
20 no reduction?
21     A.  Correct.  That would be -- yeah, I think
22 there -- well, is it 70?  It's 30 -- 5 -- 5 percent to
23 know?
24     Q.  Correct.
25     A.  Okay.  Yeah.  That would be 15 plus --

Page 284

1 did I -- that's not my -- that's your calculations
2 based on the same numbers, correct?
3      Q.  So it's --
4      A.  You're not quoting me?
5      Q.  No, I'm not quoting you.  I'm just --
6      A.  Okay.  I'm looking for that.
7      Q.  No.  Sorry.  Sorry.  We're just doing
8 math based on question 19 --
9      A.  You know, that's -- that's fair.  That's
10 fair.
11     Q.  And of the people who reported just under
12 11 percent that we should offer less for the home over
13 5 percent, there's no additional gradation there, is
14 there?
15     A.  You mean there's no -- an additional
16 category in between?
17     Q.  Yeah.  It doesn't differentiate between
18 5.1 percent and 50 percent?
19     A.  No, no, it doesn't.  It goes from -- it
20 goes from -- I believe from -- over 5 percent -- it
21 goes to a hundred percent.  So it's a hundred percent
22 of the people that they're not going to give you an
23 offer at all.
24     Q.  So presumably the hundred percent people
25 are the 17.81 percent who say, don't make an offer?



Page 285

1    A.  Correct.
2        Q.  And so the 10.96 percent people
3   presumably fall somewhere between 5.1 percent --
4        A.  And 10, yes.
5        Q.  Or a hundred?
6        A.  Or a hundred.
7        Q.  In your reports -- and this is across
8   houses, you determined that if a floor system joist
9   was replaced, all other things being equal, you would
10  expect a 5 percent stigma impact; is that right?
11       A.  In this particular report, yes.
12       Q.  Okay.  Was that report different across
13  the five reports?
14       A.  It's -- there was a difference in later
15  reports where I've got evidence and saw the exposed
16  floor where that formaldehyde wasn't totally taken
17  out.  I was -- I went in there, and it was all covered
18  up in this house.  It was all drywalled in and the
19  basement finished and so forth.  But in a subsequent
20  house, I went in and realized by looking at it -- and
21  the owner pointed out -- that their removal system
22  didn't take all of the material out.  They left --
23  they cut the joists and left it on part of the joists.
24       Q.  So that's -- that's a fair comment.  I
25  guess it's not quite what my question is.  So it seems

Page 286

1   that if the floor systems were replaced --
2        A.  Right.
3        Q.  -- you would assign a 5 percent stigma
4   value to it?
5        A.  Yes.
6        Q.  If it were scraped and cryoblasted, you
7   would assign a 10 percent?
8        A.  10 percent, yes.
9        Q.  And if it were a sealant paint system,
10  you would assign a --
11       A.  15 percent.
12       Q.  -- 15 percent remedial value?
13       A.  Right.
14       Q.  And -- and so you have three questions
15  that -- that survey results.  And then from those
16  three questions in the survey results generally, you
17  derive those numbers?
18       A.  That's -- important information as to my
19  final opinion.
20       Q.  Now what you've told me, and I think it's
21  reflected in the reports, is that in some cases you
22  saw homes that sort of fit between two remediation
23  categories?
24       A.  Correct.
25       Q.  And for those homes you assigned a value

Page 287

1   of 7.5 percent --
2        A.  Correct.
3        Q.  -- correct?  Did you ask a question
4   gauging for that in between category for broker
5   opinions?
6        A.  No.  In fact, this survey was complete
7   when I did those, because this was completed in, say,
8   March and the other -- the last reports were done in
9   whatever, July or -- so this report was complete when
10  I -- survey was completed before I looked at those
11  houses.
12       Q.  So your determination of the 7.5 isn't
13  tied to a particular question?
14       A.  No.  I mean, it's -- all of them --
15  there's nothing that directly and mathematically
16  correlates to my -- my conclusion.  My conclusion is
17  based on these general market indications and the
18  Realtors' reactions and the percentage and weight that
19  they give the different problems.  It's also based, as
20  I said earlier, on a very active market and high
21  demand in the market.  And that, you know, although --
22  and -- and I did hear from different owners at the
23  time that they felt that that market damage was much
24  higher than what my final conclusion was.
25           From their point, I -- I think that

