

April 15, 2019


Mr. Mark Nelson
The Nelson Law Firm, L.L.C.
1740 High Street
Denver, CO  80218


Re:     Rebuttal Report
        TJI® Joist with Flak Jacket® GEN-4 Protection
        Plaintiffs v. Weyerhaeuser Company, US District Court for The District of Colorado
        Civil Action No. 17-cv-02230-PAB-MEH
        JH File No.:     1A3171001


Dear Mr. Nelson:

At your request, I have reviewed defense's expert disclosure reports and prepared this rebuttal report as it relates to the Jensen Hughes expert disclosure report that was issued February 26, 2019.

The objective of our February 26, 2019 report was to present our findings and observations regarding Weyerhaeuser's development, production and remediation of a fire-resistant coating on their wooden I-joist products that were emitting formaldehyde vapors.  The subject product was designated as TJI® Joist with Flak Jacket® GEN-4 Protection.

Pursuant to your request, JENSEN HUGHES has prepared this rebuttal report during this ongoing investigation. If you have any questions concerning this report, please contact me at (425) 775-5550.

## BACKGROUND INFORMATION

In December of 2016, the Weyerhaeuser Company initiated production of a wooden flooring I-joist product designated as TJI® Joist with Flak Jacket® GEN-4 Protection.  The production of the I-joists included the application of a fire-resistant coating system designated as Flak Jacket® GEN-4 Protection.  Reportedly, in or about April 2017, the first newly constructed homes to incorporate the subject joists were completed, and by the end of the month, the new and perspective homeowners were complaining of irritant odors associated with exposed joists in their basements.  Weyerhaeuser personnel were immediately informed of the issue. By July 6, 2017, and through continuing construction and surmounting complaints, Weyerhaeuser acknowledged the irritant odors to be the result of formaldehyde emissions. This prompted Weyerhaeuser to notify dealers, distributors and builders to cease distribution and stop using the subject joists.  Weyerhaeuser subsequently issued a remediation plan that gave the owners of the affected homes a choice of three different options: 1) remove and replace the joists, 2) paint over the joists with a specially formulated paint or 3) strip and repaint the joists. Each of these repair options included complimentary formaldehyde testing of the air inside the affected homes.

O: +1 425-775-5550
F: +1 425-775-0900

23109 55th Avenue West
Mountlake Terrace, WA 98043 USA

jensenhughes.com

Exhibit 36

Rebuttal Report
Plaintiff's v. Weyerhaeuser Company
1A3171001 | April 15, 2019



## TASKS PERFORMED

JENSEN HUGHES performed the following tasks during the preparation of this rebuttal report:

1.  Reviewed the Expert Report of Alan H. Schoem of the Law Office of Alan H. Schoem LLC, dated March 18, 2019. The report was prepared for the law firm of Perkins Coie LLP and provided to Jensen Hughes on March 20, 2019 by the Nelson Law Firm.

2.  Reviewed the Expert Report of Dr. Maureen Reitman of Exponent, dated March 18, 2019.  The report was prepared for the law firm of Perkins Coie LLP and provided to Jensen Hughes on March 20, 2019 by the Nelson Law Firm.

3.  Reviewed Expert Report of Dr. James L. Poole (Certified Industrial Hygienist). The report was prepared for the law firm of Perkins Coie LLP and provided to Jensen Hughes on March 26, 2019 by the Nelson Law Firm.

## EXPERT REPORT REVIEWS

### *Expert Report of Alan H. Schoem*

In review of the Schoem Report, the author concludes that there is a general tendency for product manufacturers to discover their ill-fated products months after being introduced into commerce. Mr. Schoem goes on to say that following discovery of the formaldehyde off-gassing problem, Weyerhaeuser acted responsibly and in a timely manner.  In his report, Mr. Schoem makes no reference to the Jensen Hughes Report and he appears to be unaware of the breadth of Weyerhaeuser's protocols, communications and the processes leading to the development of the product. His report is presented in four individual sections as outlined below:

#### *Development of Joists*

Through the review of WY95_00000 numbered documents and deposition transcripts, Mr. Schoem acknowledged that as early as February 2016, Weyerhaeuser was developing protocols and discussing formaldehyde emissions. He further acknowledges that Weyerhaeuser employed the formaldehyde emission standards set forth by the California Recourses Board (CARB) and that Weyerhaeuser tested the Gen 4 product for formaldehyde emissions.  He finishes this section by claiming that since houses are typically closed, the formaldehyde is permitted to concentrate, and that Weyerhaeuser expected the off-gassing to dissipate.

**Rebuttal Statement:**    As presented in our report, the alleged formaldehyde testing never occurred, and Weyerhaeuser's expectation that the formaldehyde would dissipate was unfounded at the time the product was being produced.



### Initial Discovery

In the Schoem report, the author accurately summarizes the first reported complaint of the irritant odors in new homes on April 29, 2017 and the subsequent sampling of the joists by Weyerhaeuser and then asserts that test results show Gen 4 formaldehyde was higher than the uncoated joists. Yet, Weyerhaeuser claims to have been dumbfounded by the source of the odors and claimed it was because the early production did not receive adequate coverage of the formaldehyde scavenging topcoat.  In the following weeks and up until the middle of June 2017 Weyerhaeuser planned on top-coating the joists in some affected homes while still claiming the emissions were the result of an inadequate application of the formaldehyde scavenging top coat.