Page 288

1   there's -- in my opinion, there's a -- these homes are
2   all going to be in a marketable state.  That's my
3   assumption.
4           After they're done, they may be not
5   marketable at the same price as a competitive,
6   unaffected house across the street, but they're
7   marketable, and that the market is going to take
8   advantage of the -- the problem in these houses to
9   various degrees based on that remediation.
10           So if, you know, a buyer -- this -- this
11  broker is saying, I'm telling you not to buy that
12  house at all, and the buyer is telling him, if I can
13  get $30,000 off, I'm buying the house.  And so he
14  says, make the offer.  So that's in real world what
15  happens between buyers and brokers.
16       Q.  Was there any kind of mathematical
17  formula or weighting system that you used to turn the
18  survey results into a 5 percent reduction?
19       A.  No.  It's a -- it's a qualitative
20  analysis.  It happens to have numbers associated with
21  it, because the number of responses are listed in
22  percentages.  So that would indicate that in some way
23  that it's a quantitative analysis, but it's not.  It's
24  just the numbers are coincidental.  It's -- it's a
25  qualitative analysis, and I've based my opinion on my



Page 289

1 professional experience and my feel of the marketplace
2 taking all of these factors into consideration.
3      Q.  And is your answer to that question the
4 same for the -- all three forms of remediation?
5      A.  Yes.
6      Q.  And is the answer to that question the
7 same as it is for the partial removal?
8      A.  Yes.
9      Q.  How confident are you at -- within an
10 error rate as to the particular percentage?  In other
11 words, are you strongly confident between 4.8 percent
12 and 5.2 percent?
13      A.  Again, I can't rate that on a -- on a
14 give it confidence level to that degree where we're
15 looking -- we're taking a bunch of as-ifs and trying
16 to relate it to -- to typical market participants.
17 I'm basing it more on how buyers I've worked with and
18 sellers I've worked with and their dealing with this
19 type of problem and what their reactions to, whether
20 they sense a really good possible deal in the
21 situation or whether the fear takes over.  And in a
22 lot of cases, I think the fear would take over, and
23 say just no way am I going to expose my family to
24 that.  That, you know, the company may give an
25 absolute guarantee, but if my child gets sick, what is

Page 290

1 the guarantee worth.  So that's -- you know, I think
2 there's a lot of that within this analysis.  So I
3 think, you know, and it's my opinion that the
4 effect -- that there's a real effect on these houses,
5 a real stigma on these houses that varies based on
6 the -- on the remediation type, but I -- I don't think
7 it's -- it's not a huge number.  It's not a huge
8 percentage because of the other market factors, where
9 I could make the same -- take the same numbers and
10 say, well, you know, 50 percent of the people say I
11 wouldn't buy this house at all.  Oh, well, then that
12 means that the stigma is 50 percent.  That's not my
13 logic.
14      MR. NELSON:  Counsel, I'm just going to
15 interrupt you.  We're up -- we're at seven hours.  So
16 I'll give you a couple of minutes --
17      MR. SINK:  I appreciate that.
18      MR. NELSON:  -- to wrap her up.
19      MR. SINK:  That's where I'm heading.
20      Q.  (BY MR. SINK)  So I have -- I have only a
21 handful of questions --
22      A.  Okay.
23      Q.  -- and so if you want to elaborate,
24 that's fine, but I've got a handful of questions I
25 need to get through.

Page 291

1      A.  Let's get through your questions.
2      Q.  The analysis we've been talking about,
3 your survey methodology and the way you drew your
4 conclusions, is that the same across all of the
5 reports you've issued across the cases that we've
6 talked about today?
7      A.  Yes.
8      Q.  In the case of the 7.5 percent partial
9 removal category, did you do an independent inspection
10 to determine the status of the partial removal?
11      A.  I could see it.  I could see the material
12 on the -- on the joist that had been cut and left in
13 place.  The joists, as you can see by the picture,
14 were not -- they were not removed.  They were cut and
15 a new joist put in, and the old portion was still in
16 place.  The material that was in other homes,
17 cryoblasted and scraped, was still affixed to those
18 tails on both sides of that joist that was visible.
19      Q.  Do you know whether in the case of the
20 tails, as you call them, whether the air quality was
21 at or different from a case where it was completely
22 removed?
23      A.  Well, I know that the owner told me that
24 he was getting back with the construction people
25 saying, hey, you've still left this stuff in here,