**Rebuttal Statement:** No evidence was found to show that samples from affected homes were ever tested for formaldehyde, and no evidence was found to show the samples from an affected home were examined to determine if they were adequately covered with the formaldehyde reducing paint.  Furthermore, claims that the formaldehyde reducing paint was not adequality applied implies an awareness that formaldehyde was the issue, and no evidence exists that the prototype product was ever properly tested or yielded favorable test results for formaldehyde.  As stated in the Jensen Hughes report, June 7, 2017 was the first time that the reformulated paint tests first met the CARB formaldehyde emission standard.

### Complaints Received in Mid and Late June

In this section of the Schoem report, the author continues to assert that amongst surmounting complaints of interior odors, Weyerhaeuser still assumed that it was limited to an early production issue.  According to Schoem, by early July 2017, Weyerhaeuser began receiving results of elevated formaldehyde levels in homes, and it was at this point that Weyerhaeuser recognized the significance of their formaldehyde problem.

**Rebuttal Statement:** Weyerhaeuser's continued assumption that the formaldehyde problem was because the initial production runs did not receive adequate coverage of topcoat cannot be justified since Weyerhaeuser neglected to properly test the effectiveness of their formaldehyde scavenging topcoat prior to production. And, as previously stated, Weyerhaeuser failed to examine their joists for inadequate coverage.

### Weyerhaeuser's Efforts to Notify

The Schoem report goes on to describe the early to mid-July efforts of Weyerhaeuser to notify dealers, distributors and builders of the formaldehyde emission problem.

**Rebuttal Statement:**  Although Weyerhaeuser's remediation of the product appears to have been appropriate, the problem would not have occurred if the technical staff had followed their own product development testing protocols.  The Schoem report fails to acknowledge that Weyerhaeuser's technical staff was fully aware of the issue from the onset and elected not to properly address it.



### Expert Report of Dr. Maureen Reitman (Exhibit B)

In review of the Reitman Report, the author provides a thorough dissertation on wood products, the use of formaldehyde glues, and the characteristics of formaldehyde diffusion and off-gassing. The report continues with a well-presented analytical assessment of indoor formaldehyde data acquired before and after each of Weyerhaeuser's three remediation methods. The report also includes the findings of extended duration chamber emission tests of the Weyerhaeuser products. The information in the report prompted the conclusion that each of Weyerhaeuser's removal-base remediation methods lowers formaldehyde levels below 0.08 ppm and that levels will remain below 0.08 ppm.

On the final page of the report, Reitman asserts that many topics addressed in the Jensen Hughes report were not within the scope of her analysis and that Jensen Hughes did not address the aspects of the remediation phase. However, she claims that her investigation revealed two inconsistencies with the Jensen Hughes report, which are presented below:

#### First Claim

Firstly, the Reitman report says Jensen Hughes "suggests manufacturing changes are indicative of a defective product," and she refutes this by claiming that such changes are normal, and regardless of any formula changes, the elevated levels of formaldehyde emissions would have been the same.  She supports that claim with test data showing how two different formulas exhibits the same emission data.

**Rebuttal Statement:**   The conclusions in Jensen Hughes report that provoked Reitman's statement were not intended to indicate that formaldehyde emissions were changing as result of formula changes during the successive manufacturing runs, but rather that Weyerhaeuser never properly tested its product for formaldehyde emissions. Moreover, Weyerhaeuser did not discover the adhesion and colorfastness problems until after the product was introduced into commerce.

#### Second Claim:

Secondly, the Reitman report claims Jensen Hughes' conclusion that "no evidence was found to indicate that the W20115 Remediation Field Paint would inhibit formaldehyde beyond three to four months" was poorly supported.  She supports this assertion by showing the tabulated results of chamber tests conducted for a duration 475 days.

**Rebuttal Statement:**  Although the Reitman report afforded research and findings that Weyerhaeuser did not, our conclusion stands that Weyerhaeuser had no evidence to indicate the W20115 Remediation Field Paint would inhibit formaldehyde beyond three to four months.

Rebuttal Report
Plaintiff's v. Weyerhaeuser Company
1A3171001 | April 15, 2019



**Dr. James L. Poole**

In review of the Poole report, Jensen Hughes identified no mention or statements in conflict with our findings with the exception that Poole attempts to dispel the applicability of the airborne toxic control measures set-forth by the California Air Resource Board (CARB). In his report he correctly asserts the standard includes only, hardwood plywood, particle board, and medium density fiber board products that may contain formaldehyde glues.

**Rebuttal Statement:** Although Weyerhaeuser adopted this standard during the development phase of their joist product, it seems clear that at the time the CARB standard was written, no product was known to be surfaced with a formaldehyde laden glue coating. Furthermore, because California is a known leader in environmental standards and the CARB standard included testing protocols for products, it was an appropriate choice by Weyerhaeuser to adopt this standard as the pre-production and post-production emission level for the Gen 4 product, as well as adopting this same standard for purposes of its post-remediation warranty.

The statements in this report were based on the evidence available at the time of writing. JENSEN HUGHES reserves the right to amend this report if and when more information becomes available.

Respectfully Written and Submitted by:                    Reviewed by:

Warren Harris                                            Trevor M. Newbery, PE
Senior Forensic Chemist                                  Senior Mechanical Engineer
JENSEN HUGHES                                            JENSEN HUGHES