Page 292

1 this stuff is still dangerous.  So it was a point of
2 contention between the owner and the construction
3 people at the time I looked at the property, but I
4 don't have numbers.  And again, to go back to an
5 earlier point, those numbers, although important, they
6 tell what's truly dangerous and what's not.  That's
7 the reality.  Stigma sometimes is not based on
8 reality.  It's based on fair.
9      Q.  To your knowledge, is the information
10 about the partial tail removal piece public
11 information?
12      A.  No.  None of it is.  Well, I mean, the
13 first condition, overall condition, but what each
14 individual home went through in their repair and what
15 type of mitigation they used and all of that, none of
16 that is public information.
17      Q.  Do you have any opinion, as an expert,
18 that you have prepared or intend to share in any of
19 these cases that we haven't talked about today?
20      A.  Not to my knowledge.
21      MR. NELSON:  I'll interpose an objection
22 to form to the extent the question hasn't been asked.
23      Q.  (BY MR. SINK)  Well, I guess it's fair to
24 say, we've talked about the opinions in your report;
25 is that correct?



Page 293

1    A.  Yes.

2    **Q.  Is there any opinion in your report that**
3 **you're aware of that we haven't talked about today?**

4    A.  I'm not.  But if you ask me a different
5 question at trial, I'll probably answer it.

6    **Q.  I anticipate that you will answer**
7 **questions at trial?**

8    A.  To the best of my ability, so.  If you
9 think of something different, I'm sure there will be
10 another question.

11    **Q.  Is there any additional work that you**
12 **would like to do between now and trial to update or**
13 **complete your expert analysis in these cases?**

14    A.  That's totally up to my client.  If my
15 client wants me to increase my scope of work, I'm
16 happy to do that, and if they don't, we won't.

17    **Q.  As -- and I appreciate that answer.  Do**
18 **you individually have any additional work you would**
19 **like to do to update or refresh your work before**
20 **trial, as you sit here today?**

21    A.  Not that I can -- I mean, not that I can
22 think of.  I -- you know, if there's -- if something
23 is going to come up that -- a question that I can't
24 answer from this, and my client asks me if I can help
25 find the answer to that, then, obviously, I'm going to

Page 294

1 try to find a different response.

2    MR. SINK:  I have no further questions.

3    MR. NELSON:  Okay.  We're done.

4    THE VIDEOGRAPHER:  Going off the record.
5 This concludes the videotape deposition of Robert
6 Myers.  The time is 5:47 p.m.  We are off the record.

7    WHEREUPON, the within proceedings were
8 concluded at the approximate hour of 5:47 p.m. on the
9 26th day of March, 2019.

10    *    *    *    *    *

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 295

1    I, ROBERT MYERS, do hereby certify that I
2 have read the above and foregoing deposition and that
3 the same is a true and accurate transcription of my
4 testimony, except for attached amendments, if any.

5    Amendments attached   (  ) Yes  (  ) No

6
7
8
9    _____
   ROBERT MYERS
10
11
12
13    The signature above of ROBERT MYERS was
14 subscribed and sworn or affirmed before me in the county
15 of _____, state of _____,
16 this _____ day of _____, 2019.
17
18
   _____
19    Notary Public
   My Commission expires:
20
21
22
23
24
25    Jami Borgmann, 3/26/19 (jw)

Page 296

1    REPORTER'S CERTIFICATE
2 STATE OF COLORADO  )
          )  ss.
3 COUNTY OF DOUGLAS  )
4    I, JENNIFER WINDHAM, Certified Shorthand
   Reporter and Notary Public ID 20024038675, State of
5 Colorado, do hereby certify that previous to the
   commencement of the examination, the said ROBERT MYERS
6 was duly sworn or affirmed by me to testify to the
   truth in relation to the matters in controversy
7 between the parties hereto; that the said deposition
   was taken in machine shorthand by me at the time and
8 place aforesaid and was thereafter reduced to
   typewritten form; that the foregoing is a true
9 transcript of the questions asked, testimony given,
   and proceedings had.
10
   I further certify that I am not employed by,
11 related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of
12 this litigation.
13    IN WITNESS WHEREOF, I have affixed my
   signature this 1st day of April, 2019.
14
   My commission expires December 2, 2022.
15
16 __X__  Reading and Signing was requested.
17 _____  Reading and Signing was waived.
18 _____  Reading and Signing was not required.
19
20
21
22
   _____
23    Jennifer Windham
   Certified Shorthand Reporter
24
25